UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
_____
RONALD M. GEORGIA,

                 Plaintiff,

vs.                    3:21-cv-484

KYLE DAVENPORT,

                 Defendant.
_____


EXCERPT
Transcript of Testimony
April 19, 2023
Federal Building and Courthouse
15 Henry Street
Binghamton, New York


The HONORABLE MIROSLAV LOVRIC Presiding.



A P P E A R A N C E S


For Plaintiff:     EDWARD KOPKO, ESQ.
                   JASON VIOLETTE, ESQ.
                   KEVIN KELLY, ESQ.

For Defendant:     WILLIAM TROY III, ESQ.


Ruth I. Lynch, RPR, RMR, NYSRCR
Official United States Court Reporter
Binghamton, New York  13901

1          THE CLERK:  Court is now in session.  Case is

2     Ronald M. Georgia versus Kyle Davenport, 3:21-CV-484.

3     Please state your appearances for the record.

4          MR. KOPKO:  Edward Kopko for the plaintiff.

5          THE COURT:  All right.  Good morning, Mr. Kopko.

6          MR. KOPKO:  Good morning, sir.

7          MR. TROY:  William Troy for the respondent, the

8     defendant.

9          THE COURT:  Good morning, Mr. Troy.

10          And I know, Mr. Kopko, you have also an associate

11     that's helping out, Kevin Kelly here?

12          MR. KOPKO:  Attorney Kevin Kelly is here.  And

13     Attorney Jason Violette had to -- informed you that he had

14     to participate in a virtual conference with a New York

15     Supreme Court Justice.

16          THE COURT:  Okay.  Very good.  All right.  And

17     good morning, Mr. Georgia, to you.

18          PLAINTIFF GEORGIA:  Good morning.

19          THE COURT:  And good morning, Mr. Davenport.

20          DEFENDANT DAVENPORT:  Good morning, sir.

21          THE COURT:  All right.  All right.  Well, we're

22     here this morning, a continuation of the trial that we

23     officially started on Monday, April 17.  And just to recap

24     on what we accomplished and the importance of the matters on

25     Monday, so I did again cover with the parties, counsel and

1    the actual parties, the joint stipulation at 53.  Everyone

2    confirmed that it was their intention to proceed with a

3    bench trial, and we are going to do that.  And then

4    importantly, also the parties agreed upon and the Court

5    received in evidence exhibits 1 through 42 which are now in

6    evidence.  And you do not need to lay any foundation.  You

7    can utilize those exhibits as you see fit, and you can also

8    obviously question any witnesses simply by going directly to

9    the exhibit.

10           And then, Mr. Kopko, the Court received also on

11   Monday the trial exhibit form that you were kind enough to

12   put together along with Mr. Troy, and my law -- my courtroom

13   deputy has that.  So that will be the official exhibit list

14   of those 42 exhibits that are now in evidence.

15           And then lastly, simply, I granted and I have no

16   problem with the attorneys' request at the end of the trial

17   to submit in writing what would otherwise be oral summations

18   and rebuttal.  And we'll set a schedule for that if we get

19   to it, we'll set a schedule of that at the end of the trial.

20           So otherwise, Mr. Kopko, are we ready to proceed

21   today?

22           MR. KOPKO:  Yes, sir.

23           THE COURT:  All right.  Mr. Troy, are we ready to

24   proceed today?

25           MR. TROY:  Yes, sir.

```
1              THE COURT:  All right.  We'll then proceed with

2    the opening statements and then with the plaintiff's

3    case-in-chief.

4                        - - - - -

5              (TESTIMONY EXCERPT AS FOLLOWS:)

6              THE COURT:  All right.  Mr. Kopko, is the

7    plaintiff prepared to present its case-in-chief?

8              MR. KOPKO:  Yes, your Honor.

9              THE COURT:  All right, Mr. Kopko, you may proceed.

10             MR. KOPKO:  Call Mr. Davenport, your Honor.

11             THE COURT:  All right.  Mr. Davenport, if you

12   could come right up here.  This is the witness chair, as we

13   affectionately call it.  And if you just stand for a moment,

14   you'll be given an oath.

15             THE CLERK:  Please state your name for the record.

16             THE WITNESS:  Kyle Davenport.

17                   (The witness was duly sworn.)

18             THE COURT:  All right, let me just, before we

19   start, Mr. Kopko, so is it Deputy Davenport, Officer

20   Davenport?

21             THE WITNESS:  Deputy at the time.  At the time it

22   was Deputy.

23             THE COURT:  Okay.  That's not the critical part.

24   The critical part is use the microphone.

25             THE WITNESS:  Yes, sir.
```

1          THE COURT:  It picks up pretty well but it will

2    make it easier for all of us, including the court reporter.

3    You can also adjust that microphone up and down.  And

4    Mr. Kopko as well, please use the microphone.

5          And then, Deputy Davenport, if there are any

6    exhibits that will be shown to you, you'll see them right

7    there on the screen.  If you don't see it, please tell us.

8    As I said before, technology is great until it doesn't work,

9    so.  We should all make sure that we're seeing it.

10          All right.  Mr. Kopko, you may proceed.

11          MR. KOPKO:  Thank you, your Honor.

12                    KYLE DAVENPORT,

13          having been called as a witness, having

14          been duly sworn, testified as follows:

15                    CROSS-EXAMINATION

16   BY MR. KOPKO:

17   Q      Good morning.

18   A      Good morning.

19   Q      State your full name, please?

20   A      Kyle William Davenport.

21   Q      And, Mr. Davenport, I'm going to ask you about the

22   incidents that occurred on June 1st, 2019.  Okay?

23   A      Okay.

24   Q      And you were on patrol as a sworn deputy with the

25   Tompkins County Sheriff's Department on that date, right?

```
 1   A     That is correct.
 2            MR. KOPKO:  Your Honor, if you don't mind me
 3   instructing him.
 4   BY MR. KOPKO:
 5   Q     You don't need to lean forward all the time.  You can
 6   pull your chair forward so it's more comfortable.  Yes.
 7   A     Okay.
 8   Q     And what time did you go on duty?
 9   A     I went on duty at 11 p.m. that night.
10   Q     Now, you received a communication from the Tompkins
11   County dispatch about a noise complaint, correct?
12   A     That's correct.
13   Q     And that information that you received led you to
14   believe that you should go to Mr. Georgia's address on
15   Van Ostrand Road, correct?
16   A     I didn't know whose address it was at the time.
17   Q     You didn't know anything about that, right, all you
18   had was a noise complaint?
19   A     That's correct.  And an address.
20   Q     And when you got that noise complaint, you knew that
21   the Town of Lansing did not have a noise ordinance.
22   A     That's correct.
23   Q     That there was no -- no controls from the Town of
24   Lansing about decibel levels, correct?
25   A     That's correct.
```

1   Q      Or time restrictions, correct?

2   A      That's correct.

3   Q      Or locations of gatherings?

4   A      That's correct.

5   Q      None of those factors you were aware applied to what

6   you were doing.  Correct?

7   A      Right.

8   Q      One moment, please.  And, Deputy, you drove over there

9   and you did not contact the complainant, correct?

10  A      Correct.

11  Q      You didn't seek any information about whether the

12  complainant was particularly vulnerable to noises, correct?

13  A      Correct.

14  Q      Even though the complainant's house was directly

15  across the street from Mr. Georgia's house, correct?

16  A      Correct.

17  Q      And you agree that you could have very, very readily

18  just got out of your walk -- your patrol car and had walked

19  50 feet or so, and you could have gone over to

20  Mr. Gonzalez's house.

21  A      Correct.

22  Q      All right.  And you could have called the dispatch to

23  make certain that Mr. Gonzalez was available to you,

24  correct?

25  A      Correct.

1   Q      And you didn't do any of that.

2   A      That's correct.

3   Q      You parked your car on the roadway, correct?

4   A      Yes, sir.

5   Q      And you walked up the driveway, correct?

6   A      Yes.

7   Q      You could have driven your car up the driveway,

8   alerting people to your presence, correct?

9   A      Yes.

10  Q      You preferred to park your car on the driveway and

11  walk up the driveway in the dark.  Correct?

12  A      I parked my car on the roadway, then walked up the

13  driveway.

14  Q      But you did not announce your presence when you began

15  to walk up the driveway.

16  A      That's correct.

17  Q      And you agree that you could have pulled into the

18  driveway and turned on your emergency lights, correct?

19  A      I could have, yes.

20  Q      You -- you agree that you could have pulled into the

21  driveway and used the vehicle's public address system to

22  alert the occupants that you were there.

23  A      I could have done that as well, yes.

24  Q      And you didn't do that either.

25  A      Correct.

1    Q      All right.  Now, instead you snuck up the driveway,

2    correct?

3    A      I walked normally up the driveway.

4    Q      Well, you didn't use your flashlight to alert the

5    occupants that you were coming up there.

6    A      Correct.

7    Q      Now, there were no exigent circumstances for you to

8    enter the property.

9    A      Okay.

10   Q      I'm asking you, do you agree that there were no

11   exigent circumstances for you to enter the property?

12   A      Correct, yes.  There was no exigent circumstances.

13   Q      And you agree that you did not have a warrant?

14   A      Correct.

15   Q      All right.  And you agree, as we said before, that the

16   Town of Lansing did not have any sort of ordinance

17   controlling the volume, the place, the time of noise,

18   correct?

19   A      Correct.

20   Q      You were there because you decided that you were going

21   to stop the noise, correct?

22   A      I was going to do my best, correct.

23   Q      But that's what your goal was, correct?

24   A      Correct.

25   Q      Now, when you were walking up there, you did not

1  consider that Mr. Georgia may have had a hearing impairment

2  that he needed the music louder, correct?

3  A    Correct.

4  Q    You had no idea who turned the volume of the music up.

5  A    I had an idea that it was Mr. Georgia since he was the

6  only one there.

7  Q    You did not know that when you were walking up the

8  driveway.

9  A    As I was walking up the driveway, no, I did not know

10 that.

11 Q    You had no idea whether there were 4 people there or

12 400 people.

13 A    Correct.

14 Q    Right, so you had no idea who was responsible for the

15 music.

16 A    Correct.

17 Q    And when you were walking up there, you came upon

18 Mr. Georgia, correct?

19 A    Correct.

20 Q    And the first thing that Mr. Georgia said to you is

21 get the fuck off of my property.  Correct?

22 A    That's correct.

23 Q    All right.  And at that time, at that very instant,

24 you could have simply turned around and got the fuck off of

25 his property, correct?

1    A      Correct.

2    Q      But you decided that you weren't going to do that,

3    correct?

4    A      Correct.

5    Q      Because you were going to get that music off one way

6    or the other, correct?

7            MR. TROY:  Objection to form.

8    A      No.

9            MR. TROY:  Argumentative.

10           THE COURT:  Hold on a second, Mr. Kopko.  I'm

11   sorry, Mr. Troy?

12           MR. TROY:  I said argumentative.

13           THE COURT:  It is a little argumentative,

14   Mr. Kopko.  But I'll -- I'll let you know --

15           MR. KOPKO:  We'll move on, your Honor.

16           At this time, your Honor, I would like to display

17   the video camera.

18           THE COURT:  You may display any exhibit 1 through

19   42, Mr. Kopko.  And just let me know which exhibit we're

20   looking at now.

21           MR. KOPKO:  We're looking at D-14, your Honor.

22           THE COURT:  14?

23           MR. KOPKO:  Yeah.

24           (Video played)

25   BY MR. KOPKO:

1   Q      Now, Deputy, you were wearing a body worn AXOM video

2   and audio recorder, correct?

3   A      Correct.

4   Q      Okay.

5          MR. TROY:  Your Honor?

6          THE COURT:  Yeah, Mr. Troy.

7          MR. TROY:  I was just going to say I would like to

8   stop this before he asks his next question but he stopped

9   now.

10         THE COURT:  Okay.  Yeah, Mr. Kopko, it's playing

11  for a little bit.  And again, you can exhibit the exhibit as

12  you see fit, but it was playing while you were asking

13  questions.

14         MR. KOPKO:  Your Honor, I beg your pardon.  I know

15  that Mr. Troy is much more schooled in doing this stuff.

16  BY MR. KOPKO:

17  Q      All right, so you're wearing this audio and video

18  recorder, correct?

19  A      Correct.

20  Q      And the published protocols, policies, and guidelines

21  from the sheriff's department require you to activate it

22  when you're having contact with the public, correct?

23  A      Correct.

24  Q      And those same policies require you to keep it on when

25  you're having that contact, correct?

1    A       Correct.

2    Q       And you activated it when you were getting out?

3    A       Correct.

4            (Video played)

5    Q       Now, when this begins recording, I hear faint music,

6    but I'm not testifying.  When you heard that music, is that

7    what you believed to be loud music?

8    A       Yes.

9    Q       All right.  What you hear on -- on this tape is what

10   you personally heard.

11   A       Correct, yes.

12   Q       And you're telling this Court that you thought that

13   that was loud music.

14   A       Yes, I did.

15   Q       You don't have any particular skill or training in

16   determining unreasonably loud noises?

17   A       No, I don't.

18   Q       You never got any training like that, right?

19   A       No.

20   Q       And you didn't have a decibel meter with you?

21   A       That's correct.

22   Q       So this was all Deputy Davenport taking it upon

23   himself to determine that this was loud music, right?

24   A       That's correct, as well as the complainant's.

25   Q       You never talked to the complainant.

```
 1   A      Correct.

 2   Q      All right.  You didn't say a word to the complainant,

 3   correct?

 4   A      True.

 5   Q      You don't know what the level of music was at the time

 6   the complaint was made and the time that you heard it.

 7   A      That's correct.

 8   Q      You have no idea what that was.

 9   A      That's correct.

10   Q      You didn't ask the complainant what time he heard it,

11   correct?

12   A      That's correct.

13   Q      You didn't know anything about that.

14   A      Correct.

15   Q      All right.  You determined when you were walking up

16   the driveway that this was loud music.

17   A      Correct.

18          (Video played)

19   Q      All right.  The first thing that Mr. Georgia says to

20   you is get the fuck off of my property, right?

21   A      That's correct.

22   Q      And you clearly understood that command --

23   A      Correct.

24   Q      -- correct?

25          And you knew then that you -- you did not have a
```

1   warrant, right, to be on the property, you didn't have

2   judicial authority authorizing you to be there, correct?

3   A     I had authority because I had a complaint, and I

4   walked down the driveway.

5   Q     All right.  But you said complaint.  We went over this

6   several times.  You never got a complaint, correct?

7   A     No, I did, through my dispatch center.

8   Q     Through your dispatch center.

9   A     That's correct.

10  Q     You don't know what the complaint was?

11  A     It was loud music.

12  Q     Loud music, but you don't know how loud it was, right?

13  A     That's correct.

14  Q     You don't know when that complaint was -- was made

15  about the loud music, correct?

16  A     I -- correct.

17  Q     So you could have at that point, Deputy, just turned

18  around and walked away, correct?

19  A     Yes.

20  Q     But you chose not to do that, right?

21  A     Correct.

22  Q     Because you were dead set on getting this music turned

23  down, right?

24        MR. TROY:  Objection to form, your Honor, it's

25  argumentative.

1    A      Right.

2           THE COURT:  Well, it is a little bit, but again

3    what Mr. Kopko is trying to elicit from Deputy Davenport, so

4    I'll allow it, but, Mr. Kopko, I do want to, you know,

5    preface that you can make your points about asking the

6    witness whatever information you want from them but then not

7    argue with him as to what he should, could have, would have,

8    because you can make those arguments to the Court.  Unless

9    there's a point that you want to ask the witness as to why

10   he didn't do something, but simply saying to him well, you

11   could have done that, you know, that -- that's obvious that

12   he could have done anything, but I just don't want to get

13   into a situation where we're having arguments from the

14   witness.

15          MR. KOPKO:  Go ahead.

16          (Video played)

17   BY MR. KOPKO:

18   Q    All right.  Now, you put your right hand on the left

19   portion of Mr. Georgia's chest and you shoved him backwards,

20   correct?

21   A    I -- yeah.  Yeah.  Correct.

22   Q    Now, Deputy, you know from your training, right, that

23   an unauthorized touching like that is a battery, correct?

24   A    No.  I don't recognize touching -- I guess I'm

25   confused with what you're trying to ask.

1   Q     Let me try to clarify this, all right.  If you -- if

2   you were out on the street in uniform and I walked up to you

3   and I put my hand on your chest and shoved you backwards,

4   you know that you could arrest me for battery, correct?

5   A     I could arrest you for harassment violation level.

6   Q     Violation level?

7   A     Yes.

8   Q     All right.  So putting your hand on Mr. Georgia and

9   shoving him back you acknowledge was at least harassment

10  violation level, correct?

11  A     Correct.

12  Q     Now, did you try -- go ahead.

13        (Video played)

14  Q     Now, you grabbed Mr. Georgia's arm, correct?

15  A     I attempted to, correct.

16  Q     No, you grabbed his arm.  We can see it.  We're going

17  to do it again.

18        (Video played)

19  Q     Right there.  You see you grabbed his arm.

20  A     Yes, I do.

21  Q     All right.  Now, an unauthorized touching of another

22  person can be this harassment level violation, correct?

23  A     Correct.

24  Q     All right.  And that's what you did there, grabbing

25  his arm like that.

| | | |
|---|---|---|
| 1 | A | Is that a question? |
| 2 | Q | Yes. |
| 3 | A | Yes, I grabbed his arm. |
| 4 | Q | All right, now. |
| 5 | | (Video played) |
| 6 | Q | Do you recall saying that you're not playing this |

7  fucking game?

| 8 | A | I do. |
| 9 | Q | All right.  What game were you playing? |
| 10 | A | I wasn't playing a game. |
| 11 | Q | What game were you referring to? |
| 12 | A | Just letting him yell at me and walk all over me. |
| 13 | Q | Letting him do what? |
| 14 | A | Yell at me and, I guess it's a phrase, to walk all |

15  over me, basically like me not doing anything about it.

16  Q    Okay.  Well, you agree that -- that people can protest

17  to the police, correct?

| 18 | A | That's correct. |
| 19 | Q | And you agree that that's not a game, that people have |

20  a constitutional right to do that, correct?

| 21 | A | Correct. |
| 22 | Q | And you agree that people can say almost anything to |

23  the police except for fighting words, imminent fighting

24  words, and they have a constitutional right to say that,

25  right?

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | But yet you weren't going to play that game, correct? |
| 3 | A | Correct. |
| 4 | Q | And you weren't going to let Mr. Georgia walk all over |
| 5 | | you, correct? |
| 6 | A | That's correct. |
| 7 | Q | That's what you're saying here. |
| 8 | A | Yes. |
| 9 | Q | And by walk all over you, what you mean is that you |
| 10 | | were not going to allow Mr. Georgia to exercise his |
| 11 | | constitutional right to protest you being there, correct? |
| 12 | A | No. |
| 13 | Q | By saying you weren't going to let him walk all over |
| 14 | | you, you were not going to tolerate him ordering you off the |
| 15 | | property, correct? |
| 16 | A | Correct. |
| 17 | Q | Now, you agree that Mr. Georgia had every right to |
| 18 | | order you off of the property, correct? |
| 19 | A | That's correct. |
| 20 | Q | But you decided that nobody was going to order you off |
| 21 | | of that property, correct? |
| 22 | A | No. |
| 23 | Q | You decided that Georgia was not going to order you |
| 24 | | off of that property -- |
| 25 | A | Correct. |

1   Q      -- right?

2            And you were going to stay on the property, right?

3   A      I wasn't going to stay on the property.

4   Q      Why didn't you just turn around and leave, then?

5   A      Because I wanted to solve the problem with the noise.

6   Q      Well, you say solve the problem.  Deputy, you were the

7   one who thought there was a problem, correct?

8   A      Myself and Mr. Gonzalez.

9   Q      You never talked to Gonzalez, we already went over all

10  of that stuff.  You were the one who decided that there was

11  a problem, correct?

12  A      Myself and Mr. Gonzalez.  I believe that

13  Mr. Gonzalez --

14            MR. KOPKO:  Well --

15  A      -- also had a problem.

16            MR. KOPKO:  -- I object to that, your Honor, I

17  move to strike.  What he believes about Gonzalez is of no

18  moment.

19            THE COURT:  No, Mr. Kopko, I mean your -- your

20  questions, last several, are really getting into the mind of

21  the witness and asking him to articulate what was going on

22  in his mind.  The witness can say whatever it is, and you

23  can obviously examine him about the logic or illogic of that

24  statement, but I think that's where you've gone with this is

25  you're asking him to tell you what's going on in his head

1  and what he's doing or not doing and why, and so on, and so.

2          MR. KOPKO:  My motion to strike, that was a little

3  bit more directed, your Honor.  He never talked to Gonzalez.

4  He doesn't know anything about Gonzalez.

5          THE COURT:  I know that, and I think the record's

6  clear of that, but I think the -- the witness is

7  articulating, whether rightly or wrongly, why he did what he

8  did, and you may be right that he never spoke to Gonzalez,

9  and I believe the witness has said that.  But the witness is

10 also saying dispatch gave me the following information, and

11 he's putting two and two together in his mind.  All that

12 being said, it's his mental state and state of mind when

13 these things unfolded.  If you don't want to hear, then

14 don't ask him the question.  Don't say what were you

15 thinking or why were you doing this or why weren't you.  But

16 that's where we've gone, which, again, I don't have a

17 problem with that, because I think it's legitimate for you

18 to explore this witness's state of mind in connection with

19 the actions he took or failed to take.

20         MR. KOPKO:  We're going to move on here, Judge.

21 Go ahead.

22              (Video played)

23 BY MR. KOPKO:

24 Q    You heard the part where you said that Mr. Georgia was

25 being an ass?

1   A      Yes.

2   Q      Did you hear that part?

3   A      Yes.

4   Q      And you heard the part again where you said you're not

5   playing these fucking games --

6   A      Yes.

7   Q      -- right?

8          Is that the same game that you described earlier?

9   A      Yes.

10  Q      Now, after this, you had a conversation with your

11  lieutenant.  What is his name?  I have difficulty

12  pronouncing that.

13  A      It's Lieutenant Koskinen.

14  Q      Koskinen?

15  A      That's correct.

16  Q      Koskinen.  So Lieutenant Koskinen watched this tape,

17  correct?

18  A      That's correct.

19  Q      And he told you that your language on this tape was

20  inappropriate, unprofessional, correct?

21  A      That's correct.

22  Q      Do you agree with that?

23  A      I do.

24  Q      All right.  You didn't agree with it initially,

25  though, did you?

1   A      No.

2   Q      What -- what happened between the couple of minutes

3   between when you said you didn't do anything inappropriate

4   and to the time where you acknowledge that you were

5   inappropriate, what happened in between that time?

6   A      I think I matured as a police officer and I realized

7   that being professional is pretty important, and not cursing

8   to people, to citizens, while we're on call, I think that's,

9   I guess, important not to do that.  And that's our policy

10  now.

11  Q      Well, Deputy, you -- you knew on June 1st, 2019, that

12  it was inappropriate to be using that language, didn't you?

13  A      No.

14  Q      You didn't realize that?

15  A      No.

16  Q      You didn't get any of that training in the police

17  academy?

18  A      No.

19  Q      Nothing like that.

20  A      No.

21  Q      Had you used -- have you seen other supervisory

22  personnel at Tompkins County using that sort of language

23  towards a member of the public?

24  A      Not that I can remember.

25  Q      Well, what was your model for doing that?

1  A      Well, I was -- when I was working in the Village of
2  Groton, my field training officer told me sometimes you need
3  to talk on other people's level to get their attention.
4  Q      To get their attention.
5  A      That's correct.
6  Q      So you were trying to -- you were -- you were using
7  unprofessional language to get the attention of
8  Mr. Georgia --
9  A      That's correct.
10 Q      -- right?
11        It seems to me from the tape that you have
12 Mr. Georgia's undivided attention.  Tell us all of the
13 reasons why you thought you didn't have Mr. Georgia's
14 attention.
15 A      He was talking over me, every time -- every time I
16 tried to explain the reasons why I was there, he was talking
17 over me.
18 Q      Well, people have a right to talk over a police
19 officer, don't they?
20 A      They do, yes.
21 Q      Yeah.  Now, that irritated you, though, didn't it?
22 A      Can you repeat the question?
23 Q      Yeah.  You were irritated about the fact that
24 Mr. Georgia was talking over you.
25 A      No, I wasn't irritated.

1   Q     The tone of your voice is louder, right?  You're more

2   insistent.  You don't describe that as being irritated?

3   A     No, I think I was just doing my best to get his

4   attention.

5   Q     To get his attention.

6   A     That's correct.

7   Q     Well, I began this segment by asking what made you

8   believe that you didn't have his attention.  He was standing

9   right in front of you.

10  A     Because, like I said before, he was talking over me

11  and wouldn't let me finish sentences when I was trying to

12  explain the reason why I was there, what I was hoping to

13  accomplish.

14  Q     All right.  You agree that Mr. Georgia had the right

15  to say anything he wanted on his own property.  Right?  You

16  agree with that?

17  A     That's correct.

18  Q     Yeah.  And if he wanted to, you agree that he had the

19  right to talk over you.

20  A     That's correct.

21  Q     That's correct?  Yeah.  And you agree now that your

22  behavior was unprofessional, correct?

23  A     My language was unprofessional.

24  Q     Your language was unprofessional.  You don't think

25  anything else that you did there was unprofessional?

1    A       No.

2    Q       All right.  So your language was unprofessional.  You

3    agree, Deputy, that because your language was unprofessional

4    that you could have been escalating this encounter.

5    A       On June 1st, 2019?  No, I did not believe that.

6    Q       You didn't believe that?

7    A       No.

8    Q       You believe it now?

9    A       I do.

10   Q       And that you contributed to this unfortunate outcome?

11   A       There's a possibility of that, yeah.

12   Q       Well, you say possibility.  Your lieutenant says it

13   was unprofessional, you agree today that you -- that it's

14   unprofessional, right?  Don't -- don't you further agree

15   that your language was unprofessional on that occasion and

16   it led to a further escalation?

17   A       I don't know that.

18   Q       You don't know that?

19   A       No.

20   Q       If you had just turned around and walked away, none of

21   this would have happened, right?

22   A       That's correct.

23   Q       All right, now, you grabbed Mr. Georgia's arm, right?

24   A       Yes.

25   Q       And then you shoved him backwards, correct?

1    A      Correct.

2    Q      All right.  And then you continued, what you say,

3    trying to get Mr. Georgia's attention, right?

4    A      Correct.

5    Q      Did anything happen that led you to believe that you

6    did not have his attention?

7    A      Yes.

8    Q      What was that?

9    A      Again, like I stated before, he was talking over me

10   and he was not -- I was trying to explain the reasons why I

11   was there and what I was hoping to accomplish, and he

12   wouldn't let me finish my sentences.

13   Q      He did not have to let you finish sentences, did he?

14   A      Correct.

15   Q      All right, so.

16          (Video played)

17   Q      Now, again, you've repeated now for the third time I'm

18   not playing this game.  Correct?

19   A      Correct.

20   Q      All right.  Did it occur to you to call a supervisor

21   at that point?

22   A      Yes, it did.

23   Q      All right.  To just stop, right?  Did it occur to you

24   just to stop?

25   A      It did.

1   Q     All right.  But you didn't stop, correct?

2   A     Correct.

3   Q     You kept going with your same line of behavior.

4   Correct?

5   A     That's correct.

6   Q     In fact, you escalated your behavior by grabbing his

7   arm, correct?

8   A     I was trying to -- no.  That's not correct.

9   Q     You escalated your -- his -- your behavior when you

10  pushed him backwards, correct?

11  A     No, I don't -- I mean, I don't know what escalated his

12  behavior.

13  Q     You don't know what escalate means?  You have a

14  bachelor's degree and you don't know what escalate means?

15  A     I didn't say that.  I said I don't know what escalated

16  Mr. Georgia's behavior.

17  Q     I'm not talking about Mr. Georgia's behavior, I'm

18  talking about your behavior.  You escalated your behavior.

19  A     Is that a question?

20  Q     Yes.

21  A     I guess I'm confused.  You just said you escalated

22  your behavior, and then --

23  Q     I'm asking you, do you agree that you escalated your

24  behavior instead of stopping and just calling a supervisor?

25  A     No.  I don't -- I don't agree to that.

1    Q     So you continued to play this game with Mr. Georgia,

2    correct?  Is that correct?

3    A     I don't know what game you're talking about.

4             MR. TROY:  Objection, characterization, your

5    Honor.

6             MR. KOPKO:  It's his -- I'm sorry.

7             THE COURT:  Go ahead, Mr. Kopko.  Mr. Troy's

8    objecting, and your response?

9             MR. KOPKO:  Yes.  I'm using his words, that --

10   that -- this game.

11            THE COURT:  If you can rephrase that, Mr. Kopko,

12   I -- I get why Mr. Troy's objecting, if you could just

13   rephrase it, I think.

14   BY MR. KOPKO:

15   Q     All right, you said several times that you're not

16   playing the game.  Correct?

17   A     Correct.

18   Q     Yeah, but you continued to play the game, correct?

19   A     No.

20   Q     No?  You continued to yell at Mr. Georgia, correct?

21   A     I was just -- wasn't yelling at Mr. Georgia.

22   Q     You weren't yelling at him?

23   A     I raised my voice to get his attention.

24   Q     Oh, okay, well, let's use that.  Is that part of the

25   game?  Raising your voice?

 1    A      No.

 2    Q      That's not part of the game?

 3    A      I wasn't playing a game.

 4    Q      Well, now I'm confused.  You said three times that

 5    you're not going to play this game.

 6    A      That's correct.

 7    Q      All right.  Weren't you participating in the game?

 8    A      Obviously not because I wasn't going to play the game.

 9    Q      You weren't going to play the game.  But you were

10    raising your voice, correct?

11    A      That's correct.

12    Q      You were pushing him back, which you acknowledge was

13    a -- a violation, harassment violation, correct?

14    A      That's correct.

15    Q      You grabbed his arm, which you acknowledge was a

16    harassment violation, correct?

17    A      That is correct.

18    Q      All right.  So you were playing the game.

19    A      No, I wasn't.

20    Q      No?

21    A      No.

22    Q      Okay.  So at what point did it dawn on you that you

23    were going to call a supervisor?

24    A      I believe a few minutes from right now, from this --

25    where the video stops.

1  Q     All right.  You want us to run forward to that part?

2  A     If you want to.

3           (Video played)

4  Q     You said because you're bothering your fucking

5  neighbors.  Correct?

6  A     Correct.

7  Q     Plural, neighbors.  You used the word neighbors.  Do

8  you want to play that again?

9  A     Are you asking a question?  I'm sorry?

10 Q     Yeah, I'm asking you, do you agree that you were --

11 that you used the word neighbors?

12 A     Yes.

13 Q     All right.  But there -- there were not neighbors,

14 there was one neighbor, correct?

15 A     That's -- I had only one name that dispatch gave me.

16 Q     So you don't know when you said neighbors, there was

17 no basis for saying neighbors, correct?

18 A     There's a possibility if somebody else is in

19 Mr. Gonzalez's house that was annoyed by the noise.

20 Q     There was a possibility of that, right?

21 A     That's correct.

22 Q     You could have determined that if you had done a

23 proper investigation, correct?

24 A     That's correct.

25 Q     Yeah, you chose not to do that, correct?

1    A      Correct.

2    Q      You could have checked with actually other neighbors,

3    correct?

4    A      That's correct.

5    Q      And you chose not to do that.  Correct?

6    A      Correct.

7    Q      So when you said to him that he was bothering other

8    neighbors, there -- you didn't know what you were talking

9    about, correct?

10          MR. TROY:  Objection to form.

11          THE COURT:  I'm sorry, Mr. Troy?

12          MR. TROY:  Objection to form.  It's argumentative.

13          THE COURT:  Yeah, Mr. Kopko, I mean we are

14   arguing, again.

15          MR. KOPKO:  We'll move on, your Honor.

16          THE COURT:  I want to make sure that you can

17   elicit the information, but once you have it, arguing with

18   this witness about what he should have done or shouldn't

19   have done or could have done, I don't know where that's

20   going to lead us.

21          MR. KOPKO:  I just want -- I'm actually focusing

22   on the component of maliciousness for the punitive damages,

23   Judge, I think I have to establish that in the record.  From

24   his behavior.

25          THE COURT:  All right.  I'll -- I'll allow it,

1    Mr. Kopko.  Let's get to it.

2              MR. KOPKO:  Thank you, sir.

3              (Video played)

4    BY MR. KOPKO:

5    Q    Now, you said get in line.  You heard that?

6    A    I did hear that.

7    Q    All right.  You have been sued before?

8    A    No, I have not.

9    Q    Your statement get in line was not true?

10   A    That's correct, it's not true.

11   Q    You were lying to Mr. Georgia?

12   A    I don't think I was lying.  I just said get in line.

13   Q    You just admitted that that's not true.

14   A    That was not true, that I haven't been sued before?

15   Q    That's right.

16   A    Right, I have not been sued before.

17   Q    So when you told Mr. Georgia to get in line, you were

18   referring to being sued before, correct?

19   A    Yeah, that's correct.

20   Q    But you had not been sued before --

21   A    Correct.

22   Q    -- correct?

23        So what you said to him was a lie.

24   A    Okay, if you want to interpret it that way.

25   Q    No, I'm asking you, don't you agree that it wasn't

 1   true?

 2   A     Yeah.  I guess I will, yeah.  I guess it was --

 3   Q     So it was a lie.

 4   A     Yeah.

 5   Q     Now, do you agree that lying to Mr. Davenport would

 6   tend to further escalate the situation?

 7   A     By lying to myself, is that what you're asking?

 8   Q     I'm trying to figure out a way so that we can do this

 9   faster.  I said do you agree that lying to Mr. Davenport

10   would escalate the situation?

11   A     I guess I'm just confused, sir.  I don't --

12   Q     I don't want to --

13   A     Can you rephrase the question, I guess?

14   Q     Well, no.  No.  Let -- I ask the questions.  But I

15   don't want to confuse you.  And his Honor controls

16   everything, okay.  Do you agree, yes or no, that lying to

17   Mr. Davenport would escalate the situation?

18   A     No.

19   Q     Do you agree as a professional police officer that you

20   should not lie to people?

21   A     Yeah, I agree with that.

22   Q     But yet you lied to Mr. Davenport.

23   A     Are you saying I lied to myself?  Because I'm

24   Mr. Davenport.

25   Q     Oh.

 1   A    That's why I'm confused here.

 2   Q    No.  No.  No, that -- that's my fault.  Georgia.

 3   Mr. Georgia.  I'm sorry.  Yeah.  You lied to Mr. Georgia, I

 4   beg your pardon, thank you.  Do you agree that lying to

 5   Mr. Georgia escalated the circumstances?

 6   A    No.

 7   Q    Do you agree as you, I think you just said that, that

 8   as a professional police officer you should not lie to

 9   people?

10   A    That's correct.

11   Q    All right.  But yet you lied to Mr. Georgia.

12   A    That's correct.

13   Q    All right.  Do you think that had any effect at all on

14   the circumstances here?

15   A    No, I don't.

16        (Video played)

17   Q    You were heard to say that do you want to get arrested

18   or do you want to get in handcuffs.  Do you remember saying

19   that?

20   A    No.

21        MR. KOPKO:  Play it again.

22        (Video played)

23   BY MR. KOPKO:

24   Q    You hear that?

25   A    Yes, I did.

1  Q      Okay.  Do you want to get arrested or get in

2  handcuffs.  That's what I heard.  Is that what you heard?

3  A      No.

4  Q      What did you hear?

5  A      Do you want to get arrested or do you want to turn the

6  music down.

7  Q      I thought it said something about handcuffs.  No?

8  Okay.  So Mr. Georgia's only alternative at that point was

9  to get arrested or to turn the music down.  Is that correct?

10 A      Correct.

11 Q      Now, at that particular point, what were you going to

12 arrest Mr. Georgia for?

13 A      Disorderly conduct.

14 Q      Disorderly conduct.

15 A      Correct.

16 Q      But you knew, Deputy, and we talked about this before,

17 you knew that you could not arrest someone for disorderly

18 conduct unless you had someone other than yourself --

19 A      That's correct.

20 Q      -- right?

21        And you agree that you could not legally arrest

22 Mr. Georgia for disorderly conduct, correct?

23 A      No.

24 Q      There was no one else immediately present at the scene

25 when you were there, correct?

1  A    That's correct.

2  Q    And Mr. Gonzalez wasn't there whispering in your ear

3  saying that he's complaining, correct?

4  A    Correct.

5  Q    There was no one else there, there was no member of

6  the public there, correct?

7  A    Correct.

8  Q    And you knew that.

9  A    Correct.

10  Q    Right.  And you knew that you could not make a valid

11  arrest for disorderly conduct without a member of the public

12  being there, correct?

13  A    No.

14  Q    No?  You thought that you could do that?

15  A    Yeah, if someone makes a complaint, when I have that

16  individual's name.

17  Q    But you didn't arrest him for disorderly conduct.

18  A    No, I did not.

19  Q    You never arrested him for disorderly conduct.

20  A    I believe we did charge him for that.

21  Q    But not we.  Assistant District Attorney Bonavia did

22  that; you agree?

23  A    Yes.

24  Q    You did not do that?

25  A    That's correct.

1  Q     All right.  On this night, on this occasion, even

2  though you're telling him you're going to arrest him for

3  disorderly conduct, you told him that he was actually under

4  arrest for disorderly conduct, correct?

5  A     No.

6  Q     You didn't do that?

7  A     I don't believe I did.

8         (Video played)

9  Q     I heard you say turn the music down, you're not

10 understanding.

11 A     Correct.

12 Q     And that was even your goal here as you were getting

13 in at it with Mr. Georgia, right?

14 A     Correct.

15 Q     He had to turn that music down.

16 A     That's correct.

17 Q     No matter what, he had to turn that music down,

18 correct?

19 A     That's correct.

20        (Video played)

21 Q     I heard you say you're bothering everyone else in the

22 area.  Did you hear that?

23 A     I did hear that.

24 Q     All right.  But that's not true, is it?

25 A     It's a possibility.

1    Q      I didn't ask you that.  You had no facts that lead you

2    to believe that he was bothering everyone else in the area.

3    Is that --

4    A      That's correct, no other facts.

5    Q      All right.  So when you made that statement to

6    Mr. Georgia, it was lie, correct?

7    A      No.

8    Q      You had no factual basis for saying that, correct?

9    A      That's correct.

10   Q      All right.  You were just angry.

11   A      I was not angry.

12   Q      You were not angry?

13   A      No.

14   Q      What is your state of mind here now?

15   A      I'm a little nervous.

16   Q      A little nervous?

17   A      Yep.  And fearful.

18   Q      And fearful.  Okay.  Wow.  But yet you didn't just

19   turn around and walk away.  Correct?

20   A      That's correct.

21   Q      So you're nervous and you're fearful, but you stay

22   right there, correct?

23   A      That's correct.

24   Q      And you agree that your nerves could have been quelled

25   and your fear could have been extinguished if you just

```
1   walked away, correct?

2   A      That's correct.

3   Q      And you chose not to do that.

4   A      Correct.

5              (Video played)

6   Q      Okay.  You said you were calling your supervisor right

7   now.

8   A      Correct.

9   Q      Is that what you said?

10  A      Yes.

11  Q      Who -- and you called Sergeant Vann?

12  A      Correct.

13  Q      All right.  Now, you turned off your video recorder

14  when you made that call.

15  A      Uh-huh.  That's correct, sorry.

16  Q      But you told us earlier that you're not supposed to

17  turn off your video recorder when you're having a contact

18  with a person involved in an incident.

19  A      That's correct.

20  Q      So you violated departmental policy when you turned

21  off your audio.

22  A      No, I didn't.

23  Q      No, you didn't?

24  A      No.

25  Q      All right.  Well, I'm a little confused.  Maybe we'll
```

```
 1   go through this again.  You're aware --
 2              THE COURT:  Mr. Kopko, just a suggestion.  I have
 3   a tough time hearing --
 4              MR. KOPKO:  I'm sorry, Judge.
 5              THE COURT:  -- if you're not near the microphone.
 6   I just want to make sure the court reporter's getting
 7   everything.  And also that we all can hear it, so.  If you
 8   do move over, just keep in mind you're probably not going to
 9   be heard.
10   BY MR. KOPKO:
11   Q    So you told us that you know the departmental policy
12   requires you to keep on the audio portion and the video
13   portion when you're in a contact, correct?
14   A    Correct.
15   Q    And you were certainly in a contact with Mr. Georgia,
16   correct?
17   A    When I made the phone call to Sergeant Vann, is that
18   what you're talking about?
19   Q    You were standing right there, correct?
20   A    That's correct.
21   Q    I -- I can see your phone.  You were right there.
22   Correct?
23   A    That's correct.
24   Q    So even though you know you're not supposed to turn
25   off the audio, you turned it off, correct?
```

1  A     I could turn it off in this situation.

2  Q     Well, I'm confused here, Deputy.  You told us several

3  times you know you can't turn off the audio when you're

4  having a contact, right?

5  A     Correct.

6  Q     Okay, then we have that part done, correct?

7  A     That's correct.

8  Q     All right.  But yet you turned off your audio,

9  correct?

10  A     Correct.

11  Q     And in doing that, you violated the departmental

12  policy.

13  A     No.

14  Q     No.  Okay.  Now, you understand that you have taken an

15  oath to tell the truth, the whole truth, and nothing but the

16  truth, correct?

17  A     That's correct.

18  Q     And you understand that you're under oath here now in

19  front of a federal judge.

20  A     I do, yes.

21        MR. TROY:  Your Honor, it's an improper question.

22  He should ask fact questions, please.

23        THE COURT:  Yeah, Mr. Kopko, I think Mr. Troy is

24  getting that you're starting to ask him about the legality

25  of something or not as far as the oath, but I'm not sure

1   where you're going with this, unless there's a factual

2   question you're going to ask him about what he said or

3   didn't say or contradicted himself on.

4   BY MR. KOPKO:

5   Q    What did you say to Sergeant Vann?

6   A    I asked him --- I don't even think I got a -- I

7   didn't -- I didn't even get ahold -- I didn't get ahold of

8   him on the phone.  He never answered the phone.

9   Q    Did you text him?

10  A    No.

11  Q    Did you ever communicate with Sergeant Vann?

12  A    Until he got on scene, no.

13  Q    How did Sergeant Vann know to come to the scene?

14  A    He knew where I was at, and I tried to call him

15  multiple times, and he also heard on the radio transmission

16  that I called for another unit.

17  Q    You tried calling Vann multiple times?

18  A    Maybe just once.  I can't recall.  I just know I

19  definitely tried calling him.

20  Q    Deputy, I'm confused by your testimony.  Did you call

21  him multiple times or did you call him one time?

22  A    I don't recall.

23  Q    That was the answer, all right?  And you did not text

24  him.  Is that correct?

25  A    I don't recall that either.  I don't believe I did.

1   Q      The phone that you were using, is that your personal

2   phone?

3   A      That's correct.

4   Q      Are you issued a departmental phone?

5   A      No.

6   Q      Do any of the deputies use departmental phones?

7   A      Yes, some of them do.

8   Q      Okay.  Do most of them use their personal phones?

9   A      That's correct.

10  Q      And they text on those personal phones?

11  A      That's correct.

12  Q      Are those text messages preserved to be delivered as

13  part of discovery?

14  A      Yes.

15  Q      Did you make any text messages here in this case?  In

16  this whole case?

17  A      I don't believe I did.

18          (Video played)

19  Q      Now, tell us what you said, what you said there.

20  A      You need to back the fuck up.

21  Q      You were angry then, right?

22  A      I was definitely scared.

23  Q      I didn't ask you that.

24  A      No, I wasn't angry.

25  Q      You weren't angry.

```
 1   A      No.

 2   Q      I heard you say you're going to back the fuck up.

 3   A      Uh-huh.  That's correct.

 4   Q      And you said that you were fearful?

 5   A      Yes.

 6   Q      And you have on a gun, correct?

 7   A      That's correct.

 8   Q      You have on a Taser, correct?

 9   A      That's correct.

10   Q      Right.  You had pepper spray?

11   A      That's correct.

12   Q      Right?

13          You were trained as a police officer in dealing

14   with unruly people, correct?

15   A      That's correct.

16   Q      You didn't see any visible weapons on Mr. Georgia,

17   correct?

18   A      That's correct.

19   Q      You didn't pat him down, though, correct?

20   A      That's correct.

21   Q      You could -- you knew that you could pat him down for

22   your own safety, correct?

23   A      Correct.

24   Q      You know that the United States clearly allows that

25   for officer safety, correct?
```

1    A      Correct.

2    Q      But you never did that.

3    A      Correct.

4    Q      You could have addressed your concerns about being

5    fearful if you had simply patted Mr. Georgia down, right?

6    A      No.

7    Q      That wouldn't have done it for you?

8    A      No.

9    Q      So when you said you're going to back the fuck up,

10   right, did you push him right then --

11   A      Yeah.

12   Q      -- is that when you pushed him?

13   A      I believe so, yeah.

14   Q      And he fell to the ground.

15   A      Correct.

16   Q      Now, in the instant before you said you're going to

17   back the fuck up, right, you agree that you could have

18   de-escalated this by just turning around, right?

19           MR. TROY:  Excuse me, I didn't hear that question.

20           THE COURT:  I'm sorry, Mr. Troy?

21           MR. TROY:  I did not hear the last part of his

22   question.

23   BY MR. KOPKO:

24   Q      That -- that you could have de-escalated this by just

25   turning around, right?

1   A       Are you trying to ask turning around and walking away

2   or turning --

3   Q       Yeah.

4   A       Okay.  Yes.

5   Q       You tried to call your supervisor, correct?

6   A       Correct.

7   Q       You were looking for guidance, correct?

8   A       Correct.

9   Q       You were confused about what to do, correct?

10  A       That's correct.

11  Q       You didn't know how to handle the situation, correct?

12  A       Correct.

13  Q       All right.  You were looking for guidance, correct?

14  A       Correct.

15  Q       And you knew that all you had to do was just turn

16  around and walk or walk away or walk backwards, and that

17  would have addressed your concerns about being fearful,

18  correct?

19  A       No.

20  Q       That would not have?

21  A       It would have but I didn't believe I could just walk

22  away.

23  Q       Well, you certainly know that you could have said to

24  Mr. Georgia, you know what, I -- I beg your pardon, I heard

25  you say several times for me to get off your property, and

1  I'm going to do that now, and I'm sorry.  You could have

2  done that.

3  A      Correct.

4  Q      All right.  But you didn't do that.

5  A      That's correct.

6  Q      You chose to stay there and escalate the

7  circumstances.  Correct?

8  A      Try to de-escalate the circumstances, so no.

9  Q      I didn't ask you that.

10  A      Okay.

11  Q      I didn't ask you.  You chose to stay there and

12  escalate the circumstances by pushing Mr. Georgia backwards.

13          MR. TROY:  Objection to form.

14          THE COURT:  I'll allow it.  You've asked three

15  times but I'll allow it one more time so we can get an

16  answer from the witness.

17  A      Can you repeat the question?

18  BY MR. KOPKO:

19  Q      You chose to stay there and escalate the situation by

20  pushing Mr. Georgia backwards.  Is that correct?

21  A      No.

22  Q      Did you believe that pushing him backwards would

23  escalate the circumstances?

24  A      No.

25  Q      Did you believe that pushing him to the ground would

1    escalate the circumstances?

2    A     No.

3    Q     In your experience, pushing someone to the ground

4    would not -- would not tend to escalate the circumstances?

5    Is that correct?

6    A     I don't know.  It may or may not.

7    Q     If someone pushed you to the ground, would that, in

8    your mind, escalate it?

9    A     It depends on how big the person is that pushed me to

10   the ground.

11   Q     So if a person bigger than you pushed you to the

12   ground, you would -- would that escalate it?

13   A     No.

14   Q     If a person smaller than you pushed you to the ground,

15   would that escalate it?

16   A     Possibly.

17   Q     And the deciding factor is what you thought you could

18   do in response to that?

19   A     Can you repeat the question?

20   Q     Yeah.  Your response in deciding whether it's

21   escalated or not would be determined by the size of the

22   person.  Is that what you're telling us?

23   A     If I was being pushed to the ground.

24   Q     Yeah.

25   A     Possibly.

1    Q     Did you -- did you have any concerns that by pushing

2    Mr. Georgia to the ground that you could injure him?

3    A     Yeah.

4    Q     But you pushed him anyway.

5    A     Correct.

6    Q     And when he was on the ground, right, you went over

7    and handcuffed him.

8    A     Correct.

9    Q     Now, you filed a written report of this incident,

10   correct?

11   A     Correct.

12   Q     And you learned in the police academy to make proper

13   reports, correct?

14   A     That's correct.

15   Q     And you learned that the reports that you make would

16   be relied upon by the prosecuting attorneys in making

17   prosecutorial decisions, correct?

18   A     Correct.

19   Q     And you knew that the reports had to be accurate,

20   right?

21   A     Correct.

22   Q     And you knew that judges would be relying upon your

23   reports for accuracy, right?

24   A     Correct.

25   Q     And you made no entry in your report that you checked

1  for the tightness of the handcuffs by putting your finger in

2  between the jaw and the wrist, correct?

3  A     Correct.

4  Q     And you know that the Tompkins County policy for

5  handcuffs requires you to do that, correct?

6  A     Correct.

7  Q     So when you put the handcuffs on and you did not check

8  the tightness of them, you knew that you were violating the

9  departmental policy, correct?

10  A     I didn't know at that time, no.

11  Q     Well, weren't you trained before they gave you a gun

12  and sent you out?  Weren't you trained?

13  A     Yeah.

14  Q     And you knew that you had to check the tightness of

15  the handcuffs, correct?

16  A     I did not know that, no.  At that time.

17  Q     Don't you read the departmental policies?

18  A     Yeah.  Yep.

19  Q     Do you read the part of the departmental policy that

20  requires you to put your little finger in between the jaw

21  and the wrist?

22  A     I don't recall reading that.

23  Q     You don't recall that.

24  A     No.

25  Q     In any event, you made no attempt to determine how

1    tight the handcuffs were, correct?

2    A    Correct.

3    Q    And you know that by cranking down the handcuffs,

4    people can suffer a severe injury, correct?

5    A    That's correct.

6    Q    And you made no attempt to check whether that was

7    happening, correct?

8    A    No, I did make an attempt.

9    Q    You did make an attempt?

10   A    Correct.

11   Q    Oh, well, let's see it.

12        (Video played)

13   Q    Now, you say that in that sequence you checked the

14   tightness of the handcuffs?

15   A    No, I did not.

16   Q    Now, in that same sequence, Mr. Georgia is on the

17   ground, correct?

18   A    Correct.

19   Q    He's highly intoxicated --

20   A    Correct.

21   Q    -- correct?

22        He has his back facing you, correct?

23   A    Correct.

24   Q    And you pull out your pepper spray, correct?

25   A    Correct.

1   Q    And you try to pepper spray him, correct?

2   A    No.

3   Q    I can see you pushing on the -- the lever to do that.

4   That's not what you're doing?

5   A    That's not what I'm doing.

6   Q    I can see you on several occasions shaking the

7   canister.  Are you not trying to spray him?

8   A    No.

9   Q    What were you doing?

10  A    Trying to get his hands behind his back.

11  Q    No.

12       MR. KOPKO:  Play that again.

13       (Video played)

14  Q    Now, you have the canister in your left hand, correct?

15  A    Correct.

16  Q    And your thumb is on the top of the canister, correct?

17  A    Correct.

18  Q    And that, that is where the discharge valve is for the

19  pepper spray, correct?

20  A    The discharge valve is underneath that, so no.

21  Q    No?  Aren't you then trying to pepper spray him?

22  A    No.

23  Q    Why do you have it out?

24  A    If he's going to start to fight with me, then I have

25  it out ready to utilize it.

1   Q      Yeah, but he's on the ground, right?

2   A      Yeah.

3   Q      He's intoxicated, right?

4   A      Correct.

5   Q      He's a 62-year-old man, right?

6   A      I didn't know that at the time.

7   Q      No, he told you that earlier.  You want -- do you want

8   to replay that?

9   A      If you want.

10  Q      Not what I want, do you want it?

11  A      No.

12  Q      And he's on the ground with his back to you, and

13  you're attempting to pepper spray him, correct?

14  A      No.

15  Q      Well, why do you even have it out?

16  A      Like I said before, in case he tries to fight with me,

17  then I have it ready to utilize.

18  Q      Well, instead of taking out the pepper spray, why --

19  why didn't you just handcuff him then?

20  A      I couldn't get his hands.

21  Q      You can't get his hands when you had your one hand

22  filled with pepper spray, can you?

23  A      That's true.

24  Q      So you didn't want to handcuff him at that time,

25  correct?

1  A     No; I did want to handcuff him at that time.

2  Q     Well, why even bring out the pepper spray?  Why didn't

3  you use your hands, your two hands, and handcuff him?

4  A     I believe I tried, and he was tensing all of his

5  muscles up and I couldn't get both hands behind his back.

6  Q     But you didn't have any trouble getting both hands

7  behind his back when you put the pepper spray away?

8  A     That's correct.

9          (Video played)

10  Q     Now, is it your testimony that you're not trying to

11  pepper spray him there?

12  A     That's correct.

13  Q     Well, if -- if you're not trying to pepper spray him

14  and he's right in front of you on the ground, tell us why

15  you even have it out.

16  A     Like I said before, in case he tries to fight with me,

17  I'll have it out ready to utilize if I needed it.  He was --

18  had all his muscles tensed up, I was trying to get his hands

19  behind his back, and he wouldn't put his hands behind his

20  back.

21  Q     Let me see that I follow this.  You can't get his

22  hands behind his back because of the pepper spray in your

23  arm, right?  In your hand.

24          MR. TROY:  Objection, your Honor.

25          THE COURT:  I'm sorry, Mr. Troy, objection over?

1           MR. TROY:  I'm sorry?

2           THE COURT:  Objection as to?

3           MR. TROY:  It assumes a fact that he didn't

4    testify to.

5           THE COURT:  I'm not sure I heard the same thing.

6    Mr. Kopko?

7           MR. KOPKO:  I didn't either, Judge.  Let me try it

8    again.

9           THE COURT:  Plus, I think Mr. Kopko is asking a

10   long question.  I think he was kind of in the middle of it

11   so that's why I'm not sure.  I don't think I heard the whole

12   question yet.

13          MR. KOPKO:  Indeed, let me try this.

14          THE COURT:  And again, because we don't have a

15   jury here, it's okay if you let the question all come out

16   and then there was an objection, we'll it take it up, but.

17   BY MR. KOPKO:

18   Q    Okay.  So you say in this sequence what you really

19   want to do is get him handcuffed.  Is that correct?

20   A    That's correct.

21   Q    So instead of getting the handcuffs out, you get the

22   pepper spray out.  Is that what you're saying?

23   A    I tried to get his hands behind his back before I got

24   the pepper spray out.  And he wouldn't give me his hands.

25   So I got the pepper spray out.

1    Q    So you got the pepper spray out.

2    A    Correct.

3    Q    And then you put the pepper spray away?

4    A    That's correct.

5    Q    These movements that you're making with the canister,

6    you're -- you're saying that you're not trying to activate

7    the pepper spray?

8    A    That's correct.

9         (Video played)

10    Q    Now, in this sequence you have handcuffed him, right?

11    A    Correct.

12    Q    It didn't appear where you were having any particular

13    difficulty in handcuffing him.  Did you say that occurred?

14    A    Yeah, it did.

15    Q    It did?

16    A    Yeah.

17    Q    What -- I don't see it.  What -- what was it that you

18    said happened?

19    A    He wouldn't give me his hands, he had all of his

20    muscles tightened up, and when I told him to put his hands

21    behind his back he wouldn't, and.  So it was difficult for

22    me to physically move his arms behind his back.

23    Q    Difficult.

24    A    Yes.

25    Q    How old were you when this happened?

1   A       2019, I was 28.

2   Q       28.  You're a young strong guy, right, a deputy.

3   You're saying you couldn't put the arm of a 62-year-old

4   drunk guy's arm behind him?

5   A       That's correct.

6   Q       But you got it behind him.

7   A       I did, yeah.

8   Q       Within a couple of seconds of this shows that you got

9   him handcuffed, right?

10  A       Correct.

11  Q       You didn't have to do anything other than pull his arm

12  behind his back, right?

13  A       Once he untensed his muscles, then yes.

14  Q       That's all it was, you just pulled his arm behind his

15  back and handcuffed him, right?

16  A       Yeah.  Eventually I did.

17  Q       Eventually.  Like we're talking about seconds here.

18  This only took you a couple seconds, right?

19  A       Yes.

20          (Video played)

21          MR. KOPKO:  I beg your pardon, may I leave the

22  courtroom for a brief second?

23          THE COURT:  Oh, absolutely.  I mentioned to I

24  believe one of your colleagues, you guys can get up and

25  leave and come back.  Again, we don't have a jury here, so.

1          MR. KOPKO:  I just need to go to the men's room

2     right here.

3          THE COURT:  Do you want to take a short break,

4     Mr. Kopko?

5          MR. KOPKO:  Five minutes, would that be --

6          THE COURT:  Absolutely.  Why don't we take a

7     five-minute break.  Is that okay?

8          MR. TROY:  That's fine.

9          MR. KOPKO:  Five minutes.  Thanks, Judge.

10         THE COURT:  Deputy, you can just have a seat over

11    at the table and take a break too, go to the bathroom, or.

12              (Recess taken)

13         THE COURT:  All right, we're back from the break.

14    Mr. Kopko and Mr. Troy, just to let you know, my intention

15    was to break for lunch at 12:30-ish, unless one of you says

16    hey, we're going to finish up this witness in 5 or 10

17    minutes, whatever.  So we got another 45 minutes.  Does that

18    sound good?

19         MR. KOPKO:  Thank you, sir.

20         MR. TROY:  And there's a restriction today.  What

21    time does that take effect?

22         THE COURT:  Oh.  Oh.  Oh, the real restriction.

23    I'm just checking to make sure.  I have a detention hearing

24    at 3 p.m.

25         MR. TROY:  Okay.

```
1          THE COURT:  And it involves an interpreter so I
2   know from past experience that will -- excuse me, it's a
3   plea, it was going to be a detention hearing but the
4   individual is pleading guilty.  So that takes about an hour
5   and a half for the entire process with an interpreter, so my
6   thinking is we will break for this trial ten minutes of
7   three, wherever we are.
8          MR. TROY:  Okay.
9          THE COURT:  Mr. Kopko, you may continue.
10          MR. KOPKO:  Thank you, sir.  We're trying to get a
11   particular segment of the video.
12          THE COURT:  Okay.
13          MR. KOPKO:  We had it marked but it's not in the
14   same sequence, the same synchronized.
15          THE COURT:  When you get it, Mr. Kopko, you can
16   start, take your time.  Get it where you need to be.
17          (Video played)
18   BY MR. KOPKO:
19   Q     Deputy, let me see if I can save some time here.
20          MR. TROY:  I couldn't hear.
21          MR. KOPKO:  I'm sorry.
22          THE COURT:  Use the microphone, Mr. --
23          MR. KOPKO:  I should not have done that.
24          We're trying to find this.
25   BY MR. KOPKO:
```

1  Q     Deputy, do you remember saying if you don't shut up or

2  you don't be quiet I'm going to pepper spray you?

3  A     I don't.

4  Q     Then we've got to find that.

5        (Video played)

6  Q     So, Deputy, at this point I hear you saying you're

7  going to shut the fuck up, okay?  You're saying that.

8  A     Correct.

9  Q     All right.

10       THE COURT:  Mr. Kopko, just pull the microphone to

11 the side.  Even if you put it to the side, it will help.

12       MR. KOPKO:  Jason told me.

13 BY MR. KOPKO:

14 Q     You're saying shut the fuck up, you're going to shut

15 the fuck up, right?

16 A     I did say that, correct.

17 Q     Now, at this point, Deputy, you know that you have

18 absolutely no authority as a law enforcement officer to tell

19 someone to shut the fuck up, correct?

20 A     Correct.

21 Q     So when you're telling him to shut the fuck up, you

22 knew that that was not true.

23 A     Correct.

24 Q     And you knew that you had no authority to say that --

25 A     Correct.

```
 1   Q     -- right?
 2             But yet you repeat it several times, correct?
 3   A     Correct.
 4   Q     Now, Deputy, in this part of the sequence here when
 5   you're yelling like that, and you're pushing him backwards,
 6   you are uncontrollably angry, correct?
 7   A     No.
 8   Q     You are unaware of your surroundings.  Is that
 9   correct?
10   A     That is correct.
11   Q     All right.  And you don't even realize that the music
12   has stopped playing.  Is that correct?
13   A     That's correct.
14   Q     And the whole purpose of you coming there before you
15   told Mr. Georgia to shut the fuck up, before you pushed him
16   backwards, before you handcuffed him, you did not realize
17   that the music was not playing.  Is that correct?
18   A     Can you repeat?  Can you repeat the question?
19   Q     Deputy, do you agree that when you told Mr. Georgia to
20   shut the fuck up, when you pushed him backwards, when he
21   landed on the ground, when you handcuffed him, you were so
22   angry that you did not realize that the music had stopped.
23   Is that true or not?
24   A     That's not true.
25   Q     That's not true.  Okay.  When did you realize that the
```

1   music stopped playing?

2   A      After I got Mr. Georgia in handcuffs.

3   Q      In handcuffs.

4   A      That's correct.

5          (Video played)

6   Q      Could you tell on that in the last couple of seconds

7   there that the music stopped?

8   A      No.

9   Q      You couldn't tell that?

10  A      No.

11         (Video played)

12  Q      Deputy, do you hear the music in the background in

13  that sequence?

14  A      I do.

15  Q      You do?

16  A      Yes.

17  Q      What -- maybe I -- your hearing is probably more acute

18  than mine.  Can you -- we're going to play this again.  Can

19  you tell me when you think the music stops --

20  A      Okay.

21  Q      -- please?

22         (Video played).

23  Q      You still hear music?

24  A      I heard music in that sequence.

25         MR. KOPKO:  Keep going.

1          (Video played)

2    A     Right there.

3    BY MR. KOPKO:

4    Q     Right there?  All right.  You told us several times

5    that your whole goal here was to stop the music --

6    A     That's correct.

7    Q     -- right?

8          That's why you were there, right?

9    A     That's correct.

10   Q     You don't want to do anything else but stop the music,

11   right?

12   A     That's correct.

13   Q     You're not going to leave until the music is stopped.

14   Correct?

15   A     Till it's turned down.  So no, it's not correct.

16   Q     Well, the music stopped, right?

17   A     At that point, yes.

18   Q     Yeah, okay.  Well, the music stopping, you'll -- and

19   for your purposes is much better than the music being turned

20   down, correct?

21   A     Doesn't matter to me.

22   Q     Doesn't matter to you.  So there's no music, right?

23   A     Correct.

24   Q     And whatever purpose you had was fulfilled because

25   there's no music, right?

 1    A      Correct.

 2    Q      And at that point you just needed to leave.  Right?

 3    A      Correct.

 4    Q      But you didn't do that.

 5    A      No.

 6    Q      You pushed him backwards onto the ground, right?

 7    A      Correct.

 8    Q      You threatened to pepper spray him if he didn't shut

 9    up, correct?

10    A      I don't believe I said that.

11    Q      Yeah, but you didn't stop talking, you said, you

12    threatened to pepper spray him?

13    A      I don't believe I said that.  I might be wrong.

14    Q      You handcuffed him, right?

15    A      Correct.

16    Q      You didn't check on the tightness of the handcuffs,

17    correct?

18    A      Correct.

19    Q      You called your supervisor --

20    A      Correct.

21    Q      -- right?

22           Supervisor came to the scene?

23    A      Correct.

24    Q      Another heavy-set deputy came over there.  Who was

25    that?

1   A      Deputy Murray.

2   Q      Deputy Murray?

3   A      That's right.

4   Q      Okay.  He came over there too.  So now we have three

5   deputies on the scene, correct?

6   A      Two deputies and a sergeant.

7   Q      Oh, okay.  Thank you.  We have three law enforcement

8   personnel on the scene.

9   A      Correct.

10   Q      We have Mr. Georgia on the ground in handcuffs.

11   Correct?

12   A      That's correct.

13   Q      And no music playing.

14   A      That's correct.

15   Q      And you could have, if you wanted to, you could have

16   just said to Sergeant Vann, look, the music's off, why don't

17   we just drop this whole thing.  You could have said that.

18   A      That's correct.

19   Q      But you didn't do that.

20   A      No.

21   Q      You dragged him down the driveway, right?

22   A      No.

23   Q      He wasn't walking.

24   A      Yes, he was.

25   Q      You were partially dragging him --

DAVENPORT - CROSS                        67

```
1    A       No.

2    Q       -- right?

3            You took him to the sheriff's station, right?

4    A       Correct.

5    Q       Handcuffed?  And you booked him there, right?

6    A       Correct.

7    Q       And you took him up to CMC, correct?

8    A       Correct.

9    Q       And you just left him there.

10   A       No.

11   Q       Did you stay with him at CMC?

12   A       No.

13   Q       You just left him there, right?

14   A       No.

15   Q       You took him to CMC and then you left --

16   A       That's correct.

17   Q       -- correct?  You left him there.

18   A       That's correct.

19   Q       Okay, well, I asked you that three times and you said

20   no.

21   A       Okay.

22   Q       You -- you left him at CMC.

23   A       That's correct.

24   Q       Now.

25           (Video played)
```

1   Q     You said to Mr. Georgia you need to fuck the shut --

2   you need to shut the fuck up, okay.  In a very animated way.

3   Do you remember, did you see that part?

4   A     I did.

5   Q     Yeah.  That was different than the tone that you were

6   using before.  Did something happen that you changed your

7   affect and your tone?

8   A     Yes.

9   Q     And what happened was that you had pushed him over,

10  right?

11  A     No.

12  Q     What happened was that you handcuffed him, correct?

13  A     No.

14  Q     What happened was that you just got sick and tired of

15  him challenging you, correct?

16  A     No.

17            (Video played)

18  Q     Now, I hear Mr. Georgia saying put the handcuffs on.

19  Do you hear that too?

20  A     I do.

21  Q     All right.  And I hear the click of a ratchet of the

22  handcuffs.  Do you hear that?

23  A     I do.

24  Q     So he's just telling you to put the handcuffs on, and

25  he's cooperating with you, correct?

1   A     Correct.

2   Q     So this business about you saying, you know, he --

3   you're struggling to put the handcuffs on, that's not true?

4   A     Before he put his hands behind his back I was.

5   Q     You were.  When it actually came time to put the

6   handcuffs on, he didn't resist you at all.

7   A     No.  Not at that point.

8             (Video played)

9   Q     Now, you said that he was being aggressive, right?

10  A     Correct.

11  Q     Being aggressive is not a crime.

12  A     Correct.

13            (Video played)

14  Q     Now, I heard you say that you be quiet, right?

15  A     That's correct.

16  Q     That's because you're angry and irritated at

17  Mr. Georgia, correct?

18  A     No.

19  Q     You recognize and you agree that he has the right to

20  say whatever he wants to say, right?

21  A     That's correct.

22  Q     And you recognize and agree that you have no right

23  whatsoever to tell him to be quiet.

24  A     If he is being too loud bothering the other neighbors,

25  it's a continuous noise complaint.

1    Q    Oh.  So did you get another complaint from the

2    neighbors in the meantime?

3    A    No.

4    Q    Well, what are you talking about?  There was no

5    complaint from the neighbors, correct?

6    A    Correct.

7    Q    You're just imagining that, correct?

8         MR. TROY:  Objection, your Honor, argumentative.

9         THE COURT:  Yeah, Mr. Kopko, we're starting to get

10   into, you know, arguing with the witness about he tells you,

11   and he told you what is in his mind, I mean.  After that,

12   you can make the arguments to the Court, but it doesn't

13   really do any good to argue with the witness to say that

14   could not have been in your mind or that wasn't the reason.

15        MR. KOPKO:  Thank you for that guidance, your

16   Honor.

17        Go ahead.

18        (Video played)

19   BY MR. KOPKO:

20   Q    Excuse me, just, who -- who just walked up there with

21   the flashlight?

22   A    That's Sergeant Vann.

23        (Video played)

24   Q    Now, Deputy, afterwards --

25        MR. KOPKO:  This is Exhibit 30.  Exhibit 30, your

1    Honor.

2              THE COURT:  Okay.  So you're going to Exhibit 30

3    now, Mr. Kopko?

4              MR. KOPKO:  Yes, sir.  Yes, sir.

5              THE COURT:  Okay.

6    BY MR. KOPKO:

7    Q     Do you see Exhibit 30?

8    A     I do.

9    Q     Now, this is a subject management report that you

10   filled out regarding the arrest that we've been talking

11   about, right?

12   A     Correct.

13   Q     And you arrested Mr. Georgia for resisting arrest,

14   right?

15   A     That's correct.

16   Q     And for obstruction of governmental administration.

17   Two -- two offenses.  Right?

18   A     That's correct.

19   Q     Now, and incidentally, both of those offenses were

20   dismissed by the Lansing Town Court, correct?

21   A     I believe so.

22   Q     Now, in this report in Roman Numeral III at about the

23   top third of the page --

24             MR. TROY:  Can Counsel speak just a little louder?

25   I'm not getting --

1          THE COURT:  Really important to use the

2   microphones.

3          MR. KOPKO:  I got to.  I'm actually doing that

4   intentionally so Bill can't hear anything.

5          MR. TROY:  I suspected as much.

6          THE COURT:  Well, it might carry over to the Court

7   too.  I'm not sure we're too far apart in ages here, any of

8   us.

9          MR. TROY:  Counsel's actually three times older

10  than we are.

11         THE COURT:  Just for the record, these are all pun

12  jokes.

13         MR. KOPKO:  Yes.

14         THE COURT:  We can do that when there's no jury.

15         MR. KOPKO:  Yes, indeed.  And that's quite an

16  indulgence, your Honor, that I very much appreciate.

17  BY MR. KOPKO:

18  Q    So in Roman Numeral Number III, I'm about the top

19  third of the page, do you see resistance information?

20  A    I do.

21  Q    All right.  Now, you know that when you're completing

22  this, you have an obligation as a police officer to provide

23  accurate and complete information, right?

24  A    That's correct.

25  Q    And do you remember testifying in your examination

1  before trial?

2  A     I do.

3  Q     Yeah.  And do you remember saying that this report was

4  false in some remarks?

5  A     Yes, I do.

6  Q     Now, with regard to Roman Numeral Number III, subject

7  resisted by, check all that apply and explain in a

8  narrative.  Right?

9  A     Correct.

10  Q     So you -- you checked that he resisted verbal --

11  A     Correct.

12  Q     -- right?

13        Now, you understand from your training and law

14  enforcement education that resisting verbally can never

15  constitute resisting arrest.  You understand that?

16  A     Correct.

17  Q     And then you described in that section that there were

18  verbal threats.  Verbal threats.

19  A     Correct.

20  Q     Now, I -- I listened to the tape.  What -- what verbal

21  threats are you talking about?

22  A     When Mr. Georgia said I will fuck you up.

23  Q     You considered that to be a verbal threat?

24  A     I do.

25  Q     Do you think that you prompted that by your

1   high-handed techniques here?

2          MR. TROY:  Objection, your Honor.

3          THE COURT:  No, I'm going to allow it.  I think

4   Mr. Kopko's trying to get the witness to tell him what his

5   state of mind and his actions were in relation to what he

6   heard or allegedly heard the plaintiff say, so I'm going to

7   allow it.

8   A     Could you repeat the question?

9   BY MR. KOPKO:

10  Q     In light of the objection I'm just going to withdraw

11  that.

12         The other thing that you checked off was passive

13  resistance.  Do you see that?

14  A     Yes, I do.

15  Q     Now, you know under New York Law that simple passive

16  resistance can never constitute resisting arrest, correct?

17  A     Correct.

18  Q     And you know that you have the obligation on this form

19  to put down all of the information that you were relying

20  upon to justify your actions, correct?

21  A     Correct.

22  Q     And in the Roman Numeral Number IV part, it says

23  tactic -- tactics information.  Describe additional

24  information in SMR narrative as necessary.  So this

25  describes what you were doing, you -- you were giving verbal

1   commands.  Is that right?

2   A    That's correct.

3   Q    And you used an open hand, a bar?  Is that -- is that

4   where you grabbed his arm and shoved him backwards twice, is

5   that what you're referring to?

6   A    Yes.

7   Q    Now, and you indicate pepper spray displayed.  And

8   then that it was effective.  Right?

9   A    Correct.

10  Q    What do you mean by that?

11  A    When I had the pepper spray, all his muscles were

12  tensed, and then when I threatened to use pepper spray he

13  loosened up his muscles and I was able to holster my pepper

14  spray up and put him in handcuffs.

15  Q    But it didn't look to me as though he even saw the

16  pepper spray.  Do you know that he saw the pepper spray?

17  A    I don't know that he saw it or not.

18  Q    Now, in the Roman Numeral V, you acknowledge that

19  Mr. Georgia was injured in this incident, correct?

20  A    That's correct.

21  Q    And you write subject obtained lacerations on his

22  wrists due to him struggling after proper application of the

23  handcuffs --

24  A    Correct.

25  Q    -- right?

1          Now, I saw all of that.  I mean we all saw it.

2     Mr. Georgia was not struggling.  Do you want to see that

3     again?

4     A     No, I don't want to see it again.

5          I can explain what that means, if you want me to.

6     Q     No, I ask the questions.

7     A     Okay.

8     Q     You wrote that he was struggling after proper

9     application of the handcuffs, and we -- we all saw it, and

10    he was not struggling.  That's a false statement, isn't it?

11    A     No, it's not.

12    Q     In the narrative part in Roman Numeral Number VII, you

13    wrote, open quote, I then unholstered my department-issued

14    OC spray and told the subject that if he did not place his

15    hands behind his back then he would be sprayed, closed

16    quote.  I -- I saw that, I listened to it.  I didn't hear

17    you say that.  Is that a true statement?

18    A     We can watch the video again, just to double-check.

19    Q     I didn't ask you that.  Did you say that to him?

20    A     I don't recall.  I may have.

21    Q     Well, you wrote it here, right?

22    A     Correct.

23    Q     You -- you wouldn't write something in the report that

24    was intentionally false?

25    A     That's correct.

1   Q      So either this is false or your recollection that you

2   testified to is false.  Do you know which is true?

3   A      I don't.

4           MR. KOPKO:  A brief indulgence, your Honor.

5           THE COURT:  Certainly.

6           (Pause in proceedings)

7   BY MR. KOPKO:

8   Q      Now, Deputy, you answered my question that you -- that

9   you knew that passive resistance could never support a

10  charge for resisting arrest, correct?

11  A      Correct.

12  Q      But you nevertheless charged him with resisting

13  arrest, correct?

14  A      That's correct.

15  Q      And when you charged him with resisting arrest, you

16  knew that there was no probable cause under New York Law to

17  do so.

18  A      No.

19  Q      You did not describe any other behaviors in justifying

20  the arrest other than these three.  You agree with that?

21  A      I do.

22  Q      All right.  And you agree that none of these three

23  categories that you checked off are justification for a

24  resisting arrest charge?

25  A      That's correct.

```
1   Q     And you didn't put anything else down.

2   A     That's correct.

3   Q     Now, you also charged him with obstruction of

4   governmental administration, correct?

5   A     That's correct.

6   Q     And you know that in order to sustain that charge

7   there has to be a proper governmental administration,

8   correct?

9   A     That's correct.

10  Q     And you admitted in response to questions that you had

11  no authority under the Lansing ordinance because there was

12  no ordinance.  Is that correct?

13  A     That's correct.

14  Q     And you obviously knew, because of the multiple

15  commands, that you were being ordered to get off the

16  property, correct?

17  A     That's correct.

18              MR. KOPKO:  Just a brief indulgence, your Honor.

19              THE COURT:  Certainly.

20              (Pause in proceedings)

21              (Video played)

22  BY MR. KOPKO:

23  Q     Deputy, in the early part of your encounter with

24  Mr. Georgia, you -- and we saw it, I don't want to go back

25  to that, but you put your hand on his chest and you pushed
```

1  him back, right, that's --

2  A     Correct.

3  Q     -- that's the first time that you pushed him?

4  A     Yeah, that's correct.

5  Q     All right.  And then later on in what we just saw, you

6  actually shoved him again.  Correct?

7  A     That's correct.

8  Q     And then you shoved him a third time, and that third

9  time knocked him to the ground, correct?

10  A     That's correct.

11          THE COURT:  Just, Mr. Kopko, for the record, you

12  just showed Exhibit -- part of Exhibit 30 again, right?

13          MR. KOPKO:  Yes, sir.

14          THE COURT:  Okay, just --

15          MR. KOPKO:  Yes.

16          THE COURT:  -- I just want to make sure the

17  record's clear as to what the witness is answering your

18  questions as to.

19          MR. KOPKO:  Jason's telling me that the video is,

20  excuse me, 14, Exhibit 14.

21          THE COURT:  I'm sorry.  I misspoke.  I apologize.

22  I'm thinking Exhibit 30 was the last Exhibit 14 video which

23  we had been watching previous questioning.  You just played

24  part of it again for the witness, and that was his answer

25  response.  Right.  Thank you.

1  BY MR. KOPKO:

2  Q     And, Deputy, you shoved Mr. Georgia three times

3  because you were angry at him, correct?

4  A     No.

5  Q     You shoved him three times because you were tired of

6  this so-called game that you thought he was playing,

7  correct?

8  A     No.

9  Q     You shoved him because you were just out of control,

10  correct?

11  A     No.

12  Q     But, Deputy, after all of this stuff, you never

13  charged Mr. Georgia with assault.

14  A     Is that a question?

15  Q     Yes.

16  A     I did not charge Mr. Georgia with assault.

17  Q     But if you thought that Mr. Georgia was being

18  aggressive, as you said here, and was coming at you, that

19  you had to shove him one time and then the games continued

20  and you had to shove him a second time, and then the games

21  continued and you had to shove him a third time, but you

22  still did not charge him with assault?

23  A     That's correct.

24  Q     So you never felt threatened by Mr. Georgia.

25  A     I did feel threatened by Mr. Georgia.

1    Q      You did?

2    A      Yes.

3    Q      You -- you charged him with other crimes, and you're

4    telling the Court that you felt threatened but you never

5    charged him with assault.

6    A      That's correct.

7    Q      That's correct.

8            MR. KOPKO:  Your Honor, I respectfully invite the

9    Court's attention to the fact that it's 12:28.  I'm close to

10   the time that your Honor was going to adjourn.  Would it be

11   convenient, if instead of closing the examination, if I just

12   stopped here and think about it over the lunch hour and then

13   be able to pick up?  If I do, it will be very brief.

14           THE COURT:  Yeah, that's fine.

15           Mr. Troy, I take it you don't have any objection

16   to breaking for lunch?

17           MR. TROY:  I do not, your Honor.  Just for the

18   record, I propose not to examine my witness today but when I

19   put him on my case he will respond to --

20           THE COURT:  But you can do that as well.  You can

21   choose whether you want to do examination now, which would

22   be your cross-examination, or call him as your witness,

23   that's fine.

24           MR. TROY:  I'm going to call him as my witness.

25           THE COURT:  Okay.  So the question I have,

1   Mr. Kopko, Mr. Troy, how long do you want to take for lunch?

2   Mr. Kopko?

3            It cannot be three hours, so.

4            MR. KOPKO:  Okay.  I -- I don't -- I'm not

5   familiar so much with downtown.  There used to be a little

6   restaurant just right around the corner here.

7            THE COURT:  There -- I do not endorse anything,

8   first of all, nor do I -- I don't give any ratings of food.

9   There is a diner on this street, on this side of the

10  building that I'm pointing to, and there's a diner maybe

11  50 yards from here.  I don't know if Burger Monday's, which

12  is right here on the corner, if they're open.  But it's

13  burgers and sandwiches.  Then on the other side of the

14  building there is a taco garage, has tacos and burritos, and

15  just one block past that is the Lost Dog, which has

16  sandwiches, burgers, salads.  Those are your immediate

17  options.  And then around the corner to this side of the

18  building there is a small pizza place, I know that that's

19  still there, so.  And then if you walk over to the

20  Metrocenter one block on Main Street, there's a couple of

21  places, so.

22           MR. KOPKO:  Thank you so much, Judge.  What's the

23  Court's pleasure?

24           THE COURT:  I'll give you guys whatever, you know,

25  within reason that you want.  Half hour, 45 minutes, an

1    hour?  You know, I'll give you an hour if you want an hour.

2         MR. KOPKO:  45 minutes will do it.

3         THE COURT:  45?  Mr. Troy?

4         MR. TROY:  That's fine, your Honor.

5         THE COURT:  Okay.  So let's say we'll be back at

6    1:15 p.m.  1:15, 45 minutes?

7         MR. TROY:  Yes, sir.

8         MR. KOPKO:  Yes.

9         THE COURT:  Okay, very good.  We'll see everybody

10   after lunch.

11        (Recess taken)

12        THE COURT:  Let's go back on the record.  All

13   right.  Welcome back, everyone, from our lunch break.  We

14   are back in court, and the parties are all here and all

15   counsel are here.  Hope you had a good lunch.

16        So, Mr. Kopko, we ended before the lunch break.

17   You had Deputy Davenport on examination.  Do you have

18   additional questions, Mr. Kopko?

19        MR. KOPKO:  I have none at this time, your Honor,

20   but I reserve my right to conduct an examination after

21   Mr. Troy does his examination in his case-in-chief.

22        THE COURT:  Yes.  You would be entitled, my

23   understanding is that Mr. Troy, he can speak for himself,

24   but I understood that he would be calling Deputy Davenport

25   in his direct case-in-chief and then you would have the

1    opportunity to do cross-examination, obviously.

2             MR. KOPKO:  Yes, your Honor.

3             THE COURT:  Okay.  All right.  So you don't have

4    any further questions at this time?

5             MR. KOPKO:  No, sir.

6             THE COURT:  Okay.  And, with that, I need 30

7    seconds to grab my laptop and plug it in here, which I

8    forgot to bring.

9             (Pause in proceedings)

10            THE COURT:  All right.  So we're back on the

11   record.  And did you indicate, Mr. Kopko, that you have no

12   further questions at this time for Deputy Davenport?  Is

13   that correct?

14            MR. KOPKO:  Yes, your Honor.

15            THE COURT:  All right.  And then obviously

16   reserving the right to cross-examine him if and when

17   Mr. Troy calls him.

18            MR. KOPKO:  Yes, sir.

19            THE COURT:  All right.  Mr. Kopko, you may

20   proceed.

21            MR. KOPKO:  All right.  Thank you, sir.

22            THE COURT:  And you're calling Mr. Georgia?

23            MR. KOPKO:  Yes, the plaintiff.

24            THE COURT:  Mr. Georgia, if you just come right up

25   here to the witness chair.  And if you just remain standing

1    for a minute, be sworn in.

2              THE CLERK:  Can you please state your full name

3    for the record.

4              THE WITNESS:  Ronald Maynard Georgia.

5                  (The witness was duly sworn.)

6              THE COURT:  Somebody's rubbing against the

7    microphone, okay.  It might have been you.

8              Okay.  Yeah.  Okay, all right, Mr. Georgia, just

9    you can adjust that microphone, and please use the

10   microphone.  It makes it much easier for all of us.

11             And, Mr. Kopko, you may proceed.

12             MR. KOPKO:  Thank you, your Honor.

13                         RONALD GEORGIA,

14          having been called as a witness, having

15          been duly sworn, testified as follows:

16                      DIRECT EXAMINATION

17   BY MR. KOPKO:

18   Q    State your full name and your current address.

19   A    Ronald Maynard Georgia, 791 Van Ostrand Road, Groton,

20   New York, 13073.

21   Q    And how long have you lived there?

22   A    Almost five years.

23   Q    All right.  Now, in very summary form, just give us

24   the capsule of your life, where were you born, what kind of

25   schooling do you have, just a paragraph.

1    A     Okay, I was born in Elmira, New York.  I lived in

2    Lansing, New York, went to school in Lansing.  Graduated and

3    went into the Marine Corp.  Came out of the Marine Corps and

4    joined the sheet metal union.  Did that for 36 years.  I

5    retired and now I drive for a transit company in Ithaca, New

6    York, TCAT.

7    Q     TCAT.  And you have a companion?

8    A     I do.  Lucinda Jones.

9    Q     Tell us about her and that relationship.

10   A     Lucinda and I have been together for 33 years, so

11   we've had 4 children together.  My oldest, Hailey, who's 30

12   years old, she's a school teacher in Hannibal, New York.  My

13   second daughter, Emily, who's 25, she's a drug and alcohol

14   counselor in Ithaca, New York.  And my two sons which are

15   twins are 18, and they're both attending college at this

16   time.

17   Q     Now, and you live on Van Astrand Road?

18   A     Van Ostrand.

19   Q     Ostrand, okay.  Thank you.  Were you living there on

20   June 1st, 2019?

21   A     Yes, I was.

22   Q     All right.  In the later evening of that day, describe

23   what you were doing?

24   A     It was Saturday evening.  It was my first day of

25   vacation.  And sat out, we had a little barbecue, Lucinda

1  had to go to bed, and I was sitting back listening to music.

2  Q     And were you there alone?

3  A     Yes.  At -- outside.

4  Q     Outside.

5  A     Yes.

6  Q     And who else was there in your house?

7  A     Lucinda was there, my two sons, and a friend of

8  theirs.

9  Q     And what were you doing outside?

10  A     I was having a couple drinks and listening to music,

11  watching fireworks go off around the neighborhood, relaxing,

12  enjoying my first day of vacation.

13  Q     Do you know Mr. Gonzalez, who was reputed to be a

14  neighbor of yours?

15  A     I do.

16  Q     Did you see him that night?

17  A     I did not.

18  Q     Did he ever come over to your house and talk to you?

19  A     Not on that night.

20  Q     Did he ever come over and ask you to turn down the

21  music?

22  A     No, he did not.

23  Q     Was there a time in the course of your evening where

24  you saw Deputy Davenport?

25  A     There was.

1  Q     All right.  Tell us about that.

2  A     I was sitting there, apparently singing, and I looked

3  up and all of a sudden there was Deputy Davenport standing

4  on my patio.  And no car in the driveway, and he startled

5  me.  I couldn't figure out where he came from.  It confused

6  me.

7           MR. KOPKO:  Your Honor, I beg your pardon, I have

8  to just briefly leave the courtroom urgently here.  May I do

9  that, please?

10          THE COURT:  Sure.  Yeah.  Just take a few-minute

11 break.

12          (Pause in proceedings)

13          MR. KOPKO:  I had some health issues and I had

14 40 percent of my bowel taken out, so instead of getting a

15 half hour's notice I get like 30 seconds notice.

16          THE COURT:  Mr. Kopko, you don't need to explain

17 anything, and anyone in the courtroom, I never -- I never

18 want anybody to be uncomfortable.  So if you're sitting here

19 and you're uncomfortable and you need to take a break,

20 whether restroom or otherwise, just say so, and we take a

21 break.

22          MR. KOPKO:  That's so kind of your Honor, thank

23 you.

24          THE COURT:  Not a problem.

25 BY MR. KOPKO:

1   Q    Mr. Georgia, I was asking you about this evening, and

2   we were at the point in your examination where you were

3   telling me where you first saw Deputy Davenport.

4   A    Yes, I --

5   Q    Pick it up there.

6   A    I looked up, and I saw him standing there.  And he

7   frightened me.  I couldn't figure out where he came from.  I

8   thought he came across from the neighbor's yard, maybe.  And

9   I told him get -- get the fuck off my property.  He -- and I

10  honestly don't know as I would interact that way if he

11  pulled in my driveway and I knew why he was there or saw him

12  there.  He startled me.  That started the whole episode.

13  Q    Okay.  How did you -- tell the judge how you felt

14  about, you know, what you said.  We heard it all here and we

15  understand what it was, but describe why you were reacting

16  in the fashion that you were reacting.

17  A    I -- I would say because I was startled, and I felt

18  that I had not committed any crime.  I was listening to

19  music.  A person, not Ricky Gonzalez, had come up earlier

20  and told me to turn that crap off.  And I told him to get

21  off my property.  They said I'm going to call the police.

22  Okay.  And they left.  And then out of the dark, there's

23  Mr. Davenport standing there.  My reaction was fight or

24  flight kind of reaction.  And that's how I told him get off

25  my -- get the fuck off my property.  I -- there's no noise

1  ordinance, I know I wasn't doing anything wrong.  Couldn't

2  figure out why he was there.

3  Q    Now, you were in the United States Marine Corps.

4  A    Yes, I was.

5  Q    Tell us your views about protecting your property.

6  A    You protect it with -- as much --

7          MR. TROY:  Your Honor, objection.

8          THE COURT:  Objection?

9          MR. TROY:  I don't think this is relevant.

10         THE COURT:  Well, you know, I'm going to allow it,

11  Mr. Troy.  I think it's getting to the mind-set of the

12  plaintiff, because obviously as we saw in the video things

13  occurred from both the plaintiff and defendant, and I think

14  we explored quite a bit the mind-set of Deputy Davenport,

15  his thoughts.  I'm going to allow it because, one, I think

16  it helps explain actions and conduct that otherwise might

17  not be as clear.  And, and again, most importantly, the

18  Court, the Court is a trier of fact.  If there's something

19  irrelevant or inappropriate the plaintiff discloses, I'm

20  pretty sure I can take that and compartmentalize it, so.

21         Go ahead, Mr. Kopko.

22         MR. KOPKO:  Yes, sir.

23  BY MR. KOPKO:

24  Q    Continue on.  What was your view about defending your

25  property?

1   A      My view is that it's my constitutional right to

2   protect my property, it's my duty as a land -- a father of

3   children and a homeowner to protect my property.  Especially

4   if I'm not breaking the law doing it.  I'm following the

5   law.

6   Q      All right.  Now, you were playing music.

7   A      Yes, I was.

8   Q      How -- how was this being played, what -- what was

9   this?

10  A      It was through my phone onto a speaker.

11  Q      And were you using a particular app?

12  A      I was, and I'm drawing a blank at the name of it.

13  Q      Panda?

14  A      Pandora.

15  Q      Pandora?

16  A      Pandora.

17  Q      And you were there and Deputy Davenport, we have this

18  all on the tape and we have seen all of that stuff.  What

19  was your reaction to Deputy Davenport grabbing your arm?

20  A      I pulled away.  I didn't understand why he was

21  grabbing my arm.  And honestly didn't think he could tell me

22  where I could be on my property.  He had to be where I told

23  him on my property, which was off it.

24  Q      Now, there was also another time where Deputy

25  Davenport put his right hand on the left portion of your

1  chest and shoved you backwards.  What was your reaction to

2  that?

3  A    I think it angered me more.  Well, I know it angered

4  me more.  I didn't -- didn't hurt, it just angered me; who

5  are you, pushing me, on my property.

6  Q    And then as the video progresses, Deputy Davenport

7  pushed you two other times, okay.  Describe for his Honor

8  what your reaction was to that.

9  A    I -- I didn't even see it coming.  He pushed me and

10 then he charged me and shoved me till I hit my head on my

11 concrete patio, and attacked me.  Continued to attack me, in

12 my opinion.  Threatened to pepper spray me.  Over nothing.

13 I did nothing.  I never pushed him, I never touched him.  He

14 attacked me.  He assaulted me.  And then in fact kidnapped

15 me off my property.

16 Q    Now, and there is a segment in the video when he is

17 handcuffing you.  Did you resist being handcuffed?

18 A    No.  I couldn't understand why he was, why -- I -- I'm

19 still confused about being charged with resisting arrest

20 when the words never came you are under arrest.  So how

21 could you realize that you were supposed to be put in

22 handcuffs.  I -- I never heard those words.

23 Q    Now, tell his Honor about the pressure, the tightness

24 of the handcuffs on your wrist.

25 A    When he first put them on I think I was so angry, and

1    I don't recall a lot exactly of what I said and how I felt

2    at that time.  But later on I do remember it hurting, like

3    when I was at the police station, and asking.  And it wasn't

4    Officer Davenport that was responding, it was the bigger

5    fella, I can't remember his name, saying they're as loose as

6    I can put them.  You have big wrists.  But I was bleeding

7    from my wrists.

8    Q    Okay.  Now, and how did you -- do you remember when

9    other law enforcement officers came to the scene?

10   A    I do but I -- I recall it better from seeing it on the

11   video than what I thought had happened, to be honest with

12   you, what I remembered.  I do -- I do recall there being

13   more than one officer.

14   Q    Now, Mr. Georgia, I'm showing to you what appears to

15   be an aerial photograph.  Do you recognize this scene?

16   A    That is my property, my house.

17   Q    And can you --

18        THE COURT:  Mr. Kopko, just what exhibit are we

19   looking at, just for the record?

20        MR. KOPKO:  26, your Honor.

21        THE COURT:  Okay.  Exhibit 26.

22   BY MR. KOPKO:

23   Q    Begin with the driveway and explain what this

24   photograph depicts.

25   A    So this is Van Ostrand Road going in front of the

1  property.  The bushes that as you look at the picture are to

2  the left is where Officer Davenport parked his patrol car.

3  If you go back to the driveway, on the very edge --

4              THE COURT:  Mr. Georgia, hold on.

5              MR. TROY:  I don't mean to interrupt.  Not so much

6  that, just to request he pull the mic a little bit away,

7  because I think it's hard for him to understand.  Please

8  forgive me.

9              THE COURT:  Okay.  We have feedback, yeah.  Okay,

10  Mr. Georgia, you got a good loud voice so you don't have to

11  be right up on the mic.  I tend to do that also, so I

12  apologize.  Just step a little back, and.

13              THE WITNESS:  Can you hear me now?

14              So as you go up the driveway, you see the two

15  cars, the red car and the gray car, I guess it is.  Just to

16  the left is the canopy where I was sitting and I was

17  approached by Officer Davenport, Deputy.

18  BY MR. KOPKO:

19  Q     Now, the incident that has been described by you and

20  by Deputy Davenport, where did that occur?

21  A     At the patio.  To the right of the house, you go down

22  the driveway, to that side of the house, you can see the

23  smaller metal roof right there.  It actually was a different

24  canopy at that time.  It was a cloth one.  Okay.

25  Q     Now.

1          MR. KOPKO:  This is Exhibit 25, your Honor.

2          THE COURT:  Okay.

3   BY MR. KOPKO:

4   Q    And there's a number of photographs that are in this.

5   We're just going to go through this pretty quickly here,

6   Ron, okay?  And you're going to describe what the -- what

7   the scene depicts.  All right?

8   A    Okay.  I can't -- I guess that's -- my knee, my right

9   knee?  And down my leg where I was pushed around while the

10  handcuffs and being threatened with the pepper spray.

11         And my wrist is from the handcuffs, which I still

12  actually have a scar from that one.

13         MR. TROY:  Is that 26?

14         MR. VIOLETTE:  That's 25.

15         THE COURT:  Okay, Mr. Kopko, I think this is all

16  25, right?  A series of photos.

17         MR. KOPKO:  Yes.  These are all bundled.

18         THE COURT:  That's what -- I know Mr. Troy was

19  asking, but these are photographs in Exhibit 25 but there's

20  numerous photographs.

21  BY MR. KOPKO:

22  Q    And this is a picture of your?

23  A    My right wrist and my knee, my right leg, and my

24  elbow.

25  Q    All right, what was -- it looks like there is a more

1  prominent contusion on your elbow.  What -- what was that?

2  A    I'm not positive when that happened or at what point

3  during my attack.

4  Q    Did you have any of these injuries before Davenport?

5  A    No, I did not.

6  Q    Describe what you see on your knee.

7  A    Again, that happened at some point.  I'm -- I would

8  have to guess.  I don't think guessing is the right thing to

9  do.  It was at some point during the attack.

10 Q    All right, so you -- you had none of these injuries

11 before Deputy Davenport, you had all of these injuries

12 after.  Is that correct?

13 A    That is correct.

14 Q    All right.  Just keep going through this.

15 A    I believe that's another view of my elbow and my wrist

16 and my right arm.

17        That's my lower back, where Officer Davenport, I

18 assume it was his knees were on me.

19        I honestly can't -- I think that's under my

20 armpit.

21 Q    It looks like it could be fingerprints.  Do you

22 know --

23 A    Yes.

24 Q    -- that to be true?

25 A    Yes, I think that's what it is, grabbing me.

1          On both arms I believe that's what you can see.

2    Q    On both sides there in your bicep area?

3    A    That's where he grabbed onto me.

4    Q    The top is your chest?

5    A    Yes.

6    Q    What does that --

7    A    That is my back, actually.  That's where I actually

8    had my ribs checked to see if they had been broke.  Because

9    I was in a lot of pain for a long time for that, which they

10   weren't broke.

11          That's another bruise on my lower back.

12          MR. KOPKO:  Now, your Honor, may I sit down while

13   we're going through this?

14          THE COURT:  Sure.  Yeah, you don't have to be at

15   the podium, you can sit at the table if you'd prefer, or at

16   the podium.  Just move that mic over, if you could, please.

17   I'm pretty sure it moves.  Unless they gave you the short

18   cord that they gave me.

19          MR. KOPKO:  Thank you so much.

20          THE COURT:  Okay.

21   BY MR. KOPKO:

22   Q    Just go ahead, Ron, just describe this as accurately

23   as you can, and tell the location on your body and give some

24   account of what -- what it was.

25   A    I -- I can't honestly tell where that is on my body.

1    I -- I think it's my lower back.

2    Q    It looks to me, but I'm not testifying, it looks to me

3    as though that's in the small of your back and then it's on

4    the left -- the left-hand side?

5    A    That's how I see it too.

6            THE COURT:  Hold on a second.  Mr. Troy?

7            MR. TROY:  It's a good thing counsel's not

8    testifying.  I would object to that.

9            THE COURT:  Well, I understand.  Mr. Kopko I think

10   is just trying to direct, but the photographs speak for

11   themselves, and I think it's fairly clear on what we're

12   looking at.

13   A    Again that's my right knee, and it swelled up quite a

14   lot by then.  And it happened sometime during the attack.

15   I'm guessing after I had been rolled over for the handcuffs.

16           That also happened during the attack.  Right knee.

17           That's my left leg behind my knee.  At some point

18   during the attack.

19           That's my right arm again showing where the

20   handcuffs were on my wrists and the damage to my elbow and

21   the fingerprints on my upper arm.

22           Same.  I believe that's when I was being, I'd like

23   to use the term drug, but assisted off my property.

24   BY MR. KOPKO:

25   Q    Well, that's a point.  Do you recall that you were

1  dragged off of your property?

2  A    I recall I had no shoes on, I tried -- and I can't

3  honestly say that I was drug but I was in pain because I

4  have coal sharp stones on my driveway.  But I was being

5  pulled along at the pace that they wanted me to go at.

6  Q    Do you recognize what part of your body that is?

7  A    I think it's my left arm just below the elbow.

8        I'm honestly not sure if that's the same.  I'm not

9  sure where that is.

10        I believe that's right behind my right elbow.

11        I'm not positive.

12  Q    Well, you have to -- we have to try to identify that.

13  Think about it.  It looks like it's something --

14  A    I think it's my arm because I can see the shirt sleeve

15  at the top so I'm guessing the inside of my arm, just above

16  my elbow.

17        MR. TROY:  Object, objection to guessing.

18        THE COURT:  Well, yeah, but just to bring this

19  back, both parties agreed to these exhibits as coming into

20  evidence, the Court received them in as evidence.  They, to

21  my understanding, are photographs of various parts of the

22  plaintiff's body.  If Mr. Georgia's not sure which part, I

23  think it's pretty clear it's some part of his body.  And

24  like I said before, I think the photographs speak for

25  themselves, so.

1        You know, Mr. Georgia, don't speculate but if you

2   can assist either counsel when they're asking where it is,

3   certainly, but, but you don't have to speculate.

4        THE WITNESS:  The upper picture is my lower back

5   on the left side showing bruising.  Again I -- I'm assuming

6   happened when Deputy Davenport was on my back with the

7   handcuffs.

8        And that would be the lower side of my arm just

9   below my elbow, the back of my arm.

10       And that's showing the opposite side, like I was

11  grabbed by there, and that's where I was being pulled down

12  the driveway.

13  BY MR. KOPKO:

14  Q    Now, we see the injuries here.  Did you have injuries

15  that we cannot see like to systems of your muscles or your

16  bones or anything like that where you?

17  A    As I had stated earlier, I thought my ribs were broke.

18  But they weren't.  My wrist bothered me for a long time but

19  the doctors really couldn't find anything wrong.  Other than

20  scarring.

21  Q    What's -- what's a long time?  Was it --

22  A    A couple months.

23  Q    -- hours, days, weeks?

24  A    Couple of months.

25  Q    Couple of months?

1  A      Couple of months.  Driving bus I would notice it all

2  the time, 'cause you got that big wheel you got to turn, and

3  I could feel it in my wrist.

4  Q      Now, did you seek medical attention for these

5  injuries?

6  A      I did.

7  Q      Describe what that is.

8  A      I went to my physician's assistant, and he sent me to

9  get checked out with an MRI for my ribs, or I think it was

10  MRI or X-ray.  I guess X-ray machine.  It was a -- I don't

11  know if it's called an MRI, or.  Not positive what the

12  machine is, to check to see if my ribs were broke.  They

13  checked my wrists, they took X-rays, and they couldn't see

14  anything broke.  But they did see contusions.

15  Q      Okay.  Now, we covered that part about the contusions

16  and the musculoskeletal.  Did you have any psychiatric

17  experience as a result of this?  Did you have any mental

18  aspect of this?

19  A      Yes, I have.

20  Q      Tell the judge about that.

21  A      It's -- it's like you can lose your property for not

22  paying your taxes but I've learned that you can also lose

23  your rights by some officer deciding they're going to

24  administer punishment for not doing what they say.  Even

25  though their order was not lawful.  We double-check our cars

1  every night when we lock them.  Our doors.  And I am -- I do

2  fear for retribution from our sheriff's department.  I bring

3  this up in my mind constantly.  I -- my kids, they see it.

4  It bothers me.  I've lost my will to even work on my

5  property.  It's the same thing as it was before that all

6  started, and that was the first day of a staycation to work

7  on our property which we got into the fall before.  Our

8  first property we owned, we didn't rent.  And he was able to

9  take that from me.  By falsely accusing me, doing a press

10  release that was untrue.

11       It infuriates me to this day.  I've always

12  followed the law.  I've never broke the law.  You can look

13  up an arrest record, there isn't one.  Look up my driving

14  record, there is nothing there.  We have done nothing but

15  try to raise good kids.  I am so proud of my kids.  My

16  daughter has a master's degree in education, is at the

17  poorest school district you could be in in New York State

18  because she wants to help the kids.  My second daughter is a

19  drug and alcohol counselor who's going to college to become

20  a psychiatric nurse.  She wants to work with the VA.  My

21  boys both wanted to go in law enforcement but they don't now

22  because they're not quite sure that that's -- not saying

23  they're not, they're thinking more on the forensic side of

24  it.  I worked my butt off to get my property to have my

25  peace of mind, and I don't have it anymore from that.

1          From what you did.  You think it's not a big deal,

2    try it out sometime.  Have somebody falsely accuse you of

3    menacing your neighbors, doing a press release.

4          I had to answer to friends and my kids' parents

5    before they would let them stay at our house.  I always had

6    ten kids at our house, all the time.  Other parents got

7    where they got nervous about it because they thought I was

8    some kind of crazy drunk.  I don't drink that much.  I did

9    that night.  I did.  It was the first night of a vacation,

10   probably had more than I should have.  Probably acted a

11   little different than I normally would have.  I never acted

12   like that to anybody.  But I was furious.  And I still am

13   furious.  And I -- and I have people say well, why don't you

14   go to a psychiatrist.  How do you stop me from feeling I've

15   lost my rights.  That's how I feel about it.

16   Q    Now, you mentioned several times about the press

17   release.  Tell us what impact that press release had on your

18   life.

19   A    It's an embarrassment.  I have people to this day

20   would who still go, hey, have a good weekend, Ron, keep out

21   of the booze and keep Metallica off the radio, ha, ha, ha.

22   My employment wanted to know.  If I was found guilty they

23   might have gotten rid of me because you can't have these

24   charges on your record.  To be there.  It was a -- it was

25   like people came to our house who have known me my whole

1    life and they were like what happened.  They can't believe

2    what that press release did.  Which was a lie.  Everything

3    that was said in that press release was a lie.  I never

4    threatened the neighbor.  I didn't resist arrest.  I didn't

5    commit public -- I can't even think I'm so mad now thinking

6    about it.

7    Q     Here, just a second.  We have this up on the courtroom

8    screen, okay?  So just slowly go through this.

9           THE COURT:  Mr. Kopko, this is Exhibit Number?

10          MR. KOPKO:  36, your Honor.

11          THE COURT:  Okay.  Because we just need to put on

12   the record, because I can see it but until somebody says the

13   magic word 36, the record doesn't know what we're looking

14   at.

15          Go ahead.

16   BY MR. KOPKO:

17   Q     So I want to go through this line by line, okay?  In

18   the first line it says Tompkins County deputies responded.

19          Initially it was only Deputy Davenport.  Is that

20   correct?

21   A     That's correct.

22   Q     There were not multiple deputies responding.

23   A     Not -- not at -- at some point there were but I'm not

24   sure at that time.  No, I don't believe so.

25   Q     And in the second line it says deputies were called

1    after nearby residents.

2            There were not multiple deputies called, correct?

3    A    Correct.

4    Q    And that's -- that part is false, correct?

5    A    That's true.

6    Q    And after nearby residents.  Do you have any

7    information to believe that multiple residents called?

8    A    No, I don't.

9    Q    Now, it goes on to read, say that they were threatened

10   after they went over.  They being plural.

11           Is that statement at all true?

12   A    That is not true.

13   Q    And in your experience in this incident, nobody was

14   threatened.  Is that correct?

15   A    That is correct.

16   Q    And it reads, open quote, deputies found that the

17   music was extremely loud upon arrival.

18           Did -- did you hear the music that was broadcast

19   through Deputy Davenport's video when he got out of the car?

20   A    I did not.

21   Q    There was -- there was nothing about -- do you agree

22   that there was nothing about the volume of the music when

23   Davenport got out of his car?

24   A    Not that I could hear.

25   Q    Is there any basis, in your view, that the music was

1  extremely loud upon arrival, where they're saying when they

2  arrived?

3  A     Not to my knowledge.

4  Q     Now, it reads further that you were transported to the

5  Cayuga Medical Center due to your intoxication level.  Were

6  you transported to the Cayuga Medical Center to treat the

7  injuries that Davenport had inflicted upon you?

8  A     That's what I had asked for, according to the video in

9  the police station.

10  Q    Okay.  But it wasn't because you were intoxicated, it

11  was because Davenport had beat you, correct?

12  A     Exactly.  That's why I wanted to go and why I thought

13  I was going.

14  Q    And didn't you in fact go to the Cayuga Medical

15  Center?

16  A     I did.

17  Q    All right.  Tell us about that.  Pick up from the time

18  that you went to the Cayuga Medical Center and what happened

19  there to you.

20  A     What I remember from it was being admitted, and I

21  do -- I do know that I had -- I had cursed, and I apologized

22  to the nurse, but they took me in and a security person was

23  there.  And the attending nurse didn't think I should have

24  anything done to my wounds until I got pictures.  And then I

25  sat there till Lucinda came.

1    Q     And Lucinda took the pictures?

2    A     Yes.

3    Q     Now, when you were at the Cayuga Medical Center, were

4    you restrained?

5    A     I was.

6    Q     All right.  Tell his Honor how you were restrained.

7    A     I had the handcuffs on, and they were still wrenched

8    down just like they had been from the beginning.

9    Q     And when you were there, were you chained to a bed?

10   A     I do not recall that.

11   Q     In addition to Deputy Davenport, who else was -- who

12   else's custody were you in?

13   A     It was Sergeant Vann and I do not know the name of the

14   other officer.  It was mentioned today but, big fella.

15   Q     Can you describe what emotional effect that had on you

16   being taken to the hospital and being custody, being in

17   custody, how -- how was that for you?

18   A     It was embarrassing being brought in the public and

19   treated like I was some hardened criminal, and it was the

20   first time I saw somebody besides the police that night that

21   I could vent to that I'm being mistreated.

22   Q     And while you were at CMC, did Deputy Davenport make

23   any attempt to loosen your handcuffs?

24   A     He did not.

25   Q     Now, we see the injuries to your wrists, right, that

1  was in Exhibit Number 25.  Are those injuries were caused by

2  the handcuffs that Davenport put on you?

3  A     Yes, they were.

4  Q     Now, in addition to those contusions, did you have any

5  restrictions on -- I know you mentioned about turning the

6  wheel when you were driving the bus.  How long did that go

7  on in your life?  How long did you have some effects for

8  having the handcuffs cranked down?

9  A     A couple months.  It bothered me.  It -- I've got

10 scarring.

11 Q     You still have that scar?

12 A     I do.

13           MR. KOPKO:  Your Honor, could the Court take a

14 look at those residual scar?

15           THE COURT:  Of the wrists, are you saying,

16 Mr. Kopko?

17           MR. KOPKO:  Yes, sir.

18           THE COURT:  Mr. Troy?

19           MR. TROY:  I have no objection.

20           THE COURT:  That's fine with the Court, if

21 Mr. Georgia wants to pull up his shirt.

22           MR. KOPKO:  Your Honor, I think that's part of the

23 permanent injury here, your Honor, and I would like the

24 Court to be aware of that.

25           THE COURT:  Okay.  You can display it, the injury

1  that you believe is still there in terms of the wrists, I

2  take it, or the hands?

3          MR. KOPKO:  Yes, your Honor.

4          THE COURT:  Sure.  How would you like to do that,

5  do you want to have Mr. Georgia stand up, or?

6  BY MR. KOPKO:

7  Q    Could you stand up?  And you are -- I have seen it

8  many times.  Just show it to the judge in a way that he gets

9  a good look at that.

10         THE WITNESS:  This is the right wrist.

11         THE COURT:  Okay.

12         THE WITNESS:  If you can look in the picture, you

13  can see that that's exact spots where it was.

14         THE COURT:  All right, I'm looking at your right

15  wrist.

16         See that, Mr. Troy?

17         MR. TROY:  Yes, sir.

18         THE COURT:  Anything else, any other area, or?

19         THE WITNESS:  None that I know of.

20  BY MR. KOPKO:

21  Q    What about your legs?  You had some pretty big

22  contusions.  Do you have any residual, something long term?

23  A    I can't honestly say that I do.  My legs bother me but

24  it could be from other things at this point in my life.  I

25  worked construction for 36 years.

1  Q     Now, tell us, I'm pausing because it may be difficult

2  for you to do so.  So you have to tell us, we don't know.

3  Tell us about Lucinda.

4  A     We discovered on January 28th, they had taken her to

5  the hospital from work, they thought she was having a

6  stroke.  It turned out to be brain tumors.  And she has

7  esophageal cancer and is at home on hospice.

8          And one of her favorite things was to want to be

9  outside at night.  We have fire pits.  She wouldn't do it.

10 We -- as soon as it was dark, we were going to do it, she'd

11 hear a noise, we're going in.  And it was since that day on.

12 And that really, really, really pisses me right now because

13 she doesn't have much time left on this planet, and that was

14 one of her most enjoyable things is to be able to sit out,

15 watch the sunset, have a fire, and relax on our own

16 property.

17 Q     All right, now using -- using that same incident that

18 you described, please tell his Honor how that affects you,

19 okay?  Not -- not so much her, but how that affects you so

20 that your partner cannot enjoy this time, okay?

21 A     We've been together, like I said earlier, for 33

22 years.  She's been the best part of my life.  The mother of

23 my children.  And for her not to enjoy what time she had,

24 not even knowing where she is right now, and I also feel the

25 same way.  We don't trust being outside at night.  Just

1    absolutely not.  It's taken our pleasure away.  I complained

2    about it for years to her about this case, I brought it up

3    every night.  It's embarrassment, it's just anger that I

4    want -- went through this.  And like I said, you can look it

5    up.  I've never been arrested for fighting, pushing, saying

6    anything, breaking the law, speeding, nothing.  In my life.

7    And now I'm threatened for a bull crap fricken charge.  None

8    of it was true.  Even as you saw on the video at my patio,

9    the music wasn't playing and you continued to illegally take

10   me off my property.  I broke no law.  You did.  You broke

11   the law.

12            THE COURT:  Mr. Georgia.

13            Hold on.  Hold on, Mr. Kopko.

14            Mr. Georgia.

15            THE WITNESS:  I'm sorry.

16            THE COURT:  No, that's okay, but you -- you have

17   to restrict answering Mr. Kopko's questions and not

18   directing anything towards Mr. Davenport or his lawyer.  So,

19   you know, I understand, but.

20            THE WITNESS:  I apologize.  I apologize.

21            THE COURT:  You have to control yourself and just

22   answer Mr. Kopko's questions the best you can.  Okay?

23   BY MR. KOPKO:

24   Q    Now, Ron, with his Honor's instruction in mind, okay,

25   explain what prompts you to be so excited about this right

1  now.  Okay?  Don't direct anything to Davenport, tell the

2  judge why you're so upset right now.

3  A    This has taken three years and ten months to get here.

4  This is the only way legally I have to right the wrong that

5  I feel was put upon me.  When the district attorney, I -- I

6  blame him as well.  They saw that video footage, they saw

7  the law being broken by Mr. Davenport, and they still

8  prosecuted.  They attempted.  They lost.  It scarred my

9  soul.

10       This is -- I have tried to be a law-abiding

11  citizen, paying my taxes, doing good things, raising great

12  kids.  This stole part of that from me.  It's -- it's --

13  it's -- I -- it's my right, they've taken my rights and

14  threw them to the wind.  If you want to try to get something

15  back for your rights, then you have to end up in Federal

16  Court.  You have to spend a fourth of what I made the year

17  that I was arrested on an attorney to get off bogus charges.

18  It just infuriates me.  I don't know how to get past it, I

19  need to be better about it, but I just don't know how else

20  to explain it.  I -- I think I have a right to live in my

21  house, not break any laws, I don't break any laws, and enjoy

22  my property, and I don't have that anymore.

23  Q    Now, without saying anything that Lucinda could have

24  told you, I'm going to ask you something in a little

25  convoluted way, okay.  Just answer this yes or no.  Has

1   Lucinda been upset about this incident?

2   A      Yes.

3   Q      Okay.  Now, describe for his Honor what Lucinda being

4   upset has caused to you.  What effect is that on you?

5            MR. TROY:  Objection, your Honor.  This is way too

6   attenuated.

7            THE COURT:  Speak up, Mr. Troy, I'm sorry, I

8   couldn't hear you.

9            MR. TROY:  I'm sorry.  This is way too attenuated

10  and it's hearsay and speculation.  I don't think this

11  testimony should be permitted.

12            THE COURT:  Well --

13            MR. TROY:  This man as a party I can see, but I

14  can't see a family member.

15            THE COURT:  Well, let me just break that down.  If

16  I hear Mr. Kopko's question correctly, he does not want the

17  witness to relay any hearsay, so he's not asking that

18  Mr. Georgia should not offer what miss -- or what Lucinda,

19  as has been referred to, has said or stated.  But the other

20  half of the question is saying or asking this witness what

21  has -- what, if any, effect has that had on him, presumably

22  either emotional or psychological.  And because it's related

23  to the event, again, whether rightly or wrongly, whether or

24  not Lucinda can be affected by this event or not,

25  Mr. Georgia is being asked how has that impacted his

1  well-being, if I can put it that way, or his emotional

2  aspect.  So I'll allow that.

3        But just to be clear, Mr. Kopko, Mr. Georgia, not

4  what Lucinda may have said to you or what she feels or -- or

5  how she has internalized this, but rather how has that part

6  of your life, observing what's happened to her, how's that

7  impacted you either emotionally or psychologically.  And

8  then it's argument as to whether or not there is causation

9  or not or to what degree and so forth, but.

10       Do you understand -- Mr. Kopko, do you understand

11  my ruling?

12       MR. KOPKO:  Yes, sir, and I totally agree with it.

13  That's exactly the intent and the thrust of this.

14       THE COURT:  All right.  So, Mr. Georgia, you

15  can -- you can describe what, if any, effect it has had on

16  you, either emotionally or otherwise, observing Lucinda's

17  actions as it's related to this matter.

18       THE WITNESS:  Again, it really bothers me that she

19  can't enjoy -- so I work a job that I might be getting up at

20  five in the morning for three months, work until

21  eight thirty at night, or I could be going in at

22  four o'clock in the afternoon and getting home at two thirty

23  in the morning.  So there's many times where she's home

24  alone.  It's her night off.  She might want to sit out on

25  the patio and have a drink.  She doesn't dare.  And that

1  hurts me that she doesn't dare, that she doesn't feel

2  comfortable on our property.  She's -- our combined

3  property, it's not just mine, it's half hers.  That she does

4  not feel -- it bothers me, it hurts me that she doesn't feel

5  safe.  Got to lock the doors and get in the house.

6  BY MR. KOPKO:

7  Q    Okay, you say it bothers you, and you -- it hurts you.

8  Can you explain further as to what you're feeling about

9  that?  How that affects you?

10 A    I guess I -- I can't do anything about it and it makes

11 me feel like lesser of a person 'cause I can't make her feel

12 better about it.  I can't make her feel comfortable.  I'm

13 even to the point of trying to see if she wanted to get a

14 pistol permit.  And if she feels safe sitting outside with

15 that at night.  I -- it breaks my heart that I can't make it

16 better for her.

17 Q    Yeah.  The feelings that you're describing, have you

18 had these feelings since June 1st of 2019?

19 A    Yes.

20      MR. KOPKO:  Now, just a brief indulgence, your

21 Honor, please.

22      THE COURT:  Certainly.

23      MR. KOPKO:  Nothing further at this time.

24      THE COURT:  All right, Mr. Kopko.

25      Mr. Troy, you may inquire.

1          MR. TROY:  May we approach?

2          THE COURT:  Well, we're -- we can just go off the

3  record.  Approaching just means that we stand a little

4  closer to each other here, so let's go off the record.

5               (Off-the-record discussion was held.)

6          THE COURT:  We'll adjourn till Friday at one.

7          Mr. Georgia, you're excused for today.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right, everyone, have a good day

10  tomorrow, and we'll see you Friday at one.

11                    - - - - -

INDEX TO TESTIMONY

| WITNESS: | DX | CX |
|----------|-----|-----|
| KYLE DAVENPORT | -- | 5 |
| RONALD GEORGIA | 85 | -- |

GEORGIA - DIRECT

1            CERTIFICATE OF OFFICIAL REPORTER

2

3      I, RUTH I. LYNCH, RPR, RMR, NYS Realtime Certified

4   Reporter, Federal Official Court Reporter, in and for the

5   United States District Court for the Northern District of

6   New York, DO HEREBY CERTIFY that pursuant to Section 753,

7   Title 28, United States Code, that the foregoing is a true

8   and correct transcript of the stenographically reported

9   proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13

14

15            /s/ Ruth I. Lynch
16
17            RUTH I. LYNCH, RPR, RMR, NYSRCR
              Official U.S. Court Reporter

18

19

20

21

22

23

24

25