UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
_____
RONALD M. GEORGIA,

                    Plaintiff,

vs.                  3:21-cv-484

KYLE DAVENPORT,

                    Defendant.
_____


             Transcript of Testimony
                April 21, 2023
          Federal Building and Courthouse
               15 Henry Street
             Binghamton, New York


       The HONORABLE MIROSLAV LOVRIC Presiding.



            A P P E A R A N C E S


For Plaintiff:    EDWARD KOPKO, ESQ.
                  JASON VIOLETTE, ESQ.
                  KEVIN KELLY, ESQ.

For Defendant:    WILLIAM TROY III, ESQ.



             Ruth I. Lynch, RPR, RMR, NYSRCR
             Official United States Court Reporter
              Binghamton, New York  13901

1            THE CLERK:  Case is Ronald M. Georgia versus Kyle

2    Davenport, 3:21-cv-484.  Please state your appearances for

3    the record.

4            MR. KOPKO:  Edward Kopko for the plaintiff.

5            THE COURT:  Good afternoon, Mr. Kopko.

6            MR. TROY:  William Troy for the defendant.

7            THE COURT:  All right.  Good afternoon, Mr. Troy.

8            All right.  Well, we're back this afternoon,

9    Friday, the 21st.  And as we may recall, we last had

10   Mr. Georgia on the stand as a witness in the case-in-chief

11   of the plaintiff, and I believe, Mr. Kopko, if I recall

12   correctly, Plaintiff had completed the direct examination of

13   Mr. Georgia.  Is that right?

14           MR. KOPKO:  Yes, sir, that's correct.

15           THE COURT:  All right.  So in connection with

16   that, the next step will be Mr. Georgia will be examined by

17   Mr. Troy, and we will -- we will conduct -- conduct that

18   this afternoon.

19           The second thing to take up, before we went on the

20   record the attorneys informed the Court that there was an

21   exhibit or there is an exhibit that's been marked as

22   Number 43, and it's an aerial photograph of the location

23   where the alleged events occurred, and it's a slightly

24   different angle than the other photograph.  And my

25   understanding, Mr. Kopko and Mr. Troy, is that the parties

```
 1    agree and consent to that Exhibit 43 being received in
 2    evidence.
 3              Am I correct, Mr. Kopko?
 4              MR. KOPKO:  Yes, sir.
 5              THE COURT:  Mr. Troy?
 6              MR. TROY:  Yes.
 7              THE COURT:  All right.  So the record and the
 8    clerk will note in the exhibit list, Exhibit Number 43 is
 9    received in evidence and may be utilized by the parties at
10    will as they see appropriate.
11              And lastly on that topic, at the end when you put
12    that USB together, that will have all the exhibits that are
13    in evidence, please add 43 in there also on that USB.
14              All right.  Then the -- the next topic before we
15    break for Mr. Kopko, Mr. Kopko has a very brief Teams video
16    and/or audio at 1:30 with another court, and this Court
17    indicated that we would take a break to accommodate that.
18    So before we do that break, Mr. Kopko and Mr. Troy, just,
19    what do you anticipate us getting completed today, and then
20    what do you anticipate we will be doing on Monday, just so
21    we have somewhat of a schedule that we're looking at?
22              MR. KOPKO:  Your Honor, I expect that Attorney --
23              THE COURT:  Use the microphone, Mr. Kopko.
24              MR. KOPKO:  I expect that Attorney -- may I sit
25    down, your Honor?
```

4

1          THE COURT:  You may, yeah.  Please.  You guys can

2     sit as you like or stand, or at the podium or at your table.

3     Please do whatever's going to be comfortable.

4          MR. KOPKO:  Thank you, sir.  This afternoon I

5     anticipate that Attorney Troy will be completing his

6     examination of the plaintiff, Mr. Georgia, then he will

7     examine the defendant, and then I will do a cross of the

8     defendant, but I will not be covering the same ground, so to

9     speak, as I did when I called him as a party opponent in my

10    case-in-chief.

11          THE COURT:  Okay.

12          MR. KOPKO:  And then on Monday, we anticipate

13    calling Sergeant Vann, V-A-N-N, with the Tompkins County

14    Sheriff's Department, and I think that that's going to be

15    it, Judge.

16          THE COURT:  Okay.  Just mechanically speaking, is

17    Sergeant Vann going to be called by the plaintiff or by the

18    defendant or are you guys doing it kind of in combo?

19          MR. KOPKO:  I am going to call him.

20          THE COURT:  Okay, so he'll be -- okay.  So just

21    mechanically today, we will complete the cross-examination

22    of Mr. Georgia, and then, Mr. Troy, then you will be calling

23    on your direct the defendant, Mr. Davenport?

24          MR. TROY:  That is correct, your Honor.

25          THE COURT:  Okay.  And then Monday we will switch

1  back to the plaintiff's case where you, Mr. Kopko, will call

2  as your witness Sergeant Vann.

3        MR. KOPKO:  Yes, sir.

4        THE COURT:  Okay.  Okay.  Just so it's clear.  So

5  the plaintiff's case-in-chief will not be completed today,

6  but we're just doing things out of order just to accommodate

7  everybody's schedules, including Sergeant Vann.  Is that

8  right, Mr. Kopko?

9        MR. KOPKO:  Yes, sir.

10       THE COURT:  Okay.  Good.  All right.  So just for

11  the purposes of the record, I'll state that once

12  Mr. Georgia's completed that we will now switch over to the

13  defendant's case again and then come back to the plaintiff's

14  case on Monday.  And then on Monday after the plaintiff's

15  case I assume, Mr. Kopko, that Sergeant Vann will be your

16  last witness?

17       MR. KOPKO:  Yes, sir, that's true.  And just for

18  planning for the Court, I expect that his testimony is going

19  to be very short.  I'm thinking like 35 or 40 minutes or

20  something like that.

21       THE COURT:  Yep.  It can be two hours.  Like I

22  said, I got all the time in the world.

23       Okay.  And then, then once that happens on Monday,

24  Mr. Kopko, then after Sergeant Vann, if you rest your case,

25  then, Mr. Troy, do you anticipate calling any other

```
 1   witnesses besides Mr. Davenport?
 2           MR. TROY:  Not as of today, your Honor, no.
 3           THE COURT:  Okay.  All right, so then after
 4   Mr. Kopko rests, then we'll entertain any motions on the
 5   record, and then if -- Mr. Troy, if you rest your case, I'll
 6   entertain any motion after all of the proof.  And then also
 7   if -- if there is no rebuttal case, Mr. Kopko, and again,
 8   I'm not holding you to it, but if there's no rebuttal case,
 9   then I presume that the evidence will be completed after
10   Sergeant Vann.  Is that right?
11           MR. KOPKO:  Yes, sir.
12           THE COURT:  All right.  Okay.  So that's on the
13   record, and we're going to do -- so now it's about 1:20.
14   So we're going to break, Mr. Kopko, and you have a few
15   minutes to get ready for your 1:30 Teams meeting, and then
16   as soon as you're finished my courtroom deputy will let me
17   know, we'll come out, and then we'll continue with the cross
18   of Mr. Georgia.
19           MR. KOPKO:  Thank you, sir.
20           THE COURT:  Okay.  All right, everyone, we'll take
21   a break.
22               (Recess taken)
23           THE COURT:  Let's go on the record.  All right.
24   We're back from our short break this afternoon, Friday, the
25   21st.
```

```
 1              So, Mr. Georgia, if we could have you come back up
 2     to the witness stand here.  And if you could be seated and
 3     make yourself comfortable.  All right.  And, Mr. Georgia,
 4     you're still under oath.
 5              THE WITNESS:  Okay.
 6              THE COURT:  And as you may recall, and attorneys
 7     do, Mr. Kopko completed his examination with you on
 8     Wednesday, and so now we're going to continue with Mr. Troy
 9     examining you, and then we'll go from there.  So.  And,
10     Mr. Georgia, just use that microphone.  It's a little like
11     the Three Little Bears; not too close, not too far --
12              THE WITNESS:  Just right.
13              THE COURT:  -- just right, right.
14              So, and the same thing, Counsel, please use the
15     microphone so that the court reporter and the Court can hear
16     you, and then we'll go from there.
17              All right, Mr. Troy, you may examine.
18              MR. TROY:  Thank you.
19              MR. KOPKO:  Just a silly thing here, your Honor,
20     this -- there's a button on the bottom that says push.  Does
21     that mute this, then?  Yes?
22              THE COURT:  I'm going to ask the expert.
23              THE CLERK:  Yes.  It mutes it.
24              MR. KOPKO:  All right.  Thank you so much.
25
```

1                    RONALD GEORGIA,

2          having been recalled as a witness, having

3          been previously duly sworn, testified further as

4          Follows:

5                    CROSS-EXAMINATION

6    BY MR. TROY:

7    Q    Good afternoon, Mr. Georgia.

8    A    Good afternoon.

9    Q    We've met only briefly, I think, before this

10   proceeding.  Is that right?

11   A    That's correct.

12   Q    Okay.  Now, I'd like to take you back to the day of

13   this event.  Can you tell us the date?

14   A    It was June 1st, 2019.

15   Q    Okay.  And you told us that you were working on your

16   property that -- that day, and then you ended up starting to

17   drink about 8:00 at night.  Was that right?

18   A    To the best of my recollection.

19   Q    Please understand I'm not trying to put words in your

20   mouth, so if you're uncomfortable just say I can't answer

21   that, okay?

22   A    Sure.

23   Q    Now, you began drinking at what time?  About eight?

24   A    I don't remember exactly when.

25   Q    How many hours were you drinking before you

1  encountered the officer?

2  A      A couple.  Maybe three.

3  Q      Three?  And how much vodka did you consume?

4  A      I don't remember.

5  Q      What were you drinking it in, what size glasses?

6  A      I don't remember.

7  Q      How much were you putting in each glass with ice and

8  anything else you were putting in?

9  A      I don't remember.

10  Q      Would you agree, though, that you were intoxicated

11  that evening?

12  A      Yes.

13  Q      And about what time did you consider yourself to be

14  intoxicated?

15  A      I don't remember.

16  Q      Did you stop drinking when you realized you were

17  intoxicated?  Or did you continue?

18  A      I don't remember.

19  Q      So you were having trouble remembering things that

20  night.  Is that fair to say?

21  A      No, not really, I just wasn't paying attention to what

22  you're asking.

23  Q      Now, you have told us in your testimony already what

24  happened.  And that happened on the 1st of what month?

25  A      June.

1    Q      June.  Okay.  Now, do you remember appearing in the

2    office of a lawyer named Luciano Lama in Ithaca?

3    A      Yes.

4    Q      Did you know Mr. Lama?

5    A      No.

6    Q      Okay.  And that was on June 4th.  Is that right?

7    A      That's correct.

8    Q      Now, you told us about what happened to you at the

9    scene, but I want to question you about this one point.  You

10   were seeking to file a Notice of Claim against the sheriff's

11   department when you went to Mr. Lama's office.  Is that

12   right?

13   A      Could you repeat that?  Speak a little louder, I'm

14   having trouble hearing you.

15   Q      You were planning to file a claim against the Tompkins

16   County Sheriff's Office when you went to Mr. Lama's office?

17   A      No.

18   Q      Were you there to sign a Notice of Claim?

19   A      No.  I was there to try to find a lawyer.

20   Q      Okay.  Did you prepare something with Mr. Lama?

21   A      He prepared it.

22   Q      Were you sitting in the office when that happened?

23   A      Yes.

24   Q      Did you sign it?

25   A      I did.

1   Q      Did you understand it was a sworn statement?

2   A      I do.

3   Q      Okay, it was dated 1 -- excuse me, June 4, 2019?

4   A      That's correct.

5   Q      And you told us earlier in your testimony what

6   happened to you that evening.  Is that right?

7   A      That is correct.

8   Q      And you were asked a couple of days later to reduce

9   that to writing.  Is that fair to say?

10  A      It's -- it's fair to say that, yes.

11  Q      Okay.  Now, I'm going to show you Exhibit 42.

12         MR. TROY:  May I approach, your Honor?

13         THE COURT:  Certainly.

14  BY MR. TROY:

15  Q      Now, do you see the paragraph beginning that claimant

16  continued to object?

17  A      I'm sorry, repeat that?

18  Q      Did you see -- you see the paragraph beginning as

19  claimant continued to object to the deputy's presence?

20  A      Yes.

21  Q      You say in this statement another deputy suddenly

22  appeared out of the dark who had not been visible before.

23  Is that right?  Is that what you said or wrote?

24  A      Yes.

25  Q      Where did this person come from in terms of where did

1    he step out of, or she?

2    A      I have no idea.

3    Q      And you say this person attacked claimant, taking him

4    to the ground with violence.  Is that right?

5    A      How I remembered it, yes.

6    Q      And that he then -- it's a he, is that right, it's not

7    a female?

8    A      Yes.

9    Q      He kneed claimant in the back, injuring your ribs.  Is

10   that -- is that your statement?

11   A      Yes.

12   Q      And placed handcuffs on claimant so improperly, so

13   excessively tight, that claimant suffered serious injuries

14   to his hands, arms, and wrists that required treatment at

15   Cayuga Medical Center.

16   A      Yes.

17   Q      Did you -- did you read that before you signed it?

18   A      Yes.

19   Q      And that is your signature on the second page.  Do you

20   agree?

21   A      Yes, it is.

22   Q      Who was this officer who did these things to you?

23   A      I do not know.

24   Q      But you say it was this officer who was in addition to

25   the defendant here.  Is that right?

1    A    As I remembered it at that time.

2    Q    All right.  So you have two people at the scene, two

3    officers doing this to you.  Is that right?

4    A    As my memory was at the time.

5    Q    Okay.  Was anything affecting your memory at the time?

6    A    Yes, there was.  Can I explain?

7    Q    Just yes or no.

8    A    Yes.

9    Q    Okay.  And was drink one of them reasons?

10   A    No.

11   Q    Okay.  But did you later learn that there were not two

12   deputies there initially, at least, there was just one?

13   A    Yes.

14   Q    When did you learn that?

15   A    When I saw the police video body cam footage.

16   Q    And how long ago was that?

17   A    I can't honestly answer that.  It's been three years

18   and ten months.

19   Q    Was it a year ago, was it closer to the time?

20   A    Probably the first year, when Mr. Kopko got the

21   evidence.

22   Q    And did you later -- excuse me.  Do you remember that

23   another officer or sergeant responded to the scene while you

24   were there with the defendant?

25   A    After watching the body cam video footage.

 1 | Q     I'm talking about at the time you prepared this sworn

 2 | statement.

 3 | A     At the time I remembered completely differently.

 4 | Q     Okay.  And -- and you had three deputies at the site

 5 | doing things to you.  Is that right?

 6 | A     At the time that's how I saw it, yes.

 7 | Q     Okay.  When did you learn there was only one deputy

 8 | at -- at the spot until --

 9 | A     When I saw the body cam footage.

10 | Q     Now, you, of course, were paying attention to what was

11 | going on at that time, weren't you?

12 | A     Up until I was assaulted by the police officer there

13 | and was thrown backwards and hit my head and believe I was

14 | concussed, I remember everything prior to that.

15 | Q     All right.  And the officer you're describing is whom?

16 | A     Mr. Davenport.

17 | Q     Now, did you ever change the Notice of Claim terms and

18 | the language in it?

19 | A     I don't understand.

20 | Q     Did you redo this, this Notice of Claim?

21 | A     Not with Mr. Lama.

22 | Q     But you prepared another statement with your current

23 | lawyer.

24 | A     I did.

25 | Q     But did you ever go to the County and say I withdraw

1    that statement because it's not accurate?

2    A     I didn't know the legalities of that statement.  I had

3    not hired Mr. Lama.  It was a consultation.  He told me he

4    couldn't represent me in court because his daughter-in-law

5    was an assistant district attorney and that he'd be more

6    than willing after I was cleared of the charges that I could

7    hire him.  And he wrote that out, told me to take it to the

8    sheriff's department, so I did.

9    Q     Okay.  Now, you were taken to a car to go to the

10   police station.

11   A     That's correct.

12   Q     By two deputies.  Is that right?

13   A     Yes.

14   Q     Okay.  And were you dragged, or did you walk down the

15   driveway?

16   A     Both.  I was pulled down the driveway.  I was forced

17   down.  That's where the bruises on my arms that were shown

18   yesterday came from.

19   Q     That's -- okay.  But that doesn't mean you were

20   dragged.  There were two officers walking down.  Do you

21   agree?

22   A     They forced me to go with them, yes.  They kidnapped

23   me.

24   Q     Oh, they kidnapped you.

25           With regard to how you got down the driveway, all

1  right.

2          MR. TROY:  Bear with me one moment, your Honor.

3          THE COURT:  Certainly.

4          MR. TROY:  I just need another moment, Judge, I'm

5  sorry.

6          THE COURT:  That's okay, take your time, Mr. Troy.

7  BY MR. TROY:

8  Q    Isn't it a fact you actually walked down the driveway

9  with the two officers and walked and got in the car after

10 you were searched?

11 A    I honestly don't remember from that night, so when I

12 watch the body cam footage I remember it now, because I've

13 seen it so many times, and I get a little confused as to

14 what I actually remember that night because it's polluted by

15 what I have now seen with the body cam footage which I

16 cannot argue with.

17 Q    Now, that night -- Lucinda is your significant other?

18 A    She is.

19 Q    And you had two boys at that time?

20 A    I did.

21 Q    How old were they?

22 A    At the time they were 14.

23 Q    They were twins.

24 A    Yes.

25 Q    All right.  Now, were they at the house that night?

1    A      They were.

2    Q      Did they come out at all when this happened?

3    A      No.  Not -- they came out, apparently, afterwards.

4    Q      Okay.  Did you -- when you were talking to the deputy

5    or engaging with the deputy, did you ask for your wife or

6    sons to come out?

7    A      No.

8    Q      Did you go in the house to get your wife?

9    A      At -- at one point I turned to go in the house to go

10   to the bathroom and go to bed but was grabbed and turned

11   back around.

12   Q      And who did that?

13   A      Officer Davenport.

14   Q      When did he do that?

15   A      It's on the video.

16   Q      Okay.  What did he do?

17   A      He grabbed my arm and redirected me.

18   Q      Did you say to him I'm going in the house now to get

19   some sleep?

20   A      No.  I didn't think it was any of his business.

21   Q      And at what point in the evening?  So if I remember --

22   withdrawn.

23          Let me just back up to what I understand from

24   these videos.  The officer is wearing it, and at one point

25   you asked him do you want to dance.  Is that right?

1    A     Excuse me?

2    Q     You asked him if he wanted to dance with you?

3    A     I did.

4    Q     Okay.  Was that the time when you were going to go

5    upstairs and go to bed?

6    A     No.

7    Q     Was it before or after that time?

8    A     It was after that.

9    Q     How far after, what were you doing?

10   A     I don't remember.

11   Q     So it's your testimony that you were all ready to go

12   to bed and was stopped by the officers?

13   A     In fact, if he --

14   Q     Is that -- is that your testimony --

15   A     Yes.

16   Q     -- yes or no?

17         Okay.  What were you doing just before you were

18   stopped from doing that?

19   A     Telling Officer Davenport to leave my premises, giving

20   him a lawful order.

21   Q     Now, nowhere in the Notice of Claim is it noted that

22   you were attempting to go upstairs and get some sleep in

23   your house.  Is it?

24   A     It wasn't asked.

25   Q     But you didn't put it in as an important piece of

1  evidence, did you?

2  A     No.

3  Q     Do you know why you were taken to the hospital?

4  A     I do from watching the video of the body cam video but

5  my memory wasn't the same as that.

6  Q     What was your memory?

7  A     Because I asked to go because of the injuries that

8  they put on me.  And it was very vague.

9  Q     How was it vague?

10  A     Because, again, my memory is polluted by actually

11  watching the body cam video that I now remember because I've

12  watched it.  But what I had remembered three years and ten

13  months ago before I saw the body cam footage was completely

14  different, that I believe had to do with being concussed.

15  Q     So have you ever had a diagnosis of being concussed?

16  A     I don't believe that a person that suffers a

17  concussion actually knows that, no.

18  Q     So you have not had --

19  A     No.

20  Q     -- a medical finding?

21  A     No.

22  Q     And you went to the hospital.  Is that right?

23  A     I was brought to the hospital, yes.

24  Q     And do you know why you went to the hospital?

25  A     I thought for my injuries.

1    Q      Did you know of any other reason why you went to the

2    hospital?

3    A      No.

4    Q      Did you know about the mental hygiene law?

5    A      Excuse me?

6    Q      Did you know anything about this so-called mental

7    hygiene law?

8    A      No.

9    Q      So you went to the police station actually before you

10   went to the hospital.  Is that right?

11   A      That is correct.

12   Q      And you were processed there briefly, and then they

13   put you in a car and took you to the hospital, correct?

14   A      According to the video, yes.

15   Q      You watched the video, we're going to play, we are

16   going to go through it.

17   A      Sure, I've watched it multiple times.

18   Q      So if I understand correctly, from reading the

19   material, you were found not to have any fractures.  Is that

20   correct?

21   A      That's correct.

22   Q      You were found -- you were not stitched for anything?

23   A      No.

24   Q      You were X-rayed and there was no finding of any

25   problems internal?

```
 1   A      No broken problems.

 2   Q      Okay.

 3   A      Contusions.

 4   Q      I'm sorry?

 5   A      Contusions, yes.

 6   Q      Contusions.

 7   A      Yes.

 8   Q      And you had contusions in part because you were taking

 9   pills, right?

10   A      Absolutely not.  I -- I --

11   Q      Yes or no, please.

12   A      No.

13   Q      Okay.  But you were taking medications.  Is that

14   right?

15   A      I take some medication, yes.

16   Q      You take blood thinners, correct?

17   A      Baby aspirin.

18   Q      You take blood thinners?

19   A      Okay, yes.

20   Q      And that can contribute to some bleeding with even a

21   relatively minor contact.

22          MR. KOPKO:  I object to that, your Honor, he's not

23   competent to --

24          THE COURT:  I'm sorry, Mr. Kopko?  Just use the

25   microphone.
```

 1          MR. KOPKO:  I object here.  He's asking him for a

 2   medical opinion about the effect of taking baby aspirin.

 3          THE COURT:  No, I -- I don't think he's asking for

 4   a medical opinion.  I think he's asking whether Mr. Georgia

 5   knows or not whether medicine that he's taking had a certain

 6   impact on his body.  I mean, I'll allow it.  That's like

 7   saying to him, you know, when you did X, Y, and Z, did it

 8   hurt.  He's allowed to say yes or no.  I don't think it's

 9   asking for any kind of a medical opinion.  It'd be different

10   if he asked him some procedure or something and what that

11   meant, so I'm going to allow it.

12          MR. TROY:  Can I have the question repeated,

13   please?

14                 (The stenographer read back.)

15   BY MR. TROY:

16   Q     Yes or no.

17   A     I -- no.

18   Q     Have you ever thought about stopping your blood

19   thinners?

20   A     Only if my physician told me to.

21   Q     And who is your physician at that time?

22   A     Dr. Marino.

23   Q     First name?

24   A     Don't know.

25   Q     What kind of doctor?

1    A      Cardiologist.

2    Q      Do you have a regular internist, a general

3    practitioner?

4    A      I do.  I -- I have a physician's assistant.

5    Q      Which office does he or she work?

6    A      Cayuga Medical Associates.

7    Q      So you've never lost any income from work as a result

8    of this incident, right?

9    A      No, because I was on vacation and then I used sick

10   time.

11   Q      So the answer's you never lost --

12   A      No.  No.

13   Q      You don't have any medical bills that weren't covered.

14   Is that right?

15   A      I had to pay some copay.

16   Q      Okay.  You did not have any surgeries.  I think we've

17   covered that already.  Is that right?

18   A      That's correct.

19   Q      Were you able to go back to work when your vacation

20   was over?

21   A      No; I took another week and a half, because of the

22   injuries, of sick time.

23   Q      But at some point you go back to work.  Is that right?

24   A      That's correct.

25   Q      And you drove a bus?

1   A      That's correct.

2   Q      You had no restrictive duty during that.  Is that

3   right?

4   A      No.

5   Q      You were not found to have any fractures.  Is that

6   right?  I may have asked that.

7   A      No.

8   Q      No, that's not right, or it is right?

9   A      I -- it's right, I was not found to have any

10  fractures.

11  Q      You went back to work in about a week and a half after

12  your vacation was over?

13  A      That's correct.

14  Q      And you worked at TCAT bus system?

15  A      That's correct.

16  Q      Where do you principally work, where is it?

17  A      Excuse me?

18  Q      Where do you principally work for TCAT?

19  A      That's who I work for, that's my employer.

20  Q      You don't have -- you don't have set routes, for

21  example?

22  A      Oh, yes.

23  Q      Do you bid for the routes?

24  A      We do.

25  Q      Okay, did you lose any bids on your routes because of

1   this?

2   A     No.  My vacation started at the beginning of the

3   summer bid.  That very day.

4   Q     Just for the sake of order, Exhibit 43 you've seen, I

5   think, up close?

6   A     Yes.

7   Q     Is that a fair depiction of what your house looks like

8   from the air?

9   A     That's very correct.

10  Q     Okay.

11          MR. TROY:  All right, I have nothing further, your

12  Honor.  Thank you.

13          THE COURT:  All right, Mr. Troy.

14          Mr. Kopko, any redirect?

15          MR. KOPKO:  Just a brief indulgence, your Honor,

16  please.

17          THE COURT:  Sure.

18          MR. KOPKO:  Nothing, your Honor, thank you.

19          THE COURT:  All right, no redirect, so there's no

20  recross.

21          All right, Mr. Georgia, you're excused.  You can

22  go back to counsel table.

23          THE WITNESS:  Thank you.

24          (The witness was excused.)

25          THE COURT:  All right.  So, Mr. Kopko and

1   Mr. Troy, just to make sure I understand, so what we're

2   going to do next, if I understood correctly, and if I put it

3   on the record correctly, is that we're going to now go out

4   of order.  Mr. Kopko's next witness will be available on

5   Monday, April 24th.  That's Sergeant Vann.  So we're going

6   to put the plaintiff's case-in-chief aside, and we'll go

7   over to the defense case-in-chief where my understanding is,

8   Mr. Troy, you're going to call as your witness

9   Mr. Davenport.  And then we'll continue with that today,

10  then on Monday we'll go back to the plaintiff's

11  case-in-chief where Mr. Kopko will put Sergeant Vann on the

12  line -- on the stand, and then we'll go from there, so.

13          Is that what we're doing, Mr. Kopko?

14          MR. KOPKO:  Yes, sir.

15          THE COURT:  All right, Mr. Troy, is that my -- am

16  I correct about that?

17          MR. TROY:  Yes, sir.

18          THE COURT:  Yep.

19          MR. TROY:  Yes.

20          THE COURT:  Okay.  So we're going to take things

21  out of order.  So, Mr. Troy, you may begin your

22  case-in-chief.

23          MR. TROY:  Yes.  I call the defendant.

24          THE COURT:  Okay, Mr. Davenport?

25          All right, Mr. Davenport, if you could come back

1   to the witness chair and make yourself comfortable there.

2   And, yeah, let's have the oath again, just for the record.

3           THE CLERK:  Can you please state your full name

4   for the record.

5           THE WITNESS:  My name is Kyle William Davenport.

6           THE CLERK:  Please raise your right hand.

7               (The witness was duly sworn.)

8           THE COURT:  All right, so, Mr. Davenport, again,

9   use the microphone, and not too close, not too far, and

10  speak clearly and slowly.

11          And, Mr. Troy, you may proceed.

12          MR. TROY:  Thank you, your Honor.  At this time

13  with the help of counsel I'm going to be using the computer

14  technology to walk him through what happened in those 2

15  25-minute periods, roughly, and have him explain what was

16  happening then.

17          THE COURT:  Certainly.

18                     KYLE DAVENPORT

19          having been called as a witness, having

20          been duly sworn, testified as follows:

21                   DIRECT EXAMINATION

22  BY MR. TROY:

23  Q   So I had asked you, Officer, just to let us know if

24  you have trouble seeing or hearing anything.  Can you do

25  that?

DAVENPORT - DIRECT                    28

```
 1   A     Yes, I can.
 2            MR. TROY:  Let's start.  Is there a volume?  Let's
 3   stop for a moment.
 4            THE COURT:  Just take your time, get the volume
 5   right, and then we'll start everything.  So don't worry
 6   about playing.  It's easier to get the volume right when you
 7   hear it.
 8            (Video playing)
 9            THE COURT:  You see the green bar on the right
10   bottom?  Can you drag that?
11            We can go off the record, Miss Lynch.
12               (Off-the-record discussion was held.)
13            THE COURT:  Ruth, back on the record.
14            (Video played)
15   BY MR. TROY:
16   Q    Now, Officer, can you describe for us what's happening
17   here?
18   A    Yes.  I'm getting out of my patrol vehicle and walking
19   down the driveway of 791 VanOstrand Road.
20   Q    And that's the plaintiff's home?
21   A    That is correct.
22   Q    How did you come to be there?
23   A    I was dispatched to a noise complaint at that address,
24   791 VanOstrand Road in the Town of Lansing.
25   Q    And you heard music when you pulled up?
```

1   A      That's correct.

2   Q      Did you know the details of the noise complaint?

3   A      I did at the time.  I don't recall right now.

4          THE COURT:  Mr. Troy, just to make sure, we're

5   looking at Exhibit Number?

6          MR. TROY:  P-14.

7          THE COURT:  14, okay, just so the record's clear

8   which video.  Okay.

9          MR. TROY:  All right, start up again.

10         (Video played)

11  BY MR. TROY:

12  Q      Now, was that you speaking?

13  A      That's correct.

14  Q      What are you saying?

15  A      What's up, guys.

16  Q      Who are the guys?

17  A      I don't know.  I said that because the music was so

18  loud and it was outside, I figured there was a large party

19  going on.

20  Q      You didn't know how many people were there, you

21  assumed there was a number.  Is that right?

22  A      That's correct.

23  Q      Okay.

24         (Video played)

25  Q      Now, you're hearing music at this time.  Correct?  As

1    you're walking up here?

2    A     Yes, that's correct.

3    Q     As you were dispatched and came to the house.  Where

4    were you located when you first began to hear loud music?

5    A     I would say about maybe 75 feet from the driveway,

6    when I was driving up to --

7    Q     From the road?

8    A     On the roadway, yes.

9    Q     Okay.  And the driveway is how long?

10   A     Roughly a hundred thirty feet.

11   Q     Okay.  All right.  So as you approached the house

12   about 75 feet did you say you were away?

13   A     That's right.

14   Q     You could hear loud music?

15   A     That's correct.

16   Q     About that same volume?

17   A     It was a little less than that.

18   Q     Okay.  All right.  Proceed.

19            (Video played)

20   Q     Now, who is speaking to you like that?

21   A     That is the plaintiff, Ronald Georgia.

22   Q     Did you know who that was at the time?

23   A     No, I did not.

24   Q     Okay.  And -- okay, proceed.

25            (Video played)

1   Q      Okay, now, did you know this man who was approaching

2   you?

3   A      Yes, I saw that he was approaching me.

4   Q      Did you know who he was?

5   A      No, I did not.

6   Q      Was he the only person you saw there at the time?

7   A      That's correct.

8   Q      Okay.  And he approached you somewhat closely as shown

9   in this still picture.  Is that right?

10  A      That's correct.

11  Q      How far away was he from you when he approached you

12  like this?

13  A      I would say about one foot away from me.

14  Q      Now, so you're wearing a camera of some sort.  Is that

15  right?

16  A      That's correct.

17  Q      And where was it -- if you could stand up and just

18  show us with your fingers where it was located?

19  A      The camera was located about right here, I would say

20  six inches from the bottom of my neck.

21  Q      Okay, right along the middle portion there.  Is that

22  fair to say?

23  A      That's correct.

24  Q      All right.  Was this unusual or usual for you?

25  A      This was unusual for me.

1    Q      In what way?

2    A      For an individual to walk up onto a police officer and

3    start yelling at them and getting extremely close to a

4    police officer, I find very unusual.

5    Q      How were you attired that night?

6    A      Can you -- can you repeat?  Sorry, I didn't hear.

7    Q      What were you wearing that night?

8    A      I was wearing a Tompkins County Sheriff's Office

9    uniform with a duty belt and an outer carrier vest.

10   Q      And did you have a badge or anything shown?

11   A      That's correct, the badge was on my outer carrier

12   vest.

13   Q      On your left side?

14   A      That's correct.

15          (Video played)

16   Q      Now, you can see a hand come out and touch him.  Did

17   you see that?

18   A      Yes.

19   Q      Whose hand is that?

20   A      That's my hand.

21   Q      What were you doing?

22   A      I was trying to push Mr. Georgia away from me.

23   Q      Why were you doing that?

24   A      He was way too close to me, and I felt that he may

25   harm me if he's that close to me.

1    Q    You didn't know this man at all, did you?

2    A    No, I did not.

3    Q    You were there a few minutes, right?

4    A    That's correct.

5    Q    He was using foul language with you.  Is that right?

6    A    That's correct.

7    Q    Would you say he was aggressive or not aggressive?

8    A    I would say he was aggressive.

9    Q    Now, you used the right hand to push him?

10   A    Can we replay the video at that point?

11            (Video played)

12   Q    Did you see that?

13   A    Yes, I did.

14   Q    Okay.  Did that cause you concern?

15   A    Yes, it did.

16   Q    Why did it cause you concern?

17   A    Because this individual who I don't know is walking up

18   aggressively, swearing at me, and getting way too close to

19   me.

20   Q    And you knew him at that point for just minutes.  Is

21   that right?

22   A    I would say seconds.

23   Q    All right.  Okay.  How is his gait as he walked when

24   he had first got up and approached you?

25   A    He was -- I could tell he was slightly unsteady.  He

1    used the tower speaker to -- for balance as he was walking

2    up towards me.

3    Q    What kind of speaker was it?

4    A    It was a, I believe it's like a four-foot or

5    three-foot tower speaker.

6    Q    Okay.  And is that what was producing the music and

7    the noise?

8    A    Yes, that's what I observed.

9    Q    So when you put your hand on him, when you pushed him

10   back, what happened after that?

11   A    He stepped back, or he got back after I pushed him

12   back, and tried to talk to him, and --

13   Q    Okay, we can play some more video.

14        (Video played)

15   Q    Now, was his position close to you or about the same

16   distance when you first pushed him away?

17   A    It was about the same distance.

18   Q    So he came right back at you.  Is that right?

19   A    That's correct.

20   Q    Did you have training in the police academy about

21   letting people come close enough to you like that?

22   A    Yes, we do.

23   Q    What's the training?

24   A    It's our defensive tactics training.

25   Q    It's what?

1    A      Our defensive tactics training.

2    Q      Okay.  What are you taught about that?

3    A      If someone gets too close to you or in your space, you

4    push them with your two hands in the upper chest and say get

5    back.

6    Q      And where did you get that training?

7    A      In the police academy, the Southern Tier Law

8    Enforcement Academy.

9    Q      Proceed, if you would.

10          (Video played)

11   Q      How far away is he from you at this time?

12   A      Again I would say he's probably the same distance as

13   the first time that I pushed him back.

14   Q      Which is about what?

15   A      I would say about one foot away.

16   Q      Okay.  Now, can you -- let's digress for a moment from

17   the tape, or the video.  Can you tell us what kind of

18   equipment you carry that night?

19   A      Yes.  I carry a radio to communicate to my dispatch

20   center and to other officers.  I carry a -- I carry pepper

21   spray.  I carry extra magazines for my handgun.  I carry a

22   handgun, which is a Glock handgun.  I'm not sure if it was a

23   .9 millimeter or a .40 caliber at the time.  I also carry a,

24   did I say Taser?

25   Q      No.

1   A     Okay.  We carry a Taser.  I believe it was a

2   Taser X26P model.

3   Q     Do you carry any nightsticks?

4   A     No.

5   Q     Do you know what a nightstick is?  It's wooden and

6   about yea long?

7   A     Yes, I do know what a nightstick is.

8   Q     Do you carry any other devices, like something you

9   could pull out and hit somebody?

10  A     No.

11  Q     What do you carry in order to defend yourself person

12  to person?

13  A     I carry a Taser, I carry pepper spray, and I carry a

14  handgun, and I also have my hands.

15  Q     Your hands.

16  A     Yeah.

17  Q     And are you taught in the academy about the hands?

18  A     I am, yes.

19  Q     All right.  So in lieu of having the equipment you

20  don't carry, you're taught to use your hands.

21  A     That's correct.

22  Q     What's the purpose of putting the hands on the person?

23  A     It's a low level of force.  We're not jumping up to a

24  higher level of force with a Taser, pepper spray, or

25  firearm, so we're just going to the hands first.  It's

1    readily accessible to --

2    Q    What's your training about the hands?  Are you

3    supposed to push him to the ground or just push him away

4    from you?

5    A    You're supposed to push him away from you.  Some

6    situations may suggest to push him to the ground if need be,

7    but, in this situation I just wanted him to get away from

8    me.

9    Q    And what were you afraid of?

10   A    I was afraid that I may be assaulted as a person.  I

11   don't know who this person is, so I just wanted him to get

12   away from me.

13   Q    Now, how long have you been a deputy?

14   A    At this incident, or at this time?

15   Q    As of today.

16   A    Oh, as of today?  I've been a deputy for coming up on

17   5 years, so 4 years and a few months, or 4 years about 11

18   months.

19   Q    And when were you promoted to sergeant?

20   A    I was promoted to sergeant in 2021, May of -- May 2nd

21   of 2021.

22   Q    And what were you taught, if anything, about throwing

23   somebody to the ground?

24   A    To use the only amount of force necessary to

25   accomplish your task.

1    Q      And when you put your hands on this man, the

2    defendant -- the plaintiff, rather, and pushed him back from

3    you, you thought that was the right level of force?

4    A      That's correct.

5    Q      Did he fall down at that time?

6    A      No, he did not.

7    Q      Can you go forward?

8           (Video played)

9    Q      How large is the population of Tompkins County, would

10   you estimate?

11   A      It's a little over a hundred thousand people.

12   Q      And how many deputies are there in the county?

13   A      On this night?

14   Q      Yes.

15   A      There was three deputies working, myself included, as

16   well as a road patrol sergeant, so four county employees,

17   employees working the road that night.

18   Q      How many -- are you familiar with the state police,

19   how they patrol Tompkins County, and did --

20          MR. KOPKO:  Your Honor, I object.  I object.

21          THE COURT:  Mr. Kopko, hold on.  Hold on.  Use the

22   microphone.

23          Go ahead, Mr. Kopko.

24          MR. KOPKO:  I object to this on grounds of

25   relevance and how many officers are on patrol, how many

1    state police troopers are on patrol.  That's not relevant to

2    any of the issues that's before the Court.

3              THE COURT:  Okay.  Mr. Troy?

4              MR. TROY:  Your Honor, it's a question of whether

5    this man was acting reasonably or not.  And part of that

6    function is what resources do I have available if I get into

7    trouble.  I think it's a fair question.

8              THE COURT:  Okay.  So, Mr. Troy, you believe it's

9    relevant to -- for this officer to testify as to what kind

10   of backup resources --

11             MR. TROY:  Right.

12             THE COURT:  -- he had or did not have available

13   and how that may lend itself to his perception of the

14   situation and whether or not he needs to be in fear or not

15   be in near.

16             MR. TROY:  Exactly right.

17             THE COURT:  All right.  Mr. Kopko, does that make

18   sense?

19             MR. KOPKO:  Your Honor, it does, but I have a

20   further objection about the state police.  There's no

21   foundation that he knows what was going on with the state

22   police on that occasion.

23             MR. TROY:  I can fix that, Judge.

24             THE COURT:  Well, yeah.  I'm going to allow it,

25   Mr. Kopko.  First take it in order.  I believe law

1    enforcement, this witness and others in an area, I think

2    it's fairly easily concluded that they work in tandem and

3    the state police, the sheriff's department, and the city

4    polices all know who's where, how many are on duty, because

5    as -- as it happens in upstate, we all know that they rely

6    on each other's assistance at times.  So I don't think

7    that's really an issue.  And I do think Mr. Troy has a

8    point, which is he's trying to simply establish whether or

9    not -- and you can cross-examine, Mr. Kopko.  He's trying to

10   establish whether or not it was reasonable or unreasonable

11   for this officer at that time to have a fear or not.  So,

12   for example, if this officer were to say oh, there were 75

13   deputies on duty that night and 8 of them were down the

14   road, well, that might be a different picture than if

15   there's only 2 other deputies somewhere in the county, so.

16   I think it makes sense.  And most importantly I don't see

17   any prejudice to either side with this information, so.

18          Go ahead, Mr. Troy.

19   BY MR. TROY:

20   Q    So you're familiar with the state troopers on the

21   night shifts, how they work?

22   A    I am.

23   Q    Back around that time, what was their procedure,

24   covering the county?

25   A    At midnight they pair up, so two troopers are in one

1   car.  Most of the time.  Can't say if a hundred percent or

2   not, but most of the time they pair up around -- they meet

3   at SP up on Dryden Road at around 11:30 --

4   Q    So --

5   A    -- at night.

6   Q    So you're familiar with how the state police make

7   themselves available in the county.  Is that fair to say?

8   A    Yes.

9   Q    What did you understand your resources to be about 11

10  or 12:00 that night when you were at this man's house?

11  A    I believe my resources was I had one other sheriff's

12  deputy unit because the third sheriff's deputy unit was

13  going to be patrolling the whole west side of the county,

14  and I was covering the portion of the east side of the

15  county.  So my backup was another sheriff's deputy, my

16  sergeant if he needed to respond as well, and possibly one

17  car state police unit with two troopers inside of that car.

18  Q    Knowing that, were you concerned about what was going

19  on at this house?

20  A    Yes, I was.

21  Q    What was your concern?

22  A    That my backup was most likely at the Tompkins County

23  Sheriff's Office.

24  Q    And how far away was that, if you?

25  A    From this residence driving at normal speeds I would

 1  say around 12 to 15 minutes.

 2  Q      You didn't know this man.  Is that fair to say?

 3  A      That's correct.  Yes.

 4  Q      You had no idea what his background was?

 5  A      That's correct.  I have no idea.

 6  Q      All right.  So can we go forward?

 7         (Video played)

 8  Q      Now, you just used the word ass in reference to this

 9  man.  Is that right?

10  A      That's correct.

11  Q      You raised your voice.

12  A      Correct.

13  Q      Just generally?  Have you done that with other people

14  before this?

15  A      I have, yes.

16  Q      What were the circumstances?

17  A      They would also -- or they would initiate that kind of

18  behavior, raising their voice and swearing at me, and I

19  tried to get on and talk on their level to get their

20  attention and to hopefully de-escalate the situation.

21  Q      Okay.  How many times before this event had you used

22  that strategy?

23  A      I can't say for certain how many times but I would say

24  at least a couple.  Two.  At least two times.

25  Q      What was the success or failure rate on that?

1  A     Both times were successful, if I can remember.

2  Q     Successful being calmed down?

3  A     Yeah, they would calm down, and I would be able to

4  talk to them like a normal conversation, adult conversation.

5  Q     All right.  And I'm asking you to look at the still

6  film as it is right now.  How far would you estimate he is

7  standing from you?

8  A     At that distance I would estimate that he's about

9  three feet, three or four feet away from me.

10 Q     And did you notice anything about any smell of liquor

11 on him?

12 A     Yes.  I could smell a strong odor of an alcoholic

13 beverage emanating from his breath.

14 Q     How far away was he from you when you first smelled

15 that?

16 A     When he was about one foot away from me at first, the

17 first --

18 Q     Did you start to have concerns at that point about

19 your safety?

20 A     Yes.

21 Q     What were those concerns?

22 A     I did.  My concerns was this individual is highly

23 intoxicated, he immediately approached me, which I thought

24 was very abnormal.  Started yelling at a obvious law

25 enforcement officer and -- and swearing at me.  So I --

1  that -- those were my concerns that he could be assaultive

2  toward me.

3  Q    We're not talking about what you feared, it was what

4  you were concerned with that point.  Is that fair to say?

5  A    Yes, that's fair.

6  Q    Can you please?

7        (Video played)

8  Q    Again you're using language like fucking.  Is that

9  common for your use?

10  A    No, it's not.

11  Q    Why were you using it here?

12  A    I was using it here to try to talk on Mr. Georgia's

13  level to show that I'm not just going to let him try to --

14  continue him speaking to me that way.  I was attempting for

15  him to stop speaking to me that way, and.

16  Q    Well, was it just his speech that were concerning to

17  you or something else?

18  A    No, it was also his body language, the distance he was

19  to me, and --

20  Q    How far is he from you in this still photo?

21  A    I would say he's about three feet away from me.

22  Q    Okay.  All right, proceed.

23        (Video played)

24  Q    So what's happening here?  This is a dark picture, I

25  just want to make sure we have it described well.

1  A      Yep.  Mr. Georgia's asked me if I wanted to arrest

2  him, and that he offered to put his hands behind his back.

3  At that point I took my opportunity to try to detain this

4  individual so that I could hopefully calm the situation

5  down, and I knew that I would be safe at that point, so I

6  tried to handcuff him to detain him for my safety.

7  Q      Now, you say you handcuffed him for -- detained him

8  for your safety.  Were you arresting him or were you just

9  trying to get him under control for your protection?

10  A      I was just trying to get him under control for my

11  protection.

12  Q      What are some of the things you were worried about?

13  A      I was worried that he could possibly strike me with

14  his fist, kick me, knock me down, and maybe take one of my

15  weapons that are on my duty belt.

16  Q      And what caused you to have that thought about this

17  man?

18  A      Just because of his actions, how he was talking to me,

19  how close he kept getting to me, and just his demeanor, his

20  angry demeanor.

21  Q      If I'm hearing correctly, he said okay, you can arrest

22  me, and turned around and gave his hands behind his back?

23  And then what happened?

24  A      When I tried to place the handcuffs on him, he

25  immediately ripped his hands out from behind him, turned

 1 | around to face me.
 2 | Q      And proceed.
 3 |            (Video played)
 4 | Q      How often in your career have you had somebody like
 5 | this wanting to dance with you?
 6 | A      I can't think I've had anybody in my career.
 7 | Q      What you were thinking about when he asked that?
 8 | A      This was also again worrisome for myself how
 9 | unpredictable Mr. Georgia was being.
10 | Q      Was it weird, to use that word?
11 | A      Yes.
12 | Q      Proceed.
13 |            (Video played)
14 | Q      So did I hear that he's going to fuck you up?
15 | A      Yes.
16 | Q      What did you take that to suggest to mean?
17 | A      I took that that he was would assault me.
18 | Q      So you're 4 minutes and 39 seconds or so into this
19 | encounter, he's already threatened to fuck you up.  Is that
20 | fair to say?
21 | A      Yes.
22 | Q      All right.  Had you ever experienced that before?
23 | A      No.
24 |            (Video played)
25 | Q      What are you doing there in that scene?

1    A      I'm trying to call my sergeant, who is Sergeant Vann.

2    Q      Where was he, he was on patrol?

3    A      Yeah, I'm assuming he was at the sheriff's office.

4    Q      What were you looking to do if you reached him?

5    A      I was looking to get some guidance because I was

6    unsure what to do in this situation.

7    Q      You never really encountered anything quite like this.

8    Is that right?

9    A      That's right.

10   Q      And you sought the aid and assistance of a supervisor.

11   Is that right?

12   A      That's correct.

13   Q      And to do that you stepped away from him.  Is that

14   right?

15   A      That's correct.

16   Q      Okay.  Go ahead.

17          (Video played)

18   Q      Now, there's a phone being shown.  It looks like a

19   name on it.  What name is on it?

20   A      The name is James Vann.

21   Q      That's your sergeant?

22   A      That's my sergeant, correct.

23   Q      So you're trying to talk to him, and now are you being

24   interrupted by this man?

25   A      Yes.

1          (Video played)

2    Q     All right, so we're going to talk about what just

3    happened.  Were you walking backwards at that point?

4    A     I was walking -- trying to walk towards VanOstrand

5    Road.

6    Q     Do you know to where?

7    A     The end of the driveway.

8    Q     So you were trying to walk down.  What were you going

9    to do if you -- if you got there?

10   A     I was just going to try to get ahold of my sergeant

11   and get guidance.

12   Q     So as you're trying to walk down there, he comes up to

13   you and does what, if anything?

14   A     He comes up and stands very close behind me, yelling,

15   get the fuck off my property, or walk down my driveway.

16   Q     Okay.  And you were sort of heading down towards the

17   street so you could call the sergeant.  Is that right?

18   A     That's correct.

19   Q     Is it fair to say you had never encountered anything

20   quite like this?

21   A     That's correct.

22   Q     Had it ever been taught at the police academy to you?

23   A     Not for this situation, no.

24   Q     Okay.  Proceed.

25          (Video played)

1    Q    All right, now what just happened there, 'cause it's

2    very dark?

3    A    I pushed Mr. Georgia twice backwards.

4    Q    And how did you do it, which hands did you use?

5    A    I used both of my hands and I pushed the upper part of

6    his chest backwards.

7    Q    Is that something you had done earlier?

8    A    Yes.

9    Q    Both hands?

10   A    That's correct.

11   Q    That's what you were trained to do?

12   A    That's correct.

13   Q    And they actually gave you lessons where you learned

14   how to push people in a safe way?

15   A    That's correct.

16   Q    Okay.  Did you push him intending to knock him down or

17   just to have him step back?

18   A    I pushed him to just get him back away from me.

19   Q    Now, during the time leading up to this, you had a

20   chance to watch how he was moving with his legs.  Did he

21   seem to be moving freely or did he seem to be unsure of

22   himself as he was moving around?

23   A    I don't really recall, but from the video footage it

24   looks like he was having -- wasn't walking like a normal

25   human being would walk.

1  Q      So what was your fear factor at this point?

2  A      That Mr. Georgia kept approaching me from behind, and

3  at that point I realized that this was a very dangerous

4  situation and --

5  Q      You say approaching from behind.  What had happened

6  that you -- that you were ahead of him and he was behind

7  you?

8  A      I was trying to walk away from Mr. Georgia to call my

9  sergeant.

10 Q      And then he came up to you and went into your space,

11 to use that term?

12 A      That's correct.

13 Q      Were you expecting that?

14 A      No, I was not.

15 Q      So you were surprised?

16 A      Yes, I was.

17 Q      You were concerned?

18 A      Yes.

19 Q      And you used your training to use your two hands just

20 to push him back?

21 A      That's correct.

22 Q      Was it your intent to have him fall to the ground?

23 A      No.

24         (Video played)

25 Q      Now, what are you trying to do here?

1    A      I'm trying to place Mr. Georgia in handcuffs behind

2    his back.

3    Q      And for safety reasons?

4    A      That's correct.

5    Q      And you have something in your left hand.  What's

6    that?

7    A      That is my pepper spray.

8    Q      You had testified about that yesterday, and you were

9    asked questions about whether you actually engaged it and

10   sprayed anybody with that.  Did you?

11   A      No, I did not.

12   Q      Had you done that, who would have been sprayed?

13   A      Mr. Georgia would have been sprayed.

14   Q      You could have been sprayed too, right?

15   A      That's correct.

16   Q      Is that what you wanted, to be incapacitated with that

17   with this man?

18          MR. KOPKO:  Your Honor, I object to that, your

19   Honor, he was not sprayed.  I mean we're getting speculative

20   about Davenport spraying himself.

21          THE COURT:  No, I -- I think he's -- I think

22   Mr. Troy's asking this officer, one, whether he's sprayed or

23   not, and also why he did or didn't, and explaining the

24   scene.  I don't think it's speculative because we're getting

25   it from this witness, who's saying this is what I did, this

1    is what I didn't do, and this is why.  And then, lastly,

2    Mr. Kopko, you can cross-examine on this same topic, but I

3    think Mr. Troy is just taking the officer step by step

4    through what he did, why he did it, or why he didn't do it.

5    So.

6    BY MR. TROY:

7    Q    Had he engaged in any other conduct that made you

8    worry up to the point of pushing him where he fell to the

9    ground?

10   A    No.

11   Q    How about his hands, did you notice anything about his

12   hands?

13   A    I did notice that his hands at a few points were,

14   whether one was clenched or not I can't remember but I

15   remember that one, one or two were clenched at a couple

16   points in our interactions before I pushed Mr. Georgia.

17   Q    And when you say clenched, and you saw that, where did

18   you see his hands?

19   A    Down by his side.

20   Q    Now, is that shown on your video?

21   A    It might be.

22   Q    On your device, rather.

23   A    It might be, I'm not sure.

24   Q    Have you looked?

25   A    I have.

1   Q     Okay.  And you're not sure if it's clear?

2   A     I'm not, no.

3   Q     Okay.  But you were concerned that you thought you saw

4   him clenching his fist, one or more fist?

5   A     That's correct.

6   Q     At this point you heard him say he was going to fuck

7   you up, correct?

8   A     That's correct.

9   Q     He touted his Marine Corp experience, right?

10  A     I don't recall that.

11  Q     And did your concern level go up or down at this point

12  when he came up to you, when you were trying to talk to --

13  A     My concern level was very high.

14  Q     Which way were you facing when he approached you?

15  A     I was facing I believe towards the northwest.

16  Q     So down the driveway at an angle?

17  A     That's correct.

18  Q     Were you expecting him to come upon you like that?

19  A     No, I was not.

20  Q     And you reacted, according to your training, with both

21  hands.  Is that right?

22  A     That's correct.

23  Q     Did you intend then or at any other time to push him

24  down and throw him on the ground?

25  A     No.

1    Q      Proceed, please.

2            (Video played)

3    Q      Now, you have the spray, the pepper spray, in your

4    left hand.  Right?

5    A      That's correct.

6    Q      Okay.  And what were you trying to do with that?

7    A      I was trying to have it ready so that maybe he would

8    loosen up his muscles so that I could get his hands behind

9    his back so the threat to use pepper spray if he would

10   provide me his hands.

11   Q      So you didn't want to use the pepper spray but you had

12   it if it was necessary.

13   A      That's correct.  And also if he was going to try and

14   assault me or while I was trying to handcuff him.

15   Q      Did there come a time when you put your pepper spray

16   away without using it?

17   A      Yes, I did.

18   Q      Why did you do that?

19   A      I felt Mr. Georgia's muscles loosen up, and I was able

20   to put the pepper spray away to move his hands to the small

21   of his back.

22   Q      So he relaxed.

23   A      That's correct.

24   Q      You took that as he's not fighting now.  Is that

25   right?

1   A       That's correct.

2   Q       And you put the pepper spray away.

3   A       Correct.

4   Q       Then you went and took steps just to handcuff him so

5   he could not hurt you.  Is that fair to say?

6   A       That's fair to say, yes.

7               (Video played)

8   Q       What was that musical noise?

9   A       That is my phone ringing.

10  Q       Who was calling you, could you tell from the phone?

11  A       No, the phone was in my pocket, but I -- I believe I

12  did get a missed call from Sergeant Vann.

13  Q       Okay.  Go ahead.

14              (Video played)

15  Q       How is his demeanor there, more calm?

16  A       Somewhat calmer, yes.

17  Q       Okay.  Physically calmer but not -- not verbally?

18  A       He was somewhat verbally, he was verbally a little

19  more calmer, yeah.

20              (Video played)

21  Q       Did you throw him down on his property, yes or no?

22  A       No.

23  Q       How -- were you -- if I understand, you turned and

24  pushed him?

25              THE COURT:  Mr. Troy, just use the microphone,

1    because --

2              MR. TROY:  Sorry, Judge.

3              THE COURT:  -- if I can't hear you, I know the

4    court reporter can't hear ya.

5              MR. TROY:  I don't want to do that.

6    BY MR. TROY:

7    Q     So you pushed him in such a way that he moved away

8    from you.  Is that right?

9    A     That's correct.

10   Q     Approximately how many feet?

11   A     I would say about seven to ten feet away.

12   Q     And that's the farthest he was away from you that

13   evening up until that point.

14   A     That's correct.

15   Q     And you felt the safest at that point.

16   A     That's correct.

17   Q     And you weren't looking to hurt him, were you?

18   A     No, I was not looking to hurt Mr. Georgia.

19   Q     So do you get the handcuffs on him?

20   A     I did.

21   Q     And they were rear handcuffs or the front?

22   A     Rear.

23   Q     Is that department procedure?

24   A     Yes.

25   Q     Okay.

1              (Video played)

2    Q      There was a screen or a camera of some sort, or a

3    phone.  Did you see that?  Was that you taking the phone out

4    of your pocket?

5    A      Yes, it was.

6    Q      And who was that trying to call you?

7    A      Sergeant Vann.

8    Q      Did you speak to him?

9    A      I did speak to him.

10   Q      What'd you ask him to do?

11   A      I asked him to respond over because I had an

12   individual in custody.

13   Q      Okay.

14             (Video played)

15   Q      Now, is that dead?

16   A      It's muted at that point.

17   Q      Why was it muted?

18   A      Because I was speaking with Sergeant Vann.

19   Q      Oh, okay.  Is that -- does department procedure allow

20   you to do that?

21   A      I don't recall right now.  Our new updated body cam

22   policy does not allow us to do that.

23             (Video played)

24   Q      But the old rules might have allowed it, right?

25   A      It may have.  I don't recall.

1    Q     Okay.  Right.

2          (Video played)

3    Q     When he says let go of me, what were you doing to him?

4    A     I had my hand on the top of his I believe right

5    shoulder.

6    Q     Okay.  What was the purpose of that?

7    A     So he wouldn't fall over one way or another.  He was

8    seated on his butt.

9    Q     On the ground?

10   A     Yes.

11   Q     All right.

12         (Video played)

13   Q     What just happened there?

14   A     Mr. Georgia just kicked his cooler.

15   Q     Okay.  Okay, with his bare foot?

16   A     It looks like he had a sandal on and it fell off.

17         (Video played)

18   Q     What's that light that was flashing?

19   A     That was my flashlight.

20   Q     To alert the sergeant where you were?

21   A     Yes.

22         (Video played)

23   Q     Who has just arrived?

24   A     That would be Sergeant James Vann.

25   Q     And what's happening now?

1  A      Sergeant Vann and I are on either side of Mr. Georgia

2  and we're walking him down his driveway towards our patrol

3  cars.

4  Q      Were you dragging him?

5  A      No, I was not dragging him.

6  Q      Were you carrying him?

7  A      No, I was not carrying him.

8  Q      He was walking as you described.

9  A      That's correct.

10 Q      He wasn't complaining about walking.  Is that fair to

11 say?

12 A      That is fair to say.

13         (Video played)

14 Q      Does he have difficulty understanding as he was

15 walking along there?

16 A      Yes.

17 Q      What was he saying, from what you knew?

18 A      I don't know.

19 Q      You have years dealing with people who are

20 intoxicated, is that right, years of experience?

21 A      That's correct.

22 Q      In the DWI settings and the like?

23 A      That's correct.

24 Q      At this point did you form an opinion about whether he

25 had consumed excess alcohol that night?

DAVENPORT - DIRECT                          60

1   A      I did.

2   Q      What was that opinion?

3   A      That he was highly intoxicated due to consumption of a

4   large amount of alcoholic beverages.

5           (Video played)

6   Q      Did that cause you to make sure he was handcuffed and

7   walking to the car?

8   A       Yes.

9           (Video played)

10  Q      Now what's happening here?

11  A      I muted my body camera to tell Deputy Murray, who just

12  arrived on scene, and Sergeant Vann about what just

13  happened.

14  Q      What were the regulations for the sheriff's department

15  in terms of muting your machines?

16  A      If I'm out of public's -- if I'm not dealing with a

17  member of the public and I'm just interacting with fellow

18  officers, then I can mute the body camera.

19  Q      Go ahead.  See, it's going.

20          (Video playing)

21  Q      While we're looking at this playing, what were you

22  telling them, in sum and substance?

23  A      I was telling them that when I arrived on scene for

24  this noise complaint only one individual came up to me and

25  was being very aggressive.  He approached me several times,

1   told him to get back.  Never did.  Then when I pushed him

2   the second or third time he was right behind me when I was

3   trying to call for James' assistance, or, sorry, Vann's

4   assistance, and pushed him back twice and the third time

5   where he fell to the ground, then placed him in handcuffs

6   and made a decision to arrest him for obstructing

7   governmental administration.

8           (Video played)

9   Q    Now, is your mic on now?

10  A    No, it's not.

11  Q    What were you doing at that point?

12  A    Right now I was letting my dispatch center know that I

13  had one male in custody and that I was going to be

14  transporting him from 791 VanOstrand Road to the Tompkins

15  County Sheriff's Office and I was providing them with my

16  starting mileage.

17          (Video played)

18  Q    For the record, can you tell us where this is taking

19  place, what we're seeing here?

20  A    Yeah, this scene is outside of Tompkins County

21  Sheriff's Office.

22  Q    The ride you just took was from plaintiff's home to

23  the sheriff's department.  Is that right?

24  A    That's correct.

25          (Video played)

```
 1  Q    That is this tape?  That's the ending of the drive to
 2  the sheriff's office?
 3  A    That's correct.
 4  Q    Okay.  Now, is there another video that shows us from
 5  the sheriff's office to the hospital?
 6  A    Yes, there is.
 7             MR. TROY:  It's P-16 I'm told, your Honor.  Is
 8  that it?
 9             (Video played)
10             MR. TROY:  This is -- for the record, I'm
11  beginning to show Exhibit P-16, which covers the ride from
12  the sheriff's office to the hospital.
13             THE COURT:  Okay.  So we have Exhibit 16 now.
14             (Video played)
15  BY MR. TROY:
16  Q    Now, he says I don't want to go to the hospital, I
17  just want to go home.  Is that an option for you?
18  A    No.
19  Q    Why not?
20  A    I believe that Mr. Georgia was highly intoxicated and
21  unable to care for himself and was a potential danger to
22  himself or others.
23  Q    And what does that occasion?
24  A    That's covered by the New York State Mental Hygiene
25  Law, 22.09.
```

1   Q      Okay, what does that provide in general, that people

2   intoxicated like that must be taken to hospital?

3   A      If there's nobody to care for them.

4   Q      And as you were there, you didn't know of anybody to

5   care for him.  Is that right?

6   A      That's correct.

7            (Video played)

8   Q      Now, what happened here?

9   A      I muted my body camera.  It may have been an accident,

10  I don't recall.  But I don't know why I would have muted it.

11  Q      There's a few seconds of talking to the other officer.

12  Is that right?

13  A      That's correct.

14           MR. TROY:  For the record, your Honor, this is

15  about 22 and a half minutes long, this current film.

16           THE COURT:  Okay.

17           MR. KOPKO:  If he's going to show that, Judge, may

18  I take a brief break here?

19           THE COURT:  Yeah, let's take a few-minute break

20  before, stretch your legs and use restrooms, okay?

21           (Recess taken)

22           THE COURT:  All right.  We're back on the record

23  after a very short, brief recess.  And, Mr. Troy, you may

24  continue.

25           MR. TROY:  Continue.

1          (Video played)

2          MR. TROY:  Stop for a minute.

3    BY MR. TROY:

4    Q    Now, sir, the picture's gone black here.  This is a

5    car pulling away.  Do you see that?

6    A    Yes, I do.

7    Q    What seems to have happened?

8    A    It looks like the seat belt when I put it on covered

9    the camera lens.

10   Q    Okay, can you hear, though, through the machine?

11   A    Yeah, once the audio kicks back on.

12   Q    Okay.  And this is taking the plaintiff from the

13   sheriff's office to the hospital.  Is that right?

14   A    That's correct.

15   Q    Okay.

16        (Video played)

17   Q    Are you in the same police car you were in earlier?

18   A    That's correct.

19   Q    And you're heading to the Tompkins Community Hospital?

20   A    I was heading to Cayuga Medical Center.

21   Q    Cayuga Medical Center.

22   A    Yeah.

23   Q    Okay.

24        (Video played)

25   Q    How long is the ride usually from the sheriff's

1  department to CMC?

2  A     It's about 12 to 13, 14 minutes.

3            (Video played)

4  Q     What is that noise?

5  A     I have no idea.

6            (Video played)

7            MR. TROY:  Your Honor?

8            THE COURT:  Yes.

9            MR. TROY:  I can represent to the Court I've

10 watched this.  I have never heard this noise before.  This

11 was the --

12           THE COURT:  The crackling?

13           MR. TROY:  Yes.  It's been suggested that the

14 noise is in here.  I'm not blaming anybody.

15           THE COURT:  I think it could be correct because

16 when you folks submitted the exhibits, I did watch the

17 submitted exhibits, or some of them, I should say, some of

18 the video, and the same crackling is not there, so.  It

19 could be our system the way the sound is inputted.  That

20 being said, you're welcome to play any of these videos here

21 today, but keep in mind the Court will review these again,

22 because it's all in evidence.

23           MR. TROY:  We understand that.  I just wanted to

24 represent I don't know where this is coming from.

25           THE COURT:  I agree with you, because I did review

 1   some of the video, especially the other video that we

 2   watched which was Exhibit 14, and there was some crackling

 3   in that too that you don't hear when you play it on a

 4   computer.  On the computer alone, so.

 5              MR. TROY:  All right.

 6              THE COURT:  It's a long way of saying I think

 7   you're correct.

 8              (Video played)

 9   BY MR. TROY:

10   Q     What is he doing in the video there?

11   A     He's peeing on the floor.

12              (Video played)

13   BY MR. TROY:

14   Q     What just happened there?

15   A     I turned my body camera off.

16   Q     Why did you do that?

17   A     Because we were in a patient care center of the

18   hospital, and they have a right to privacy.

19   Q     And that's your procedure at the sheriff's department?

20   A     That's correct.

21   Q     All right.  Now, Deputy, did you intend at any time to

22   harm the plaintiff here?

23   A     No.

24   Q     What were you concerned about in addressing the

25   plaintiff?

DAVENPORT - CROSS                    67

1   A      I was concerned about my safety, the safety of anybody

2   else who came onto the property of Mr. Georgia.

3   Q      What could have happened if you had left?

4              MR. KOPKO:  I object to that, your Honor.

5              MR. TROY:  I withdraw the question.  I withdraw

6   the question.

7              THE COURT:  Okay.

8   BY MR. TROY:

9   Q      You were concerned about your own well-being at that

10  point, right?

11  A      That's correct.

12  Q      And were you concerned about neighbors who might have

13  been in a similar situation?

14  A      Yes.

15  Q      Who wouldn't have tools and the training you have to

16  protect themselves?

17  A      That's correct.

18             MR. TROY:  And I have nothing further, your Honor.

19             THE COURT:  All right, Mr. Troy.  Thank you.

20             Mr. Kopko, are you ready to examine?

21             MR. KOPKO:  Yes, your Honor.

22             THE COURT:  Okay.  You may proceed.

23                         CROSS-EXAMINATION

24  BY MR. KOPKO:

25  Q      Now, Deputy, we talked before about your knowledge of

1    making accurate police reports.  You remember talking about

2    that?

3    A      I do.

4    Q      And you knew that your supervisors would be reading

5    your reports?

6    A      Yes.

7    Q      And you wanted to have an accurate factual record

8    about what you saw and everything, right?

9    A      Correct.

10   Q      Now, when you were beginning your testimony this

11   afternoon, you said that you heard music 75 feet, 75 feet

12   before you came up to Georgia's house.  Right?  You never

13   made a record of that in your report.

14   A      No, I did not.

15   Q      You didn't mention that to anybody.  Right?

16   A      Correct.

17   Q      But now you remember 3 years and 10 months later that

18   it was 75 feet that you heard that.

19   A      Roughly, correct.

20   Q      Okay.  Deputy, you're just making this up as you go

21   along, aren't ya?

22   A      No, I'm not.

23   Q      Deputy, you -- you said that -- several times that you

24   were aware of other deputies that you could call, right?

25   You could call for assistance?

```
1    A      Correct.

2    Q      Right.  And you were aware of state troopers, correct?

3    A      Correct.

4    Q      And you were aware of a sergeant?  Correct?

5    A      Correct.

6    Q      And you -- what you're telling the Court is that you

7    were afraid for your safety, correct?

8    A      Correct.

9    Q      And you were concerned about your well-being, correct?

10   A      That's correct.

11   Q      Yeah.  But you never called anybody.

12   A      That's incorrect.

13   Q      You didn't talk to Sergeant Vann.

14   A      That's correct.

15   Q      You didn't make a radio call for help.

16   A      Yes, I did.

17   Q      And what did you say in the radio call?

18   A      Along the lines of can you send another unit.

19   Q      All right.  But you didn't say it in an urgent way.

20   A      That's correct.

21   Q      Right.  You were all casual about that, correct?

22   A      Correct.

23   Q      Yeah.  So when you're here telling the Court that you

24   were afraid for your safety that night, you weren't afraid

25   for your safety, were you?
```

1   A      No, I was afraid for my safety.

2   Q      You were the aggressor.  Correct?

3   A      No, that's incorrect.

4   Q      Do you remember getting the performance correction

5   notice about your behavior?

6   A      I do.

7   Q      And you remember that occasion?  Right?

8   A      I -- yeah, I never got that, but I remember the

9   meeting with Lieutenant Koskinen.

10  Q      You remember the meeting, right?

11  A      That's correct.

12  Q      And that's where your performance was being corrected,

13  correct?

14  A      That's correct.

15  Q      It reads, open quote:  I explained to Davenport that I

16  reviewed his body camera footage and it was clear to me that

17  Davenport was unsure about himself after repeatedly telling

18  Georgia you're under arrest for disorderly conduct but not

19  taking appropriate action to commence the arrest.  You agree

20  that you were unsure of yourself?

21  A      Yes.

22  Q      Okay.  In fact, you said that you were calling

23  Sergeant Vann for guidance, correct?

24  A      Yes.

25  Q      All right, you didn't know what you were doing, did

1    you?

2    A     I just wanted some clarification.

3    Q     I didn't ask you that.  You didn't know what you were

4    doing and you were calling Sergeant Vann for guidance.

5    A     That's correct.

6    Q     You didn't know what to arrest or anything like that,

7    correct?

8    A     That's correct.

9    Q     And then the lieutenant said that after reviewing this

10   that he considered your behavior to be unprofessional by

11   using profanity many times towards Georgia.  You now agree

12   with that, correct?

13   A     I do.

14   Q     That you were unprofessional.

15   A     Yes, that's correct.

16   Q     All right.  And you were also unprofessional in being

17   aggressive towards Georgia.  Correct?

18   A     No.

19   Q     You don't think so?

20   A     No.

21   Q     On the second page of this --

22            THE COURT:  Mr. Kopko, just for the record, what

23   exhibit number is it you're looking at?

24            MR. KOPKO:  This one's Exhibit 30, your Honor.

25            THE COURT:  30?  Okay.

1   BY MR. KOPKO:

2   Q      On the top of the page it says, open quote, I

3   explained to Deputy Davenport that if he was unsure if an

4   arrest was warranted, he could have just walked away from

5   the scene and contacted his supervisor.  You agree with

6   that, Deputy?

7   A      Yes, I do.

8   Q      So when you were there and Mr. Georgia was yelling at

9   you, you could have just walked away.  Correct?

10  A      I didn't think that at the time.

11  Q      At the time you didn't think that.

12  A      Correct.

13  Q      But now you know that that is the correct thing to do.

14  A      Correct.

15  Q      So between the time that you were there shoving

16  Mr. Georgia and screaming profanities at him and pushing him

17  over and arresting him, between that time and today, you

18  learned that that was inappropriate behavior, correct?

19  A      No.

20  Q      No?

21  A      Not all of that.

22  Q      Oh.  When did you learn that that was inappropriate

23  behavior?

24  A      Can you be more specific on what behavior you're

25  talking about?

1   Q      Yeah, when did you learn that using the profane

2   language was inappropriate?

3   A      I learned that I would say probably a year after this

4   incident.

5   Q      A year?

6   A      I would say, roughly.

7   Q      And what -- what happened that you learned that?

8   A      I don't know, I just -- this incident, I would say.

9   Q      I'm a little bit confused, Deputy.  It took you a year

10  to understand that your language was inappropriate?

11  A      Correct.

12  Q      What were you doing in that year to reflect upon your

13  behavior?

14  A      I felt that I was professional.

15  Q      Okay.  Did you take any courses about de-escalating?

16  A      No, I did not.

17  Q      Did you take any courses about appropriate

18  police/civilian conduct, contacts?

19  A      No, I did not.

20  Q      Did you consult with, say, Lieutenant Koskinen about

21  appropriate police conduct?

22  A      In the meeting that we had, yes.

23  Q      Okay.  But I'm talking about the year later when you

24  had this revelation.

25  A      No.

1    Q      Did you just wake up one morning and it dawned on you

2    that you were unprofessional?

3    A      No.

4    Q      How did it happen?

5    A      I feel like it happened over a course of time.

6    Q      Over a course of time.

7    A      Correct.

8    Q      Just time led you to believe that you were

9    unprofessional.

10   A      Yeah, time and experience.

11   Q      Time and experience.  Well, what was the experiences

12   that you had?

13   A      Just watching other police interactions throughout the

14   country.

15   Q      And then you came to the conclusion that you were

16   unprofessional.

17   A      That's correct.

18   Q      All right.  Now, Lieutenant Koskinen says that you

19   were unsure.  And you were unsure, correct?

20   A      That's correct.

21   Q      All right.  That you could have -- and his quotes,

22   he -- quotes, he could have just walked away, closed quotes.

23   You could have just walked away and none of this would have

24   happened, correct?

25   A      There's a possibility of that, yeah.

1  Q     No, Deputy, you could have just walked away, and none

2  of this would have happened.  Is that correct?

3  A     I -- that's a possibility, yeah.

4  Q     If you were not there, none of these events would have

5  happened.

6  A     Again, that's another possibility.  I don't know if

7  that's the case or not.

8  Q     Well, I'm asking you, Deputy, if you were not there,

9  do you agree that none of these events would have happened?

10  A     No, I don't agree.

11  Q     Well, who would have shoved Georgia?

12  A     I don't know.

13  Q     Who -- who would have handcuffed Georgia if you

14  weren't there?

15  A     I don't know.

16  Q     Nobody would have done it, correct?

17  A     Another officer if I wasn't there, maybe.

18  Q     But there was no other officer, Davenport, there was

19  no one.

20         If you had just walked away, none of this would

21  have happened.  Correct?

22  A     I don't know the answer to that question.

23  Q     You don't know that.

24  A     No.  It's a possibility.

25  Q     Well, let's talk about the possibilities.  Tell me all

1   of the possibilities that if you were not there, how this

2   could have happened.  Tell me the -- start with number 1.

3   We're going to write them down and talk about them.  Give me

4   the first possibility.

5   A     If I wasn't there, then another officer would get

6   dispatched to that call and would possibly do the same

7   actions that I did.  I don't know.  That's a possibility.

8   Q     You don't know that, Deputy.

9   A     I -- I -- exactly.

10  Q     Is that the only possibility that you can come up

11  with?

12  A     No.  If I walked away, a neighbor could respond over

13  to try to have Mr. Georgia turn the music down and they

14  could potentially be assaulted.

15  Q     Deputy, you're just fantasizing about this, aren't

16  you?

17  A     It's a possibility.

18  Q     A possibility.  Do you -- do you in your mind think

19  that there is any chance that that possibility could occur?

20  A     Yes.

21  Q     You do believe that?

22  A     I do.

23  Q     Now, it says here, Deputy, quote, Davenport agreed to

24  my advice.  Do you see that?

25  A     Yes.

1    Q      Now, the date on this is June 21st, 2019.  You see

2    that?

3    A      I do.

4    Q      So it wasn't a year after this that you had your

5    revelation, you -- you agreed 20 days later, correct?

6    A      Correct.

7    Q      So where are you coming up with this year business?

8    A      Just from watching like other body cam videos

9    throughout the country of officers interacting with the

10   general public really just set it in stone.

11   Q      Other officers in other video.  Right?

12   A      That's correct.

13   Q      But the lieutenant is recording that you agreed with

14   him on June 21st.

15   A      That's correct.

16   Q      You agreed that you should have just walked away.

17   A      That's correct.

18   Q      So, so when you're telling us about all of these

19   possibilities, it contradicts what you reported in this

20   report, that you agreed with the lieutenant, correct?

21   A      That's correct.  I agreed that I would walk away from

22   the property and investigate it further, not leave the whole

23   scene.

24   Q      It says, could have just walked away from the scene.

25   A      Okay.

1  Q      You understand what it says?

2  A      I understand what it says.

3  Q      And you agreed with what the lieutenant was telling

4  you, correct?

5  A      Correct.

6  Q      Now, I'll ask you here for the last time.  You agree

7  that all of this could have been avoided if you had just

8  done as the lieutenant advised you, correct?

9  A      Correct.  If I walked away from Mr. Georgia and to my

10  patrol car to investigate it further.

11  Q      I didn't get that last part.

12  A      To investigate it further.

13  Q      Yes.  Yeah.  And you agree that by staying there, you

14  were escalating this.

15  A      No.

16  Q      You pushed Georgia three times.

17  A      Correct.

18  Q      The last time you pushed him, you knocked him over.

19  If you had left the scene and gone to your patrol car, you

20  would have never knocked him over, correct?

21  A      No.

22  Q      How would he have gotten knocked over?

23  A      If I came back to arrest him with another deputy and

24  he wanted to resist or try to flee or something along those

25  lines.  And there's a possibility that he could have been

1    knocked over again.  Or for the first time, I should say.

2    Q    Deputy, you understand that none of that happened.  Do

3    you -- do you get that?

4    A    Yes, I do.

5    Q    Now, Deputy, and you turned off your body camera at

6    several times in these tapes.  Right?

7    A    Can you be more specific?  Did I turn the audio or the

8    video off?

9    Q    You turned off your -- your body camera.

10   A    No, I did not.

11   Q    You didn't turn off your body camera when you were

12   talking to Vann and the other deputy in the roadway?

13   A    No, I turned the audio off.  I muted the body camera.

14   But it was still --

15   Q    Oh, you turned off the audio.

16   A    That's correct.

17   Q    Okay.  And you try to be a conscientious police

18   officer, correct?

19   A    That's -- that's correct.

20   Q    And you try to do your job, correct?

21   A    Correct.

22   Q    And you know the tools of your job are following the

23   procedures, the policies, and the guidelines that are

24   published by the sheriff's department, correct?

25   A    That's correct.

1    Q      And you know that you have to follow those policies

2    and guidelines, correct?

3    A      Correct.

4    Q      And you have read those policies and guidelines so

5    that you can be competent in the performance of your duties,

6    correct?

7    A      That's correct.

8    Q      And you read the policy dealing with the video and the

9    body camera, correct?

10   A      That's correct.

11   Q      Did you read the part where it says, once recording --

12          MR. KOPKO:  This is Exhibit 33, your Honor.

13   BY MR. KOPKO:

14   Q      Once recording of an incident has begun, officers will

15   continue recording until, indented photograph ii, an

16   arrested subject has been transported to the public safety

17   building or jail.  You see that?

18   A      I do.

19   Q      You agree that the policy is you have to leave your

20   camera and your body camera on.

21   A      That's correct.  I realize that.

22   Q      You realize that.

23   A      Yes.

24   Q      But you were so proficient in your job you realized it

25   on June 1st too, didn't you?

1   A      I did, yeah.

2   Q      And you should not have turned off the audio.

3   A      Can you point where it says the audio is not off?

4   Q      This --

5   A      Or the definition of recording?

6   Q      This is the procedures that were delivered to me by

7   counsel regarding the body camera.  Do you have something

8   else that you rely on?

9   A      Currently yes, we have video updated body worn camera

10  policy.

11  Q      Deputy, do you understand I'm not asking you about

12  that?

13  A      Yes, I understand that.

14  Q      I'm talking about June 1st, 2019.  Do you get that?

15  A      I do.

16  Q      And the policy that was in effect on that time says

17  that you have to keep this -- keep -- once recording of an

18  incident is started, you've got to keep it going.

19  A      That's correct.

20  Q      And you violated that policy by turning off the audio.

21  A      I don't believe I did.

22  Q      Well, tell me, point to me where it says you can turn

23  it off.  Show us.

24  A      I didn't turn the body camera off, I just muted it.

25  Q      You show us where it says you can mute it.  Where's it

1  say that?

2  A     I don't remember if it does say that in this older

3  policy.  That was our procedure that all of our deputies and

4  sergeants did at that time.

5  Q     Well, we'll ask Vann about that on Monday.

6  A     Okay.

7          MR. KOPKO:  A brief indulgence, your Honor.

8          THE COURT:  Certainly.

9          Mr. Kopko, let's go off the record for a minute.

10          MR. KOPKO:  Yes, your Honor.

11              (Off-the-record discussion was held.)

12          THE COURT:  You may continue, Mr. Kopko.

13          MR. KOPKO:  Thank you, sir.

14          Brief indulgence, your Honor, while we load this.

15          THE COURT:  Certainly.

16          MR. KOPKO:  May I approach the witness, your

17  Honor?

18          THE COURT:  You may.

19          MR. TROY:  Which exhibit is that?

20          MR. KOPKO:  43.

21  BY MR. KOPKO:

22  Q     Deputy, I have handed to you what's been marked as

23  Exhibit 43.  It's not in the packet but it will be, but we

24  have agreed to the admission of that and his Honor has

25  accepted it, all right?  Do you recognize the scene of that?

1    A       I do.

2    Q       All right.  And that's the aerial photograph of

3    Mr. Georgia's property?

4    A       That's correct.

5    Q       And right across the street in that photograph is the

6    residence of Mr. Gonzalez.

7    A       Okay.

8    Q       Do you agree with that?

9    A       I never went to Mr. Gonzalez' residence so I don't

10   know.

11   Q       Oh, that's right, you never bothered to go there,

12   right?  Did you learn that this was across the street?

13   A       No, I did not.

14   Q       So it wasn't important to talk to Gonzalez.

15   A       No, it was important.

16   Q       It was important.

17   A       Correct.

18   Q       Is that another mistake you made?

19   A       That's correct.

20           MR. KOPKO:  Just a brief indulgence, your Honor.

21           THE COURT:  Certainly.

22           MR. KOPKO:  Exhibit 30, your Honor.  We will

23   display it here in a second.

24           THE COURT:  All right, you're going to put

25   Exhibit 30, Mr. Kopko, on the screen?

1          MR. KOPKO:  Yes, sir.

2          THE COURT:  Okay.

3    BY MR. KOPKO:

4    Q     Do you see that in front of you, Deputy?

5    A     I do.

6    Q     All right, do you see where the lieutenant has written

7    I further educated Deputy Davenport that he can make a

8    disorderly conduct arrest for unreasonable noise on private

9    property so long as a third party complainant provides a

10   supporting deposition.  You see that?

11   A     I do.

12   Q     Now, when you were there and you were confused about

13   what you were doing, you didn't know that, did you?

14   A     No, I did know that I was confused.

15   Q     Pardon me?

16   A     I did know that I was confused.

17   Q     All right.  Did -- did you -- when you were

18   threatening to arrest Mr. Georgia for disorderly conduct,

19   you didn't know that you couldn't do that without a

20   supporting deposition from a complainant.

21   A     That's correct.

22   Q     Well, why were you threatening to arrest him?

23   A     Because I didn't think I needed a supporting

24   deposition.

25   Q     On what basis?

1  A     On the basis that I already had a name from our

2  complainant, Ricky Gonzalez, and I could put that into the

3  to wit section of the accusatory.

4  Q     Deputy, this requires a supporting deposition,

5  correct?

6  A     I understand that now, yes.

7  Q     You understand it now.  Correct?

8  A     That's correct.

9  Q     But you didn't understand it then?

10 A     That's correct.

11 Q     And that's all part about you didn't know what you

12 were doing, correct?

13 A     Correct.

14 Q     Did you ever consider the effect of your error upon

15 Mr. Georgia?

16 A     No.

17 Q     You didn't consider that?

18 A     No.

19 Q     Did you see how he recoiled when you were threatening

20 to arrest him for disorderly conduct?

21 A     Yes.

22 Q     All right.  And you know now that that would have been

23 an illegal arrest, correct?

24 A     I don't.  I think I -- I would have gotten advice from

25 my sergeant and could have gotten a supporting deposition.

1    Q     But you didn't do that, Deputy.  You didn't do that.

2    A     Correct.

3    Q     You were just arresting him and you were not following

4    the proper procedures, correct?

5    A     No, I was following the proper procedures.

6    Q     Deputy, you did not have the supporting deposition.

7    A     Correct.

8    Q     So you were not following the proper procedures.

9    A     I was trying to detain Mr. Georgia.

10   Q     I didn't ask you that.  You did not have the

11   supporting deposition, correct?

12   A     That's correct.

13   Q     You were not following the proper procedures.

14   A     That's incorrect.

15   Q     That's incorrect.

16   A     Yes.

17   Q     Well, how -- how do you under -- how do you explain

18   that, that there's a requirement for a supporting deposition

19   and you didn't have it?

20   A     I was trying to just detain Mr. Georgia to calm the

21   situation down and figure out things from there.

22   Q     Oh, that's what you were doing --

23   A     That's correct.

24   Q     -- right?  You -- you think that you have authority to

25   detain people without any justification?

1    A      I think so, when they're -- I did have justification.

2    I was investigating a noise complaint.

3    Q      Deputy, do you understand that you can't investigate a

4    noise complaint without a supporting deposition?  Do you get

5    that?

6    A      No, I believe you can investigate a noise complaint

7    without a supporting deposition.

8    Q      Do you also believe that you could have arrested

9    Mr. Georgia for disorderly conduct?

10   A      On June 1st, 2019, I did.

11   Q      All right.  But you were so unsure of yourself that

12   you had to call Vann, correct?

13   A      That's correct.

14   Q      So you didn't know what you were doing, Deputy.  Is

15   that correct?

16   A      I was unsure of myself, that's correct.

17   Q      And you were so unsure of yourself, but it never

18   dawned on you to do what the lieutenant had advised and just

19   walk away.  Correct?

20   A      Correct, I did not walk away.

21   Q      Yeah.  That's because you were angry, correct?

22   A      I was not angry.

23   Q      Were you -- you told Mr. Georgia that -- that he was

24   then under arrest, and I wrote this down.  You told

25   Mr. Georgia that he was under arrest for obstruction of

1  governmental administration, quote, you wouldn't listen to

2  me when I told you to back up.  Right?

3  A    Correct.

4  Q    You -- you think that you can arrest someone for

5  obstructing governmental administration because they don't

6  listen to you?

7  A    It depends on the circumstances.

8  Q    I asked you, do you think that you can arrest someone

9  because they don't listen to you?

10 A    Again, it depends on the circumstances.

11 Q    Well, under these circumstances --

12 A    Yes.

13 Q    -- you think that you could arrest him?

14 A    Yes.

15 Q    Well, do you have an explanation for the fact that the

16 Court threw out this charge?

17 A    I do not.

18 Q    Without a hearing?  All right.  Do you think that the

19 Court agreed that you had no authority to do this?

20 A    I don't know what the Court decided.

21 Q    Now, Deputy, we're ready to do this here now.  75 feet

22 away you -- you say you hear very loud noise.  Right?

23 That's your sworn testimony.

24 A    That's correct.

25 Q    All right.  And there's no doubt in your mind about

1   that.

2   A       Roughly.  Roughly 75 feet away.

3   Q       All right.

4   A       From the -- where I parked my patrol car.

5   Q       And when you're driving, you have the noise and the

6   chatter of the radio communications, correct?

7   A       Rarely.  It's 11:00 at night so there's not a lot of

8   radio traffic.

9           MR. KOPKO:  Go ahead.

10          (Video played)

11  BY MR. KOPKO:

12  Q       You hear all that background noise?

13  A       I do.

14  Q       What is that?

15  A       That's my radio traffic.

16  Q       Hold on.  Hold on.

17          So you say you rarely have radio traffic, and the

18  instant that we turn this on, there's radio traffic.

19  A       Correct.

20  Q       That's correct.  Well, do you have constant radio

21  traffic or do you have it rarely, what is it?

22  A       It depends on what's going on throughout the county.

23  Q       All right.  But at that moment when you were pulling

24  up, there's radio traffic, and that's the only thing that

25  you hear on that is your radio traffic, correct?

```
 1   A     No.  I hear music being played from 791 VanOstrand
 2   Road.
 3   Q     You hear music.
 4   A     That's correct.
 5   Q     Can you identify the music?
 6   A     No, I just know that it's music.
 7   Q     And you think from this -- this tape that that music
 8   was unreasonably loud?  I -- I cannot hear that.  Can you
 9   actually tell the judge that you hear that?
10   A     Yes.
11   Q     But you don't know what it was.
12   A     I just knew it was music.
13   Q     What kind of music?
14   A     I don't know.
15   Q     You have no idea?  Was it reggae, was it hard rock,
16   was it classic rock?
17   A     I don't recall.
18   Q     All right.
19             (Video played)
20   Q     Now, you're the witness but I -- I don't hear any
21   music.  Are you telling the Court that you hear music
22   playing?
23   A     Yes.
24   Q     When you're getting out.  Okay.
25   A     That's correct.
```

1  Q      And you think that the music that you hear is

2  sufficient to support an unsubstantiated complaint about

3  loud music.  Is that your position?

4  A      When -- yeah, on June 1st, 2019, that's what I

5  thought, yes.

6  Q      That's what you thought.

7  A      Correct.

8  Q      And when you stepped out of your patrol car, you --

9  you believed that that music, that I can't hear, I don't

10 know if anybody else can hear, that I can't hear, that music

11 was loud enough to substantiate your complaint and go on

12 that property without a warrant.

13 A      That's correct.

14             (Video played)

15 Q      Now, again, you know, you're the witness.  I -- I

16 didn't hear any music until you said what's up, guys.

17 You -- you're saying that you heard music all that way?

18 A      Correct.

19 Q      And the music that you were hearing is loud enough to

20 support this complaint as you're walking up there.

21 A      That's correct.

22             MR. KOPKO:  Brief indulgence, your Honor.

23             THE COURT:  Certainly.

24             MR. KOPKO:  Can we caucus for just a minute, your

25 Honor?  Caucus with my client for just a minute, consult

1    with my client?

2            THE COURT:  Oh, yeah, absolutely.  Yep.

3            MR. KOPKO:  We're going to fast-forward on the

4    video, your Honor, there's just one other point that I --

5            THE COURT:  Hold on, Mr. Kopko, I want to make

6    sure we go on the record.  You want this on the record,

7    right?

8            MR. KOPKO:  Yes, please.

9            THE COURT:  Okay, go ahead, we're back on the

10   record.

11           MR. KOPKO:  We just have one other point here.  We

12   are going to fast-forward through the videotape, and then

13   we'll be done with this.

14           THE COURT:  That's fine.

15           (Video played)

16   BY MR. KOPKO:

17   Q    Deputy, you agree that this segment is an example of

18   the unprofessional conduct that the lieutenant was talking

19   about?

20   A    My language, yes.

21   Q    All right.  And you should never have said that.

22   A    Correct.

23   Q    And you said it because you were angry.

24   A    No, I think I was very worked up and scared and trying

25   to get this guy into custody.

1  Q      Worked up, okay.  You were worked up.

2  A      Yeah.

3  Q      Let's talk about that.  All right.  You considered

4  yourself to be a professional police officer?

5  A      I do.

6  Q      But you know that just by virtue of being a police

7  officer, do you agree that you can get worked up in

8  situations all the time?

9  A      Correct, yes.

10 Q      All right.  And do you agree that you have an

11 obligation, a professional obligation, to exercise

12 restraint?

13 A      Yes.

14 Q      All right.  But you didn't do that here.

15 A      No, I did not.

16 Q      Do you -- do you think that your lack of restraint had

17 any impact upon Mr. Georgia?

18 A      No.

19 Q      Nothing whatsoever.

20 A      No.

21 Q      You don't think a police officer, heavily armed police

22 officer, rushing towards him and pushing him backwards twice

23 had any effect on him?  Is that what you're saying?

24 A      No.

25 Q      None whatsoever.

1    A      (Shakes head).

2    Q      If somebody had rushed at you and put their hands on

3    your chest and pushed you twice and pushed you over, you're

4    saying that wouldn't have any effect on you?

5    A      I see what you're saying now.  Yeah, it would have an

6    effect on me.

7    Q      Of course it would.

8    A      Yeah.

9    Q      And you -- you agree that that effect on Mr. Georgia

10   would -- would have -- would have the effect of making him

11   angry, right?

12   A      It's a possibility, yes.

13   Q      Well, you say possibility.  It -- you pushed him over

14   backwards.  You don't think that would make him angry?

15   A      It's a possibility.

16   Q      But you say possibility.  Why are you qualifying it?

17   Is he -- is he justified in being angry or not?  Yes or no?

18   A      I -- no.

19   Q      No.  But yet for you it's different.  If someone had

20   charged you and pushed you twice and pushed you over, you

21   feel like you would be justified in being angry.

22   A      Depends on what I did.

23   Q      If you were just trying to get somebody off of your

24   property that had no business being there, would you be

25   angry?

1   A      It's a possibility.

2   Q      Possibility.

3           MR. KOPKO:  I have nothing further, your Honor.

4           THE COURT:  All right, Mr. Kopko.

5           Mr. Troy, anything on redirect?

6           MR. TROY:  Very briefly, your Honor, if I may.

7                        REDIRECT EXAMINATION

8   BY MR. TROY:

9   Q      What charges were brought on the night of this arrest?

10  A      It was resisting arrest and obstructing governmental

11  administration.

12  Q      Nothing about disorderly conduct, right?

13  A      That night, no.

14  Q      Now, on Exhibit 30, which you were questioned about,

15  write-up by I guess Kyle Koskinen, right, if you look at the

16  page with measurable tangible improvement goals?

17          THE COURT:  Mr. Troy, if you could use the mic,

18  because I can't hear the last part.

19          MR. TROY:  I'm sorry.

20  BY MR. TROY:

21  Q      I'm asking you to look at paragraph 1, measurable,

22  tangible improvement goals.  Do you see that?

23  A      I do.

24  Q      And what happened in that part of this analysis is it

25  was explained to you that if he was unsure if an arrest was

1   warranted, he could have just waited, walked away from the

2   scene, and contacted his superior, correct?

3   A      Correct.

4   Q      Okay.  Now, did you have any questions about whether

5   or not an arrest was warranted for the two charges that were

6   pressed?

7   A      No, I did not.

8   Q      So you did not charge disorderly conduct that night.

9   Is that right?

10  A      That's correct.

11         MR. TROY:  I have nothing further, your Honor.

12         THE COURT:  All right, Mr. Troy.

13         Mr. Kopko, any recross?

14         MR. KOPKO:  Yes.

15         THE COURT:  You may -- you may proceed.

16         MR. KOPKO:  Thank you, sir.

17                    RECROSS-EXAMINATION

18  BY MR. KOPKO:

19  Q      You told Mr. Georgia that he was under arrest for

20  disorderly conduct, correct?

21  A      I believe I just said obstructing governmental

22  administration.

23  Q      I didn't ask you that.

24  A      So no.

25  Q      You told Mr. Georgia that he was under arrest for

1  disorderly conduct.  Is that true or not?

2  A     I don't believe so, no.

3            (Video played)

4  Q     Did you hear that?

5  A     I do.

6  Q     All right.  You told him you're going to arrest him

7  for disorderly conduct, correct?

8  A     No.

9            (Video played)

10 Q     All right, did you hear that?

11 A     I did.

12 Q     What did you hear?

13 A     I can arrest you for disorderly conduct.

14 Q     All right.  So you're telling the Court that you never

15 arrested him for disorderly conduct --

16 A     That's correct.

17 Q     -- is that true?

18 A     That's true.

19 Q     All right.  Well, if you -- if you didn't do it, and

20 you know that you could not do it, you had no business even

21 saying it, correct?

22            MR. TROY:  Objection, your Honor.

23            THE COURT:  Objection to the question?

24            MR. TROY:  Yes.

25            THE COURT:  Mr. Kopko?

1          MR. KOPKO:  Well, this all goes to his

2    maliciousness, your Honor, or his -- no, this goes to his

3    maliciousness.  If -- if he was -- he knew that there was no

4    basis for it, and he wasn't going to do it, it supports the

5    conclusion that he was simply being malicious.

6          THE COURT:  But I thought your question was to the

7    witness if you could not arrest for disorderly conduct, then

8    why did you say that he could be arrested for disorderly

9    conduct.  Was that your question?

10          MR. KOPKO:  Yes, your Honor.

11          THE COURT:  And Mr. Troy is objecting?  I don't

12    know why, I'm not sure I got the legal reason, but Mr. Troy

13    objects because?

14          MR. TROY:  Well, because you can talk about any

15    number of charges you're thinking about bringing as a police

16    officer but before that went anywhere, they had two

17    accusatories.  Not one was disorderly conduct.

18          THE COURT:  Yeah.

19          MR. TROY:  I think a police officer's entitled to

20    put his thinking cap on and decide what's the appropriate

21    charge once you get things calmed down.

22          THE COURT:  I get it.  Mr. Kopko, I'll let you ask

23    the question but I -- I'm not sure where and how it's

24    relevant, because the officer's told you, the witness has

25    said to you he did not arrest him for dis con.  That's what

1   the witness says.  And he admits that on the video here he

2   told Mr. Georgia at the time that he could arrest him for

3   dis con, and beyond that now I'm not sure other than

4   arguing --

5              MR. KOPKO:  This refines it here, Judge, let me --

6   with your indulgence, let me proceed with this.

7              THE COURT:  Okay.  Let's hear where we go.

8   BY MR. KOPKO:

9   Q    All right.  Now, you knew that you could not arrest

10  Mr. Georgia for disorderly conduct, correct?

11  A    No.

12  Q    You didn't know that?

13  A    Nope.

14  Q    Oh, you only learned that when the lieutenant

15  reprimanded you, correct?

16  A    Correct.

17  Q    Okay.

18             MR. KOPKO:  Nothing further, Judge.  Thank you.

19             THE COURT:  All right, Mr. Kopko.

20             Mr. Troy, anything else?

21             MR. TROY:  Just so we're crystal clear.

22             THE COURT:  Hold on.  Get to the microphone first.

23             MR. TROY:  I'm sorry.

24                        REDIRECT EXAMINATION

25  BY MR. TROY:

1  Q     Just so we're very clear, when you prepared accusatory

2  instruments, for what charges were they that night?

3  A     Obstructing governmental administration and resisting

4  arrest.

5  Q     Nothing to do with disorderly conduct.  Do you agree?

6  A     Correct.

7  Q     You had suggested that that's one charge you perhaps

8  could pursue, but you decided later not to do it.  Correct?

9  A     I think my supervisor thought it would be smart to

10  make that charge.

11  Q     Okay.  But you never charged him with disorderly

12  conduct.

13  A     I never charged him with disorderly conduct.

14  Q     So you used your own discretion and said that's not an

15  appropriate charge, and you charged two other issues.

16  A     Correct.  That night, I did not arrest for disorderly

17  conduct.

18              MR. TROY:  Thank you.

19              MR. KOPKO:  Your Honor?

20              THE COURT:  Okay, Mr. Kopko?

21              MR. KOPKO:  Yes, sir.

22              THE COURT:  Wait till you get to the microphone.

23              MR. KOPKO:  Yep.

24              THE COURT:  Helps us all.

25              MR. KOPKO:  No, I'm just following Bill's lead,

1   and I should not have done that.

2                       RECROSS-EXAMINATION

3   BY MR. KOPKO:

4   Q     Now, when you were pressing these charges, you did

5   bring a charge of obstructing governmental administration.

6   Correct?

7   A     That's correct.

8   Q     All right.  And you understand that being a competent

9   police officer you have to be familiar with the New York

10  Penal Law, correct?

11  A     That's correct.

12  Q     And because of that, you're familiar with the elements

13  of obstructing governmental administration, correct?

14  A     That's correct.

15  Q     What are they?

16  A     They are when a police officer is doing an official --

17  an official function of their job duties and somebody either

18  by intimidation or physical force impedes that government

19  function.  That's how I interpret it.  I don't have it right

20  in front of me, so I'm not -- I can't read it verbatim.

21  Q     Do you understand that it has to be a legitimate

22  governmental function?

23  A     Yes.

24  Q     You do?

25  A     Yes.

1    Q     All right.  And do you understand under the facts of

2    this case that there -- you had no business being on the

3    property?

4    A     I did not at that time.

5    Q     But you understand that now.

6    A     No, I -- I think I could have still been on the

7    property trying to investigate this noise complaint.

8    Q     Tell me all the reasons why, when Mr. Georgia told you

9    to get the fuck off his property, you ignored him.

10   A     I wanted to mediate the situation, just try to get him

11   to turn down the music so I could leave, and that obviously

12   was not happening, so I went to -- he was becoming

13   aggressive.  Trying to detain him, that didn't happen, so

14   try to call my sergeant to get further guidance and figure

15   out where to go from there, and so I feel like I'm still --

16   I felt that I was still investigating this incident doing a

17   official -- an official function.

18   Q     Yeah, but, Deputy, you know that while you were there,

19   the music went off.

20   A     I know that now.  I did not know that on June 1st,

21   2019.

22   Q     Here, let me see that I understand.  You're there

23   investigating a loud music complaint, correct?

24   A     That's correct.

25   Q     And while you're there, the music goes off, correct?

1    A      Correct.

2    Q      Correct?  Right?  And you're telling the Court that

3    you were unaware of that?

4    A      Yes.

5    Q      You agree that that was your reason for being there.

6    A      Yes.

7    Q      And once the music went off, you could have just left,

8    correct?

9    A      That's correct.

10   Q      But, but by that time you were so angry and so upset

11   that you weren't going to leave unless Georgia went with

12   you, correct?

13   A      No, that's not correct.

14   Q      Why didn't you just leave when the music went off?

15   A      I didn't hear the music go off.

16   Q      Well, didn't Vann walk up to you and say there's no

17   music playing?

18   A      No, he didn't.

19   Q      Didn't the other heavy-set deputy come up and say to

20   you there's no music playing?

21   A      No.

22   Q      Nobody said that.  No?

23   A      No.

24   Q      Okay.

25          MR. KOPKO:  Nothing further, your Honor.  Thank

1   you.

2           THE COURT:  All right, Mr. Kopko.

3           Mr. Troy?  Anything else?

4                       REDIRECT EXAMINATION

5   BY MR. TROY:

6   Q     Would you agree that music can go on and music can go

7   off?

8   A     Can you repeat?  I didn't hear.

9   Q     Can -- do you agree that music can go off and then it

10  can go on?

11  A     Yes.  I do agree with that.

12  Q     So you had no way of knowing, and you didn't know,

13  whether or not the music was done but for the rest of that

14  night or for whatever period of time.  Is that right?

15  A     That's correct.

16  Q     And you never --

17          MR. TROY:  Nothing further, your Honor.

18          MR. KOPKO:  Nothing, your Honor.

19          THE COURT:  All right.  Mr. Troy, nothing further.

20          Mr. Kopko?

21          MR. KOPKO:  Nothing further, your Honor.

22          THE COURT:  All right.  All right.  Deputy

23  Davenport, Sergeant Davenport, you're excused.  You can go

24  back to counsel table.

25          THE WITNESS:  Thank you, your Honor.

```
1                   (The witness was excused.)

2                   THE COURT:  Okay.

3                   All right.  So I believe we are wrapped up for

4       today.

5                   Mr. Troy, is that correct?

6                   MR. TROY:  Yes, your Honor.

7                   THE COURT:  Okay, Mr. Kopko?

8                   MR. KOPKO:  Yes, your Honor.

9                   THE COURT:  Okay.  So my understanding is on

10      Monday Sergeant Vann will be called by you, Mr. Kopko, for

11      examination and whatever cross, and then -- and again, I'm

12      not holding you to it, Mr. Kopko, but my understanding is

13      that that will then be the plaintiff's case.  Is that

14      generally right now your -- your position?

15                  MR. KOPKO:  Yes, your Honor, it is.

16                  THE COURT:  Okay.  And then, Mr. Troy, although

17      I'm not holding you either, you believe that you will not be

18      presenting any further evidence after that?

19                  MR. TROY:  That's correct, your Honor.

20                  THE COURT:  Okay.  All right, so my thinking was

21      10 a.m. on Monday.  Does that work for you, Mr. Kopko?

22                  MR. KOPKO:  Yes, sir.

23                  THE COURT:  Mr. Troy?

24                  MR. TROY:  Yes, sir.

25                  THE COURT:  All right.  So 10 a.m. Monday morning,
```

1   we will continue the trial, and we will go from there.

2          MR. TROY:  Thank you, sir.

3          THE COURT:  Everyone have a nice rest of the day,

4   have a -- have a nice weekend, everybody.  We'll see you

5   Monday morning at 10 a.m.

6          MR. KOPKO:  Thank you.

7          THE COURT:  Thank you.

8                    - - - - -

```
1                        INDEX TO TESTIMONY

2      WITNESS:                DX    CX    RDX    RCX

3      RONALD M. GEORGIA       --     7    --     --

4      KYLE DAVENPORT          27    66    94     95
                                           98    101
5                                          103    --
```

1         CERTIFICATE OF OFFICIAL REPORTER

2

3

4      I, RUTH I. LYNCH, RPR, RMR, NYS Realtime Certified

5   Reporter, Federal Official Court Reporter, in and for the

6   United States District Court for the Northern District of

7   New York, DO HEREBY CERTIFY that pursuant to Section 753,

8   Title 28, United States Code, that the foregoing is a true

9   and correct transcript of the stenographically reported

10  proceedings held in the above-entitled matter and that the

11  transcript page format is in conformance with the

12  regulations of the Judicial Conference of the United States.

13

14

15

16            /s/ Ruth I. Lynch
17

            RUTH I. LYNCH, RPR, RMR, NYSRCR
18          Official U.S. Court Reporter

19

20

21

22

23

24

25