# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ATTORNEY FOR PLAINTIFF:
Edward E. Kopko, Esq.
NDNY Bar Roll No. 510874
Edward E. Kopko, Lawyer, P.C.
308 North Tioga St., Second Floor
Ithaca, New York 14850
607.269.1300; 607.269.1301 fax
office@kopko.law

| | |
|---|---|
| RONALD M. GEORGIA,<br>　　　　　　Plaintiff,<br>vs.<br><br>KYLE DAVENPORT,<br>Defendant | Civil No. 3:21-cv-0484-ML<br>Honorable Miroslav Lovric |

---

## PLAINTIFF'S CLOSING ARGUMENT

---

## INTRODUCTION

Plaintiff, Ronald M. Georgia ("Georgia") hereby submits this Closing Argument following trial of this matter held on April 17, 19, 21, and 24, 2023. It is respectfully submitted that for the reasons stated below, this Court should find Defendant Kyle Davenport ("Davenport") liable for excessive force, false arrest and imprisonment, and malicious prosecution.

Georgia established Davenport violated Georgia's constitutional rights by using excessive force against him, and falsely arresting and imprisoning, and maliciously prosecuting Georgia.

Further, the evidence adduced at trial establishes Davenport is not protected by qualified immunity.

## EXCESSIVE FORCE

The Fourth Amendment prohibits "unreasonable and therefore excessive force" by a police officer in effecting an arrest. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d.Cir. 2010). The Court evaluates the record from the "perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must review the totality of

1

the circumstances of each case, considering: "(1) the nature of and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396). Force is excessive when it is more than necessary under the particular circumstance.  See *Brown v. City of New York*, No. 11-CV-1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 332 (2d Cir. 2003)).

### The nature and severity of the underlying crime

The evidence adduced at trial indicates that originally Davenport threatened Georgia with arrest for disorderly conduct.  P-14, T03:28:34Z[1].  Then, as Georgia was being led in handcuffs from his property, Davenport, in reply to Georgia's inquiry, stated Georgia was being arrested for obstruction of governmental administration.  P-14, T03:38:07Z.  However, the original underlying reason Davenport gave for being on Georgia's property was that Georgia's music was too loud.  P-14, T03:28:09Z.  Ultimately, Georgia was arrested for resisting arrest and obstruction of governmental administration.  Ex.1, p.71, lines 13-18.  As Georgia pointed out, and as Davenport confirmed, there is no noise ordinance in Lansing that prohibited Georgia from playing music loudly.  P-14, T03:28:34Z; Ex.1, p.6, lines 20-22.  Further, as Davenport's body camera footage establishes, when Davenport got out of his vehicle on Van Ostrand Road and began walking towards Georgia's house the music was barely audible, and only became louder the closer Davenport walked toward Georgia's house.  P-14, T03:27:11Z.  Thus, the underlying nature and severity of the crime —that Georgia was playing music loudly — was no crime at all, and posed no danger to the public or Davenport.

---

[1] The time stamps correspond to the body camera narrative below.

*Whether Georgia posed an immediate threat to the safety of Davenport or others*

The evidence also indicates that Georgia posed no immediate threat to the safety of Davenport.   Admittedly, one might criticize Georgia's choice of language in responding to seeing Davenport by telling him to "get the fuck off" his property, but there is no dispute that Georgia was within his lawful right to ask Davenport to do so and Davenport failed to leave.  Further, Davenport first pushed Georgia when he thought Georgia was too close to him, not because Georgia had made an aggressive move toward him or had laid his hands on Davenport. P-14, T03:28:18Z.  Georgia did not respond aggressively to Davenport pushing him, but appeared surprised, and continued to demand that Davenport leave. Id.  Davenport, clearly angered by Georgia's demands to leave, then told Georgia that he is not "playing this game" and told Georgia to put his "hands behind your fucking back."  Id.   Georgia continued to protest and when Davenport told Georgia he was going to be arrested for disorderly conduct because Georgia was "bothering everybody else" even though there was no prohibitive noise ordinance, Georgia threatened to sue Davenport.  P-14, T03:28:34Z-T03:30:11Z.

Georgia, clearly (and legally) intoxicated, began dancing and asked Davenport at one point whether he wanted to dance. P14, T03:30:11Z.  Davenport declines the offer, and it is self-evident that Georgia was teasing Davenport about the music.

At one point during their exchange, Georgia says to Davenport: "You're on my, my land motherfucker and you want to fuck with me? I'll fucking trash your ass.  I'm 62 years old and I'll fuck you up." P-14, T03:31:26Z.  It is obvious this remark did not cause Davenport to think Georgia posed an immediate threat to the safety of Davenport as Davenport responded to the remark by repeating his demand that Georgia turn his music down or he will be arrested.  Id. Georgia said "I will not.  You can't make me."  Id. Davenport said "Yes, I can."  Id.  Georgia said "No, you can't."  Id. Davenport said "Yes, I can."  Davenport then tells Georgia he is going to get his "Sergeant over here right now." Id.

3

*Whether Georgia was resisting arrest or attempting to evade arrest*

At or around the time Davenport called Sergeant James Vann ("Vann"), his supervisor, for backup, the music had stopped; that is, the reason Davenport stated he was on Georgia's property no longer existed.  P-14, T03:32:00Z.  Up to this point, Davenport had threatened to arrest Georgia at least seven times: telling Georgia to put his hands behind his back (P-14, T03:28:18Z; T03:28:57Z; T03:30:11Z; T03:31:26Z); that he can arrest him for disorderly conduct (P-14, T03:28:34Z); asking Georgia whether he wants to get arrested or turn the music down (P-14, T03:30:11Z); and asking him whether he wants to get arrested (P-14, T03:31:26Z).  Davenport asked Georgia whether he wants to turn the music down or get arrested after he told Georgia to put his hands behind his back.

Davenport was issued a Performance Correction Notice dated June 21, 2019 concerning this incident.  P-30.  In that notice, Lieutenant Kyle Koskinen stated:
"I asked Deputy Davenport if he could have handled the call differently.  With hesitation Davenport replied, "No."  I explained to Davenport that I had reviewed his body camera footage and it was clear to me that Davenport was unsure of himself after repeatedly telling Georgia you are under arrest for Disorderly Conduct, *but not taking appropriate action to commence an arrest*."  P-30 [emphasis added].

While Davenport is trying to reach Vann, Georgia continues to tell Davenport to leave.  P-14, T03:32:14Z.  He is gesturing toward Van Ostrand Road, and standing approximately one to two feet from Davenport.  Id.  Suddenly, Georgia stumbles backwards, having been pushed by Davenport, and Davenport yells "Back the fuck up." P-14, T03:32:25Z.  Georgia is now standing approximately three to four feet from Davenport.  Id.  Georgia is not moving and appears stunned.  Id.  He is not saying anything, he is not moving, he is not threatening Davenport, he is not carrying a weapon, and he is not moving toward Davenport.  P-14, T03:32:36Z.

Davenport yells "You need to back the fuck up!" and rushes toward Georgia. Davenport violently pushes Georgia with significant force, sending Georgia flying backwards, causing him to stumble over a cooler on the ground and falling, striking a outdoor grill with his right arm on his way down where he landed heavily on his back, his arms and legs flailing. P-14, T03:32:36Z.   At the time Davenport struck Georgia, Davenport had not arrested Georgia, and Georgia was neither actively resisting or attempting to evade arrest.

Taking the totality of the circumstances into consideration, Davenport's use of force was unreasonable and excessive.  Georgia posed no threat to Davenport when Davenport pushed him to the ground.  Georgia was a safe distance from Davenport, not moving toward Davenport or threatening Davenport.  Instead, Davenport was incensed at Georgia's repeated protests and demands against Davenport and lashed out at Georgia in anger.  This is apparent in light of Davenport's continued references to Georgia's legitimate protests as a "game," and, and after knocking Georgia to the ground, yelling to Georgia that he is "sick of this fucking game right now," and telling Georgia that he "need[s] to shut the fuck up." P-14, T03:32:36Z.  Davenport testified he knew he had no authority whatsoever to tell Georgia to "shut the fuck up." Ex.1, p.61, lines 14-25.

Davenport testified he was not angry, yet he testified he was unaware of his surroundings at this time and did not notice the music had stopped. Id., p.62, lines 4-13.

Davenport testified he had police training to deal with unruly people. Ex.1, p.45, lines 13-15.  He testified he saw no visible weapons on Georgia.  Id., lines 16-18. Davenport did not pat Georgia down even though considerations for officer safety would have allowed him to do so.  Id., p.45, lines 19-45, p.46, lines 1-3.

In addition, after throwing Georgia to the ground, Davenport straddles him and holds his head tightly against the ground with his right hand, while he manipulates a pepper spray with his left.  P-14, T03:32:49Z.  In the body camera footage, it appears Davenport attempts to discharge the pepper spray held mere inches from Georgia's face

5

and eyes, but, fortunately for Georgia, the pepper spray is malfunctioning and, despite Davenport's best efforts, does not spray Georgia.  P-14, T03:32:49Z-T03:33:08Z.  At the time Davenport tried to pepper spray Georgia, Georgia was underneath Davenport, his belly and face toward the ground.  Use of the pepper spray was entirely unwarranted, but indicates Davenport's unreasonable and disporportionate use of force against Georgia.  Davenport denies he was trying to pepper spray Georgia. Ex.1, p.53. Davenport claims he had it out in case Georgia tried to start a fight with him.  Id.  Davenport confirms he is holding the pepper spray in his left hand, and his thumb is at the top of the canister. Id.  Davenport claims the discharge valve is underneath.  Id.  Davenport's testimony is not credible in light of the body cam footage clearly showing his attempts to use it.

Davenport testified that he did not cuff Georgia because he could not get to Georgia's hands.  Id., p.54.  Davenport admitted he could not get to Georgia's hands since one of Davenport's hands was holding the pepper spray.  Id.  Davenport also testified he did not have any trouble getting both of Georgia's hands behind his back when he put the pepper spray away.  Id., p.55.

Davenport, in contravention of Tompkins County policy, failed to check for the tightness of the handcuffs he had placed on Georgia by putting his finger between the jaw and the wrist.  Id., p.50, line 25, p.51, lines 1-3.  Davenport testified he did not know that department policy required him to do so at that time.  Id., p.51, lines 4-16.

In light of the circumstances confronting Davenport, it was objectively unreasonable for Davenport to apply the force he did in striking Georgia to the ground at a time when Georgia was not under arrest, when he posed no threat to Davenport, and when he was not running from or toward Georgia.  This is all the more true since, as Lieutenant Koskinen pointed out, Davenport failed to take "appropriate action to commence an arrest" in the first place, and it cannot be said Georgia was resisting or evading arrest.  P-30. In addition, this was the third and final time Davenport had laid hands on Georgia.  Id., p.79, lines 3-10.

## FALSE ARREST AND IMPRISONMENT

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV; accord *Garenani v. County of Clinton*, 552 F. Supp. 2d 328, 333 (N.D.N.Y. 2008). False arrest and imprisonment is an unreasonable seizure of a person in violation of the Fourth Amendment which is actionable under § 1983." *Garenani*, 552 F. Supp. 2d at 333. "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). To prove the elements of false arrest under New York law, a plaintiff must show that "(1) the defendant intended to confine plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Garenani*, 552 F. Supp. 2d at 333 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Probable cause to arrest is a complete defense to the claim of false arrest and imprisonment. Id. (citing *Bernard*, 25 F.3d at 102 and Weyant, 101 F.3d at 852). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. "A district court must look to the 'totality of the circumstances' in deciding whether probable cause exists to effect an arrest." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983)).

Even if there was not probable cause to arrest the plaintiff, the defense of qualified immunity entitles public officials to freedom from suit, as a result of the consequences of the performance of their discretionary duties, when "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to

believe their acts did not violate those rights." *Martinez v. Simonetti*, 202 F.3d 625, 633–34 (2d Cir. 2000) (quoting *Weyant*, 101 F.3d at 857). Qualified immunity is an affirmative defense, and, as such, defendants bear the burden of proving that the privilege of qualified immunity applies. *Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). In considering a qualified immunity defense, courts should not be "concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Martinez*, 202 F.3d at 634 (quoting Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995)). "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Martinez*, 202 F.3d at 634 (citing *Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1987)). "An officer's determination is objectively reasonable" — and thus, arguable probable cause is demonstrated—when "officers of reasonable competence could disagree on whether the probable cause test was met." *Jenkins*, 478 F.3d at 87 (quoting *Lennon*, 66 F.3d at 423–24). But arguable probable cause is not "almost" probable cause. See *Jenkins*, 478 F.3d at 87.

In addition, the area "immediately surrounding and associated with the home," its curtilage, is "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 133 S.Ct. 1409, 1412, 569 U.S. 1 (2013), quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984). A front porch, for example, is a classic example of an area "to which the activity of home life extends." *Florida*, 133 S.Ct. at 1412, quoting *Oliver*, 466 U.S. 182. Generally, the area around the home is linked to the home itself where expectations of privacy are highest. See *California v. Ciraolo*, 476 U.S. 207, 213 (1986).

A police officer may approach a home without a warrant to speak to its occupant, but may not enter without the occupant's permission and in the absence of exigent circumstances. See *Kentucky v. King*, 563 U.S. 452, 469 (2011); *INS v. Delgado*, 466 U.S. 210, 217 (1984).

Davenport's testimony establishes he lacked probable cause to arrest Georgia. Davenport testified that he received information from Tompkins County dispatch about a noise complaint.  Ex.1, p.6, lines 10-22.  He knew at the time that Lansing did not have a noise ordinance controlling decibel levels, or restricting times or locations of gatherings. Id., p.6, lines 23-25; p.7, lines 1-4.

Davenport did not contact the complainant before going onto Georgia's property, even though complainant's house was directly across the street from Georgia's, approximately 50 feet from where Davenport parked his cruiser.  Id., p.7, lines 8-21. Davenport did not contact dispatch to see if the complainant was available to speak with him.  Id., lines 22-25.  Davenport did not make a proper investigation by determining if there was a possibility that others besides the complainant, including other neighbors, and other members of the complainant's household, were bothered by the noise.  Id., p.31, lines 4-25, p.32, lines 1-6.

Davenport was disciplined for failing to make a proper investigation so that he had a basis for a disorderly conduct arrest.  Lieutenant Kyle Koskinen wrote in the Performance Correction Notice issued to Davenport:

> I explained to Deputy Davenport that if he was unsure if an arrest was warranted that he could have just walked away from the scene and contacted his supervisor.  Davenport agreed to my advice.  I further education Deputy Davenport *that he can make a Disorderly Conduct arrest for unreasonable noise on private property as long as a third party complainant provides a supporting deposition.*
> P-30 [emphasis added]

Although Davenport testified he thought the music was loud when he got out of his cruiser, the body camera footage demonstrates the music was faint, and got louder as Davenport walked toward Georgia's home.  Ex.1, p.13, lines 5-14; P-14, T03:27:11Z-T03:27:32Z. Davenport had no idea how loud the music was at the time the complaint was made.  Ex.1,p. 14, lines 5-7, p.15, lines 10-13.

Davenport did not have a warrant to arrest Georgia or to search his home, and no exigent circumstances were present. Id., p.9, lines 7-14. Nevertheless, Davenport claimed he was going to do his best to stop the noise. Id., lines 20-22. However, even when the music did stop, Davenport did not leave Georgia's property. Id., p.64, lines 4-25, p.65 lines 1-5.

The first thing Georgia told Davenport was to get off his property, and Davenport, while acknowledging that he could have left, instead decided not to. Id., p.10, lines 20-25, p.11, lines 1-4, p.14, lines 19-23, p.15, lines 17-23, p.16, line 1.

Davenport acknowledges that people, in the absence of fighting words, have a constitutional right to protest the police. Id., p.18, lines 16-25. Yet Davenport claims Georgia was playing a "game," and he was not going to play it by "letting [Georgia] yell at me and walk all over me." Id., p.18, lines 11-12, p.19.

Davenport acknowledges his language toward Georgia during this interaction was inappropriate and unprofessional. Id., p.22, line 19-23, p.25, line 23. Davenport further agrees that his unprofessional languages contributed to the escalation of his encounter with Georgia. Id., p.26, lines 2-11. Davenport was issued a Performance Correction Notice dated June 21, 2019 concerning this incident in which Davenport's supervisor, Lieutenant Kyle Koskinen stated: "It was further explained to Davenport that his conduct was unprofessional by using profanity multiple times toward Georgia. Davenport agreed that should have been more professional." P-30.

Davenport told Georgia he could arrest him for disorderly conduct. Ex.1, p.36, lines 7-15; P-14, T03:28:24Z. Davenport testified, however, that he knew he could not arrest Georgia for disorderly conduct unless someone other than Davenport complained. Id., p.36, lines 16-25, p.37, lines 1-18. Davenport testified no one else was at the scene, and he did not have any facts anyone else in the area was being disturbed. Id., p.39, lines 1-3.

Davenport called his supervisor looking for guidance because he was confused about what to do and did not know how to handle the situation.  Id., p.47.

As Davenport and Vann led Georgia in handcuffs away from his home, Davenport told Georgia he was arresting him for obstruction of governmental administration.  P-14, T03:38:07Z.  When Georgia asked "How?," Davenport replied "'Cause you weren't listening to what I was trying to tell you."  Id.  Davenport lacked probable cause to arrest Georgia for obstructing governmental administration because Davenport was not engaging in authorized conduct and had illegally arrested Georgia.  Davenport testified that in order to sustain the charge of obstruction of governmental administration there has to be proper governmental administration, yet Davenport acknowledged he had no authority under a Lansing ordinance since there was no ordinance.  Ex.1, p.78, lines, 6-13.

Davenport also lacked probable cause to arrest Georgia for disorderly conduct as Davenport himself admits.  Accordingly, since Davenport lacked probable cause to arrest Georgia, Davenport falsely arrested and imprisoned Georgia.

Georgia was also charged with resisting arrest.  Ex.1, p. 71, lines 13-15.  That charge was dismissed in the criminal proceeding.  Id., lines 19-21.  Davenport submitted a false report concerning Georgia's alleged resistance.  Id., p.73, lines 3-5. In Davenport's Subject Management Report, he indicates Georgia resisted verbally and passively.  P-30. Davenport testified, however, that he knew that verbal and passive resistance can never constitute resisting arrest.  Ex.1, p.73, lines 13-16, p.74, lines 15-17.  In fact, Davenport confirmed that none of the resistance categories he checked off in his report justify a charge of resisting arrest.  Id., p.77, lines 22-25.

The Fourth Amendment protections extended to Georgia on his patio.  The aerial photograph of Georgia's home shows a double-wide set back from the road with a long driveway.  P-26.  Georgia's home is surrounded by woods on two sides of the property, and there are no neighboring houses close to Georgia's home.  Id.  There is vegetation

11

along the edge of the property running along the road providing additional privacy.  Id.
Georgia's driveway terminates at the end of his house, where there is a patio.  Id.  There
is a fabric canopy providing shade and shelter on the patio, as well as patio furniture
including chairs, and an outdoor grill.  Id.

The patio located just outside the entrance to Georgia's home is an area associated
with the home, to which activity of home life extends, and where expectations of privacy
are highest.   The same Fourth Amendment protections that would apply to Georgia's
home, here apply to the patio area next to his home.

### Qualified immunity

The defense of qualified immunity is an affirmative defense, which Davenport has
the burden of proving.  It is submitted that Davenport did not establish that he had
arguable probable cause to arrest Georgia or that Davenport's actions did not violate
clearly established constitutional rights or that it was objectively reasonable for
Davenport to believe his conduct did not violate Georgia's rights.

Qualified immunity provides "ample protection to all but the plainly incompetent
or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Here,
it is obvious that no reasonably competent officer would have concluded that Davenport
had probable cause to arrest Georgia for disorderly conduct.  And, since there was no
probable cause to arrest Georgia for disorderly conduct, Davenport was not authorized
to be on Georgia's property or to seize and arrest Georgia.  Thus, no reasonably
competent officer would conclude that probable cause to arrest Georgia for obstruction
of government administration or resisting arrest existed either.  See *People v. Perez*, 47
A.D.3d 1192, 1193-194 (4th Dept. 2008).

### MALICIOUS PROSECUTION

The elements for a claim for malicious prosecution are: (1) the initiation of a
proceeding; (2) its termination in favor of the plaintiff; (3) lack of probable cause; and (4)

malice.  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003), citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983).  Liability under this theory will also give rise to liability under 42 U.S.C. § 1983. *Cook v. Sheldon*, 41 F.3d 73, 77-79 (2d Cir. 1994).  The existence of probable cause is a complete defense to a claim of malicious prosecution.  *Colon*, 60 N.Y.2d at 82.

A criminal proceeding was initiated against Georgia.  P-1 – P-13; Ex1, p.37, lines 20-25.  That proceeding was terminated in Georgia's favor.  P-1 – P-2.  As demonstrated above, Davenport lacked probable cause to arrest Georgia.

The malice element "may be proven by circumstantial evidence" and is rarely demonstrated by direct evidence of an ulterior motive.  *Maxwell v. City of New York*, 156 A.D.2d 28, 34-35 (1st Dept. 1990), citing *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502 (1978), *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977).  However, the existence of actual malice may be inferred from the lack of probable cause.  *Martin*, 42 N.Y.2d at 18.

Davenport never investigated the noise complaint by speaking to the complainant.  Ex.1, p.7, lines 8-25.  Davenport had no facts known to him to establish anyone else was bothered by Georgia's music.  Id., p.37, lines 2-9.  Davenport, in fact, did not arrest Georgia for disorderly conduct.  Id., lines 17-18.  Yet, the prosecutor's decision to move to dismiss the charge of disorderly conduct was based on the fact that the complainant was unable to identify Georgia.  P-2.

These facts were available to the prosecution prior to initiating a criminal proceeding against Georgia since Davenport did not speak with the complainant and no one else was present at the scene.  There were no facts sufficient to prosecute Georgia for disorderly conduct which was known to the prosecution at the time the criminal proceeding was commenced.

Furthermore, Davenport arrested Georgia for obstruction of governmental administration and resisting arrest, not disorderly conduct.  An inference can readily be drawn that the commencement of a criminal proceeding against Georgia for disorderly

13

conduct, when there were no facts available to the prosecution to support such a charge, was done improperly, without supporting facts, and in malice.

## **DAVENPORT'S BODY CAMERA FOOTAGE**

Since Davenport's body camera footage is irrefutably the best evidence of the underlying facts concerning this case.  Below is a narrative of the video evidence with the time stamp of Davenport's body camera footage, which is recorded in the upper right hand corner of the screen, preceding the narrative at the point the pertinent video begins.

<u>T03:27:11Z</u>:  The audio on the body cam footage begins and Officer Davenport is exiting his vehicle.  The music is not audible on the footage.

<u>T03:27:20Z</u>:  The faint sound of a cymbal is heard.  Davenport begins walking toward Georgia's house.

<u>T03:27:25Z</u>:  Georgia can be heard saying something undecipherable like "Haaaa" or "Waaa," or maybe even "What's up?"  As Davenport walks toward Georgia's house the music become more audible.

<u>T03:27:32Z</u>:  Davenport says "What's up guys?"  The music gets louder as Davenport approaches Georgia's house.

<u>T03:27:50Z</u>:  More lyrics can be heard, and Georgia says "Oh my God."

<u>T03:28:01Z</u>:  Georgia says "Get the fuck out of my property."

<u>T03:28:02Z</u>: Davenport says "What's going on boss?"

<u>T03:28:04Z</u>:  Davenport approaches Georgia's patio, situated at the end of Georgia's driveway and immediately adjacent to the entrance of Georgia's home, partially covered and enclosed with a fabric canopy structure.  Georgia says "Get the fuck off my property right now."

<u>T03:28:06Z</u>:  Davenport says "What's going on, man?"

14

T03:28:07Z:  Georgia comes into view on Davenport's body camera.  He is under the canopy.  He is standing and moving toward Davenport.  Georgia says "No.  Get the fuck off my property" pointing back towards his driveway.

T03:28:09Z:  Davenport says "Relax, your [inaudible] too loud, dude

T03:28:11Z:  Georgia approaches Davenport, pointing towards his right (toward the driveway) and says "Relax nothing.  Get the fuck off my property."

T03:28:14Z:  Davenport: "No."  Georgia: "Yes."  Davenport: "No."  Georgia gets closer to Davenport.  Davenport:  "You're being disrespectful."  Georgia:  (recording is distorted) "…[inaudble] there's no fucking noise…."

T03:28:18Z:  Davenport places his right hand on the upper left side of Georgia's chest and pushes Georgia back about a foot saying "Back the fuck up right now. Okay?"  Georgia says "Woooah.  Get the fuck off my property."  Davenport says:  "All right, you know what?  We're not playing this game.  I'm coming here being respectful…[inaudible]… with me?"  Georgia:  "Get the fuck off my property."  Davenport:  "No we're not doing that fucking game.  Put your hand behind your fucking back."  Georgia:  "What? No." Davenport:  "Now.  Right fucking now, all right?"  Georgia:  "Why?"  Davenport: "I'm not playing this fucking game."

T03:28:34Z:  Georgia: "I'm on my property."  Davenport:  "'Cause your music's fucking loud.  I came here respectfully to talk to you and then…[inaudible – Georgia and Davenport speaking simultaneously]."  Georgia:  "…'cause you live over there? 'Cause you live over there?"  Davenport:  "No.  I don't live over there. I'm the deputy sheriff's office."  Georgia:  "Is that your house over there?"  Davenport:  "No, it's not."  Georgia: "…no…there's no noise ordinance in Lansing."  Davenport:  "It doesn't matter. You're causing an issue."  Georgia:  "I can do whatever I can."  Davenport:  "I can arrest you for disorderly conduct."  Georgia:  "For what?  For what?  On my property?"  Davenport: "Yes, 'cause you're bothering everybody else."

T03:28:57Z:  Georgia: "Get the fuck off my property."  Davenport:  "No, I'm not playing this fucking game.  Put your hands behind your fucking back."  Georgia: "I'm not playing nothing."

T03:29:04Z:  Office Davenport's radio beeps and Davenport says:  "1210 I need some…[inaudible]."  Georgia turns toward his left, raising his right arm.  Georgia: "Wait a minute.  Wait a minute.  Let me call…[inaudible]."  Davenport reaches for Georgia's right arm, saying:  "No, no, no.  We're not playing this fucking game dude."  Georgia:

"No I'm done.  I'm sitting on my…"  Davenport:  "No.  Because you're being an ass right now."  Georgia:  "I'm living on my property, listening to my music, drinking my booze, not on the road, not doing nothing.  You got, where's your cam?"  Davenport:  "Right here."  Georgia:  "Okay.  You're going to fuck with me?"  Davenport's radio beeps, and he says "That's affirmative."  Georgia:  "You're going to fuck with me?"  Davenport:  "No. I'm not trying to fuck with you, I'm just asking you… telling you to turn  your fucking…."  Georgia:  "No, I can't."  Davenport:  "Why not?"  Georgia:  "'Cause I love my life.  I served you motherfucker.  I served you."  Davenport:  "Put your fucking music down."  Georgia: "Quit the fucking with me."  Davenport:  "No, I'm not playing this game with you."

<u>T03:29:42Z</u>:  Georgia:  "You fucker.  I can do whatever I can do."  Davenport:  "No, you can't."  Georgia:  "Why?"  Davenport:  "Because you're bothering your fucking neighbors, that's why."  Georgia:  "No.  Is there a noise ordinance?"  Davenport:  "No, but you acting like you…[inaudible]…"  Georgia:  "But wait a minute…"  Davenport: "…disorderly conduct."  Georgia:  "What, disorderly conduct on my own property?" Davenport:  "…[inaudible] because you're bothering everybody else."  Georgia:  "I don't give a fuck."  Davenport:  "Yeah, well New York State does."  Georgia:  "Well, let's see the law.  Let's see the law.  You fuck with me and I'll sue the motherfucking shit out of you."  Davenport:  "Go ahead."  Georgia:  "And I'll fucking…"  Davenport:  "Get in line, man, get in line."

<u>T03:30:11Z</u>:  Georgia:  "Arrest me… [inaudible]."  Davenport:  "All right.  Put your hands behind your back.  Let's go."  Georgia:  "Okay, let's go."  Georgia turns around, his back towards Davenport, and puts his hands behind his back.  Georgia then says:  "Wait a minute," raising his right arm.  Davenport's right hand can be seen, holding a pair of handcuffs, and Davenport attempts to place the handcuffs on Georgia.  Georgia turns around facing Davenport.  Davenport:  "No.  You want to pull away from me?"  Georgia: "Wait a minute.  Don't fuck with me on my own property."  Davenport:  "What do you want to do?  You want to get arrested or do you want to turn your music down?" Georgia:  "You want to fuck with me on my property?"  Davenport:  "I'm not playing this fucking game.  Turn your music down."  Georgia:  "I'm not playing with your game. I'll do whatever the fuck I want on my property."  Davenport:  "No you're not.  Okay?" Georgia:  "Why?"  Davenport:  "Turn your music down."  Georgia:  "Who the fuck are you, a Trumpster?  Are you a Trump motherfucker?  Gonna tell me what the fuck I can do on my property?"  Davenport:  "…[inaudible]… music's this loud.  That's what you can't have.  Georgia:  "Want to dance?"  Georgia begins moving to the music. Davenport:  "No, I don't."  Georgia:  "Want to dance?  C'mon, let's dance.  Let's dance." Davenport:  "Got I.D. on you boss?"  Georgia:  "Let's dance."  Davenport:  "Do you have I.D. on you?"  Georgia:  "I don't have to have I.D. on mine, my property.  I'm on my property."  Davenport:  "You need to turn your music down."  Georgia:  "No."

Davenport: "You're not understanding." Georgia: "No, I don't." Davenport: "Yes, you do." Georgia: "Why?" Davenport: "Because you're bothering everybody else in the area." Georgia: "Okay. Okay. And is there a law against that?" Davenport: "Yes, there is." Georgia: "Where? Where? Tell me…[inaudible]." Davenport: "Penal law. New York State Penal Law. Disorderly Conduct." Georgia: "It's not disorderly conduct." Davenport: "Yes, it is." Georgia: "On my property?" Davenport: "Yes, it is." Georgia: "You know you're wrong. You fuck with me I'll sue the motherfucking shit…" Davenport: "[inaudible]." Georgia: "…out of Tompkins County, and you…[inaudible] motherfucker." Davenport: "That's totally fine."

<u>T03:31:25Z</u>:  The music stops.

<u>T03:31:26Z</u>: Georgia: "Arrest me." Davenport: "Go ahead. Put your hands behind your back. Let's do it." Georgia: "No, I'm not putting my hands behind my back." Davenport: "So, what do you want to do? You want to get arrested or not?"

<u>T03:31:26Z</u>:  The music starts again, but it sounds as if the volume is lower.

<u>T03:31:26Z</u>: Georgia: "Do whatever the fuck you want to do." Davenport: "All right, let's, let's go." Georgia: "No, no, no." Davenport: "Oh, so apparently not, huh?" Georgia: "You're on my, my land motherfucker and you want to fuck with me? I'll fucking trash your ass. I'm 62 years old and I'll fuck you up." Davenport: "Turn your music down." Georgia: "I will not." Davenport: "Or you're getting arrested." Georgia: "I will not. I will not. You can't make me." Davenport: "Yes, I can." Georgia: "No, you can't" Davenport: "Yes, I can." Georgia: "You're fucking your law abiding fucking…[inaudible]." Davenport: "All right. I'll get my Sergeant over here right now." Georgia: "Get him. Get him over here.

<u>T03:32:00Z</u>: The music stops.

<u>T03:32:00Z</u>: Georgia: "Get him over here." Davenport: "All right." Georgia: "Get him over here. Get him over here. And you fucking motherfucker…[inaudible]…get the fuck off my land."

<u>T03:32:13Z</u>:  Davenport's cell phone screen can be seen showing he is calling "James Vann."

<u>T03:32:14Z</u>: Georgia, pointing towards the road: "Walk out on the street. Walk it the fuck on my street. You walk the fuck out on my street. Walk it on VanOstrand Road. Get out my driveway. Get the fuck…" Davenport: "I'll be right back." Davenport's cell phone

comes into view showing he is calling "James Vann."  Georgia:  "Get the fuck out of my driveway."  Davenport:  "All right."  Georgia points toward the driveway.  He is standing approximately one to two feet from Davenport.  Davenport:  "I'm not playing with you."  Georgia"  "Get the fuck…"  Davenport:  "No."

T03:32:25Z:  Georgia can be seen stumbling backwards, presumably having been pushed by Davenport who says "Back the fuck up."  Georgia is now approximately three to four feet away from Davenport.

T03:32:36Z:  Davenport:  "You need to back the fuck up."  While yelling this, Davenport rushes Georgia —who had not moved and who was not moving toward Davenport — and pushes Georgia violently, causing Georgia to fly backwards, fall over a cooler, then, as he is falling to the ground, strike his outdoor grill with his right arm.  Georgia falls to the ground, landing on his back, his arms and legs flailing.  Davenport, who is still moving toward Georgia, continues to yell "…I'm sick of this fucking game right now."  Georgia (still on the ground): "All right. Calm down."  Davenport:  "No.  You need to shut the fuck up."  Georgia:  "You need to leave my property.  You're going to fuck me up."  Davenport:  "Because you keep getting close to me.  I keep tell you to back up."  Georgia:  "It's my property.  No, I didn't.  No, I didn't.  I never got…[inaudible]."  Davenport:  "I'm going to pepper spray you if you don't shut the…"

T03:32:48Z:  Davenport is on Georgia, who is lying on his belly on the ground.  Davenport is wielding pepper spray in his left hand, pointed at Georgia's head from inches away.  Davenport is holding Georgia's head down against the patio stone with his right hand and arm.

T03:32:48Z:  Georgia:  "I never did nothing."  Davenport:  "…[inaudible]…lay on your stomach and put your hands on your back right now."  Georgia:  "That's what I'm doing.  I'm on my property."  Davenport:  "Right now.  On your stomach.  Hands behind your back or you're getting sprayed."  Georgia:  "I'm on my property, drinking my alcohol…"

T03:32:57Z:  Davenport appears to try and decompress the trigger on the pepper spray, but it doesn't discharge.  Davenport fiddles with the thumb trigger but apparently is unable to make it work.

T03:33:00Z:  Georgia:  "…and your stinking…"

T03:33:01Z:  An audible click is heard from the pepper spray as Davenport continues to fix it.

18

<u>T03:33:02Z</u>:  Georgia:  "fucking…no, don't you fucking with me. I'm going to sue the motherfucking shit.  Go ahead, spray me."

<u>T03:33:08Z</u>:  There is another click from the pepper spray.

<u>T03:33:08Z</u>:  Georgia:  "Go ahead. Go ahead. Go ahead I'm on my own land doing my fucking thing."

<u>T03:33:17Z</u>:  Davenport:  "Show your hands.  Give me your fucking hands."  Georgia:  "Okay, you can arrest me.  You can arrest me.  Arrest me on my property.  Arrest me on my prop… I will fucking own you.  Go ahead."  Davenport places the handcuffs on Georgia. Georgia: "Go ahead. Go ahead, put your handcuffs on.  Put your handcuffs on. Have a good time. Go ahead.  Go ahead.  Have fun.  Throw handcuffs on me.  Go ahead. What did I do wrong?  Now, you're going to throw me down on my own property." Davenport: "Stay right there." Georgia: "You're going to throw me down…" Davenport: "You have any weapons on you?"  Georgia:  "You're going to… No." Davenport: "Are you hurt?"  Georgia:  "..[inaudible] nothing on me.  I'm on my land.  I'm on my land.  My tax-paying dollar fucking land and you're throwing me down.  You gotta be fucking shitting me.  On my land."

<u>T03:34:22Z</u>:  Davenport's audio recording on body camera turns off.

<u>T03:34:44Z</u>:  Davenport's audio recording on body camera comes back on.

<u>T03:34:45Z</u>:  Georgia:  "…fucking shit out of you.  You're on my property.  We're not on the fucking side of the road."  Davenport:  "No, we got…"  Georgia:  "No, you motherfucker.  You're not on the side of the road.  I'm on my property.  My tax-paying… don't fucking push me down."  Davenport:  "Lay right down."  Georgia:  "Don't' push me down motherfucker.  Let go of me."  Davenport:  "[inaudible]."  Georgia:  "No.  I'm on my property.  I've done nothing wrong to nobody.  And I'll become a millionaire because of you motherfucker."  Davenport:  "No, 'cause you kept walking up to me and pointing at me."  Georgia:  "What the?  Fuck you."  Davenport:  "Kept telling you to get back."  Georgia:  "Fuck you, you're in my house."  Davenport:  "Kept telling you to get back."  Georgia:  "You're in my house."  Davenport:  "Yeah, right, for loud music." Georgia:  "You're in my house.  No. Go ahead, fucking do something."  Davenport:  "Sit down."  Georgia:  "No, I won't sit down.  You're in my house motherfucker.  This is my property.  I paid for this.  I fucking fought in the goddamn Vietnam War and you're gonna sit here and fucking tell me what fucking music I'm going to play.  This is my property.  Don't you date shut off your fucking camera. You piece of shit."  Davenport: "It's recording."  Georgia:  "You piece of shit.  I'll fuck you over.  Take your handcuffs off

of my hands." Davenport: "No, 'cause you're being aggressive." Georgia: "No. Take the handcuffs… being aggressive. Fuck you. You're on my property. You're on my land. Not your land, you motherfucker. I'll own your house. I'll own every fucking thing you've ever owned. I'll fuck you out of your car. Everything you think you fucking have. I'll fuck the county. You're sitting in my… are you shitting me? Are you shitting me?" Davenport: "No." Georgia: "No, you're fucking bullshit."

T03:36:39Z:  Georgia, who is handcuffed, sitting with his hands behind his back, kicks a plastic water cooler.

T03:36:41Z:  Georgia:  "You're going to have to punch me. Now get the handcuffs off right now. I'll let you go. Get the handcuffs off. Get the fucking handcuffs off me. I'm going to get a lawyer and sue the motherfucking shit out of you." Davenport: "That's fine. I believe that." Georgia: "No. I'm telling you. I'm suing the fucking shit out of you and this county. I'll never work again. You have made… I actually thought I won the lotto. I thought I would win the lotto tonight. You know what?"

T03:37:15Z:  Davenport flashes his flashlight toward the end of the driveway to get Vann's attention.

T03:37:15Z:  Georgia: "Okay. Do what you gotta do. Do what you gotta do. Bring your other douchebag. Bring your fucking…"

T03:37:23Z:  A patrol vehicle comes into view passing the end of Georgia's driveway. Davenport flashes his flashlight again.

T03:37:24Z:  Georgia: "Hey, right here. My, my driveway. I can't wait, you douchebag. I will own you. I will own the county. In my fucking driveway." Davenport: "Will you be quiet?" Georgia: "Shut the fuck up. You be quiet. You're in my fucking property. On my property. You motherfuckers are trying to arrest me. I'm telling you what. You fucking douchebag. You walked into my fucking house." Davenport: "No, I did not walk into your house." Georgia: "Yes, you did." Davenport: "I was here the whole time." Georgia: "You walked into my fucking patio and you decided to arrest me."

T03:38:01Z:  Lieutenant James Vann ("Vann") comes into view on Davenport's body camera walking down Georgia's driveway.

T03:38:03Z:  Georgia: "Hey, you better be careful because you're going to lose everything you ever had."

<u>T03:38:07Z</u>: Vann: "[inaudible]." Davenport: "Yeah." Georgia: "Everything. Everything you ever had. I'm on my property, and this dumb fuck…" Vann: "Okay, let's go." Georgia: "No, no, no. Pick me up. Here we go. Now wait a minute. You're going walk me off my property. Off my property…[inaudble]… motherfucking shit…[inaudible]… what are you arresting me for?" Davenport: "Obstructing governmental administration." Georgia: "How?" Davenport: "'Cause you weren't listening to what I was trying to tell you." Georgia: "[inaudible]… wait a minute. On my property. On my property. Wait a minute. Wait a minute." Davenport: "No, we're not waiting." Georgia: "No…[inaudible]… on my property." Vann or Davenport: "[inaudible]." Georgia: "…[inaudible]… you can't pull me off my patio. You're gonna pull me off my patio." Vann or Davenport: "Are you left side?

## DAMAGES

Georgia is entitled damages for the violations of his civil rights, and punitive damages for the acts of Davenport taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Georgia.

Georgia suffered physical injuries including contusions of the right and left wrists; abrasions of the right and left wrists: contusions of the right and left lower legs and abrasions of the right and left lower legs, and chest pain, knee pain, and hip pain, and mental and emotional distress, and loss of enjoyment of life. P-23, P-24, P-25. The injuries sustained by Georgia caused Georgia to seek and obtain medical treatment and incur medical expenses totaling $557.71. P-37.

Georgia also suffered humiliation as a result of the press release issued by the Tompkins County Sheriff's Department. P-36.

## CONCLUSION

The evidence at trial establishes Davenport violated Georgia's constitutional rights by using excessive force against him, and falsely arresting and imprisoning, and maliciously prosecuting Georgia. Furthermore, officers of reasonable competence would not disagreee that Davenport lacked probable cause to arrest Georgia and Davenport therefore has no qualified immunity.

Accordingly, this Court should find in favor of Georgia on all counts and enter judgment accordingly.

*[signature]*

Edward E. Kopko, Lawyer, P.C., NDNY Bar Roll No.:  510874
Atty. for Plaintiff Ronald Georgia
308 North Tioga Street, 2nd Floor
Ithaca, New York 14850
607.269.1300; 607.269.1301 fax; office@kopko.law
Wednesday, May 31, 2023

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I am over the age of eighteen years, employed in Tompkins County New York.  The business address is 308 N. Tioga St., Ste.2, Ithaca, New York 14850.

**DOCUMENTS**:        **Plaintiff's Closing Argument**

I caused to be served a true copy of the above-named documents per the addressee below by ELECTRONIC SERVICE.

William J. Troy, III, Esq.
NDNY Bar Roll No. 301140
Tompkins County Attorney
125 E. Court St.
Ithaca, NY 14850

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.
Served and executed this 31st day of May, 2023.

*[signature]*

_____
Edward E. Kopko, Esq.

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
_____
RONALD M. GEORGIA,

                    Plaintiff,

vs.                    3:21-cv-484

KYLE DAVENPORT,

                    Defendant.
_____


                    EXCERPT
             Transcript of Testimony
                April 19, 2023
          Federal Building and Courthouse
                15 Henry Street
              Binghamton, New York


      The HONORABLE MIROSLAV LOVRIC Presiding.



              A P P E A R A N C E S



For Plaintiff:    EDWARD KOPKO, ESQ.
                  JASON VIOLETTE, ESQ.
                  KEVIN KELLY, ESQ.

For Defendant:    WILLIAM TROY III, ESQ.



                    *Ruth I. Lynch, RPR, RMR, NYSRCR*
                    *Official United States Court Reporter*
                     *Binghamton, New York  13901*

Exhibit 1

1          THE CLERK:  Court is now in session.  Case is

2     Ronald M. Georgia versus Kyle Davenport, 3:21-CV-484.

3     Please state your appearances for the record.

4          MR. KOPKO:  Edward Kopko for the plaintiff.

5          THE COURT:  All right.  Good morning, Mr. Kopko.

6          MR. KOPKO:  Good morning, sir.

7          MR. TROY:  William Troy for the respondent, the

8     defendant.

9          THE COURT:  Good morning, Mr. Troy.

10         And I know, Mr. Kopko, you have also an associate

11    that's helping out, Kevin Kelly here?

12         MR. KOPKO:  Attorney Kevin Kelly is here.  And

13    Attorney Jason Violette had to -- informed you that he had

14    to participate in a virtual conference with a New York

15    Supreme Court Justice.

16         THE COURT:  Okay.  Very good.  All right.  And

17    good morning, Mr. Georgia, to you.

18         PLAINTIFF GEORGIA:  Good morning.

19         THE COURT:  And good morning, Mr. Davenport.

20         DEFENDANT DAVENPORT:  Good morning, sir.

21         THE COURT:  All right.  All right.  Well, we're

22    here this morning, a continuation of the trial that we

23    officially started on Monday, April 17.  And just to recap

24    on what we accomplished and the importance of the matters on

25    Monday, so I did again cover with the parties, counsel and

1    the actual parties, the joint stipulation at 53.  Everyone

2    confirmed that it was their intention to proceed with a

3    bench trial, and we are going to do that.  And then

4    importantly, also the parties agreed upon and the Court

5    received in evidence exhibits 1 through 42 which are now in

6    evidence.  And you do not need to lay any foundation.  You

7    can utilize those exhibits as you see fit, and you can also

8    obviously question any witnesses simply by going directly to

9    the exhibit.

10          And then, Mr. Kopko, the Court received also on

11   Monday the trial exhibit form that you were kind enough to

12   put together along with Mr. Troy, and my law -- my courtroom

13   deputy has that.  So that will be the official exhibit list

14   of those 42 exhibits that are now in evidence.

15          And then lastly, simply, I granted and I have no

16   problem with the attorneys' request at the end of the trial

17   to submit in writing what would otherwise be oral summations

18   and rebuttal.  And we'll set a schedule for that if we get

19   to it, we'll set a schedule of that at the end of the trial.

20          So otherwise, Mr. Kopko, are we ready to proceed

21   today?

22          MR. KOPKO:  Yes, sir.

23          THE COURT:  All right.  Mr. Troy, are we ready to

24   proceed today?

25          MR. TROY:  Yes, sir.

```
 1              THE COURT:  All right.  We'll then proceed with

 2    the opening statements and then with the plaintiff's

 3    case-in-chief.

 4                      - - - - -

 5              (TESTIMONY EXCERPT AS FOLLOWS:)

 6              THE COURT:  All right.  Mr. Kopko, is the

 7    plaintiff prepared to present its case-in-chief?

 8              MR. KOPKO:  Yes, your Honor.

 9              THE COURT:  All right, Mr. Kopko, you may proceed.

10              MR. KOPKO:  Call Mr. Davenport, your Honor.

11              THE COURT:  All right.  Mr. Davenport, if you

12    could come right up here.  This is the witness chair, as we

13    affectionately call it.  And if you just stand for a moment,

14    you'll be given an oath.

15              THE CLERK:  Please state your name for the record.

16              THE WITNESS:  Kyle Davenport.

17                  (The witness was duly sworn.)

18              THE COURT:  All right, let me just, before we

19    start, Mr. Kopko, so is it Deputy Davenport, Officer

20    Davenport?

21              THE WITNESS:  Deputy at the time.  At the time it

22    was Deputy.

23              THE COURT:  Okay.  That's not the critical part.

24    The critical part is use the microphone.

25                  THE WITNESS:  Yes, sir.
```

1              THE COURT:  It picks up pretty well but it will

2     make it easier for all of us, including the court reporter.

3     You can also adjust that microphone up and down.  And

4     Mr. Kopko as well, please use the microphone.

5              And then, Deputy Davenport, if there are any

6     exhibits that will be shown to you, you'll see them right

7     there on the screen.  If you don't see it, please tell us.

8     As I said before, technology is great until it doesn't work,

9     so.  We should all make sure that we're seeing it.

10             All right.  Mr. Kopko, you may proceed.

11             MR. KOPKO:  Thank you, your Honor.

12                       KYLE DAVENPORT,

13           having been called as a witness, having

14            been duly sworn, testified as follows:

15                     CROSS-EXAMINATION

16    BY MR. KOPKO:

17    Q     Good morning.

18    A     Good morning.

19    Q     State your full name, please?

20    A     Kyle William Davenport.

21    Q     And, Mr. Davenport, I'm going to ask you about the

22    incidents that occurred on June 1st, 2019.  Okay?

23    A     Okay.

24    Q     And you were on patrol as a sworn deputy with the

25    Tompkins County Sheriff's Department on that date, right?

1  A      That is correct.

2          MR. KOPKO:  Your Honor, if you don't mind me

3  instructing him.

4  BY MR. KOPKO:

5  Q      You don't need to lean forward all the time.  You can

6  pull your chair forward so it's more comfortable.  Yes.

7  A      Okay.

8  Q      And what time did you go on duty?

9  A      I went on duty at 11 p.m. that night.

10  Q      Now, you received a communication from the Tompkins

11  County dispatch about a noise complaint, correct?

12  A      That's correct.

13  Q      And that information that you received led you to

14  believe that you should go to Mr. Georgia's address on

15  Van Ostrand Road, correct?

16  A      I didn't know whose address it was at the time.

17  Q      You didn't know anything about that, right, all you

18  had was a noise complaint?

19  A      That's correct.  And an address.

20  Q      And when you got that noise complaint, you knew that

21  the Town of Lansing did not have a noise ordinance.

22  A      That's correct.

23  Q      That there was no -- no controls from the Town of

24  Lansing about decibel levels, correct?

25  A      That's correct.

1   Q     Or time restrictions, correct?

2   A     That's correct.

3   Q     Or locations of gatherings?

4   A     That's correct.

5   Q     None of those factors you were aware applied to what

6   you were doing.  Correct?

7   A     Right.

8   Q     One moment, please.  And, Deputy, you drove over there

9   and you did not contact the complainant, correct?

10  A     Correct.

11  Q     You didn't seek any information about whether the

12  complainant was particularly vulnerable to noises, correct?

13  A     Correct.

14  Q     Even though the complainant's house was directly

15  across the street from Mr. Georgia's house, correct?

16  A     Correct.

17  Q     And you agree that you could have very, very readily

18  just got out of your walk -- your patrol car and had walked

19  50 feet or so, and you could have gone over to

20  Mr. Gonzalez's house.

21  A     Correct.

22  Q     All right.  And you could have called the dispatch to

23  make certain that Mr. Gonzalez was available to you,

24  correct?

25  A     Correct.

DAVENPORT - CROSS                              8

1    Q      And you didn't do any of that.

2    A      That's correct.

3    Q      You parked your car on the roadway, correct?

4    A      Yes, sir.

5    Q      And you walked up the driveway, correct?

6    A      Yes.

7    Q      You could have driven your car up the driveway,

8    alerting people to your presence, correct?

9    A      Yes.

10   Q      You preferred to park your car on the driveway and

11   walk up the driveway in the dark.  Correct?

12   A      I parked my car on the roadway, then walked up the

13   driveway.

14   Q      But you did not announce your presence when you began

15   to walk up the driveway.

16   A      That's correct.

17   Q      And you agree that you could have pulled into the

18   driveway and turned on your emergency lights, correct?

19   A      I could have, yes.

20   Q      You -- you agree that you could have pulled into the

21   driveway and used the vehicle's public address system to

22   alert the occupants that you were there.

23   A      I could have done that as well, yes.

24   Q      And you didn't do that either.

25   A      Correct.

1  Q     All right.  Now, instead you snuck up the driveway,

2  correct?

3  A     I walked normally up the driveway.

4  Q     Well, you didn't use your flashlight to alert the

5  occupants that you were coming up there.

6  A     Correct.

7  Q     Now, there were no exigent circumstances for you to

8  enter the property.

9  A     Okay.

10  Q     I'm asking you, do you agree that there were no

11  exigent circumstances for you to enter the property?

12  A     Correct, yes.  There was no exigent circumstances.

13  Q     And you agree that you did not have a warrant?

14  A     Correct.

15  Q     All right.  And you agree, as we said before, that the

16  Town of Lansing did not have any sort of ordinance

17  controlling the volume, the place, the time of noise,

18  correct?

19  A     Correct.

20  Q     You were there because you decided that you were going

21  to stop the noise, correct?

22  A     I was going to do my best, correct.

23  Q     But that's what your goal was, correct?

24  A     Correct.

25  Q     Now, when you were walking up there, you did not

1    consider that Mr. Georgia may have had a hearing impairment

2    that he needed the music louder, correct?

3    A    Correct.

4    Q    You had no idea who turned the volume of the music up.

5    A    I had an idea that it was Mr. Georgia since he was the

6    only one there.

7    Q    You did not know that when you were walking up the

8    driveway.

9    A    As I was walking up the driveway, no, I did not know

10   that.

11   Q    You had no idea whether there were 4 people there or

12   400 people.

13   A    Correct.

14   Q    Right, so you had no idea who was responsible for the

15   music.

16   A    Correct.

17   Q    And when you were walking up there, you came upon

18   Mr. Georgia, correct?

19   A    Correct.

20   Q    And the first thing that Mr. Georgia said to you is

21   get the fuck off of my property.  Correct?

22   A    That's correct.

23   Q    All right.  And at that time, at that very instant,

24   you could have simply turned around and got the fuck off of

25   his property, correct?

```
 1    A     Correct.
 2    Q     But you decided that you weren't going to do that,
 3    correct?
 4    A     Correct.
 5    Q     Because you were going to get that music off one way
 6    or the other, correct?
 7              MR. TROY:  Objection to form.
 8    A     No.
 9              MR. TROY:  Argumentative.
10              THE COURT:  Hold on a second, Mr. Kopko.  I'm
11    sorry, Mr. Troy?
12              MR. TROY:  I said argumentative.
13              THE COURT:  It is a little argumentative,
14    Mr. Kopko.  But I'll -- I'll let you know --
15              MR. KOPKO:  We'll move on, your Honor.
16              At this time, your Honor, I would like to display
17    the video camera.
18              THE COURT:  You may display any exhibit 1 through
19    42, Mr. Kopko.  And just let me know which exhibit we're
20    looking at now.
21              MR. KOPKO:  We're looking at D-14, your Honor.
22              THE COURT:  14?
23              MR. KOPKO:  Yeah.
24              (Video played)
25    BY MR. KOPKO:
```

1   Q      Now, Deputy, you were wearing a body worn AXOM video

2   and audio recorder, correct?

3   A      Correct.

4   Q      Okay.

5          MR. TROY:  Your Honor?

6          THE COURT:  Yeah, Mr. Troy.

7          MR. TROY:  I was just going to say I would like to

8   stop this before he asks his next question but he stopped

9   now.

10         THE COURT:  Okay.  Yeah, Mr. Kopko, it's playing

11  for a little bit.  And again, you can exhibit the exhibit as

12  you see fit, but it was playing while you were asking

13  questions.

14         MR. KOPKO:  Your Honor, I beg your pardon.  I know

15  that Mr. Troy is much more schooled in doing this stuff.

16  BY MR. KOPKO:

17  Q      All right, so you're wearing this audio and video

18  recorder, correct?

19  A      Correct.

20  Q      And the published protocols, policies, and guidelines

21  from the sheriff's department require you to activate it

22  when you're having contact with the public, correct?

23  A      Correct.

24  Q      And those same policies require you to keep it on when

25  you're having that contact, correct?

1    A      Correct.

2    Q      And you activated it when you were getting out?

3    A      Correct.

4           (Video played)

5    Q      Now, when this begins recording, I hear faint music,

6    but I'm not testifying.  When you heard that music, is that

7    what you believed to be loud music?

8    A      Yes.

9    Q      All right.  What you hear on -- on this tape is what

10   you personally heard.

11   A      Correct, yes.

12   Q      And you're telling this Court that you thought that

13   that was loud music.

14   A      Yes, I did.

15   Q      You don't have any particular skill or training in

16   determining unreasonably loud noises?

17   A      No, I don't.

18   Q      You never got any training like that, right?

19   A      No.

20   Q      And you didn't have a decibel meter with you?

21   A      That's correct.

22   Q      So this was all Deputy Davenport taking it upon

23   himself to determine that this was loud music, right?

24   A      That's correct, as well as the complainant's.

25   Q      You never talked to the complainant.

 1   A      Correct.

 2   Q      All right.  You didn't say a word to the complainant,

 3   correct?

 4   A      True.

 5   Q      You don't know what the level of music was at the time

 6   the complaint was made and the time that you heard it.

 7   A      That's correct.

 8   Q      You have no idea what that was.

 9   A      That's correct.

10   Q      You didn't ask the complainant what time he heard it,

11   correct?

12   A      That's correct.

13   Q      You didn't know anything about that.

14   A      Correct.

15   Q      All right.  You determined when you were walking up

16   the driveway that this was loud music.

17   A      Correct.

18          (Video played)

19   Q      All right.  The first thing that Mr. Georgia says to

20   you is get the fuck off of my property, right?

21   A      That's correct.

22   Q      And you clearly understood that command --

23   A      Correct.

24   Q      -- correct?

25          And you knew then that you -- you did not have a

1  warrant, right, to be on the property, you didn't have

2  judicial authority authorizing you to be there, correct?

3  A    I had authority because I had a complaint, and I

4  walked down the driveway.

5  Q    All right.  But you said complaint.  We went over this

6  several times.  You never got a complaint, correct?

7  A    No, I did, through my dispatch center.

8  Q    Through your dispatch center.

9  A    That's correct.

10 Q    You don't know what the complaint was?

11 A    It was loud music.

12 Q    Loud music, but you don't know how loud it was, right?

13 A    That's correct.

14 Q    You don't know when that complaint was -- was made

15 about the loud music, correct?

16 A    I -- correct.

17 Q    So you could have at that point, Deputy, just turned

18 around and walked away, correct?

19 A    Yes.

20 Q    But you chose not to do that, right?

21 A    Correct.

22 Q    Because you were dead set on getting this music turned

23 down, right?

24        MR. TROY:  Objection to form, your Honor, it's

25 argumentative.

1    A      Right.

2              THE COURT:  Well, it is a little bit, but again

3    what Mr. Kopko is trying to elicit from Deputy Davenport, so

4    I'll allow it, but, Mr. Kopko, I do want to, you know,

5    preface that you can make your points about asking the

6    witness whatever information you want from them but then not

7    argue with him as to what he should, could have, would have,

8    because you can make those arguments to the Court.  Unless

9    there's a point that you want to ask the witness as to why

10   he didn't do something, but simply saying to him well, you

11   could have done that, you know, that -- that's obvious that

12   he could have done anything, but I just don't want to get

13   into a situation where we're having arguments from the

14   witness.

15             MR. KOPKO:  Go ahead.

16             (Video played)

17   BY MR. KOPKO:

18   Q    All right.  Now, you put your right hand on the left

19   portion of Mr. Georgia's chest and you shoved him backwards,

20   correct?

21   A    I -- yeah.  Yeah.  Correct.

22   Q    Now, Deputy, you know from your training, right, that

23   an unauthorized touching like that is a battery, correct?

24   A      No.  I don't recognize touching -- I guess I'm

25   confused with what you're trying to ask.

1  Q     Let me try to clarify this, all right.  If you -- if

2  you were out on the street in uniform and I walked up to you

3  and I put my hand on your chest and shoved you backwards,

4  you know that you could arrest me for battery, correct?

5  A     I could arrest you for harassment violation level.

6  Q     Violation level?

7  A     Yes.

8  Q     All right.  So putting your hand on Mr. Georgia and

9  shoving him back you acknowledge was at least harassment

10 violation level, correct?

11 A     Correct.

12 Q     Now, did you try -- go ahead.

13        (Video played)

14 Q     Now, you grabbed Mr. Georgia's arm, correct?

15 A     I attempted to, correct.

16 Q     No, you grabbed his arm.  We can see it.  We're going

17 to do it again.

18        (Video played)

19 Q     Right there.  You see you grabbed his arm.

20 A     Yes, I do.

21 Q     All right.  Now, an unauthorized touching of another

22 person can be this harassment level violation, correct?

23 A     Correct.

24 Q     All right.  And that's what you did there, grabbing

25 his arm like that.

1   A     Is that a question?

2   Q     Yes.

3   A     Yes, I grabbed his arm.

4   Q     All right, now.

5         (Video played)

6   Q     Do you recall saying that you're not playing this

7   fucking game?

8   A     I do.

9   Q     All right.  What game were you playing?

10  A     I wasn't playing a game.

11  Q     What game were you referring to?

12  A     Just letting him yell at me and walk all over me.

13  Q     Letting him do what?

14  A     Yell at me and, I guess it's a phrase, to walk all

15  over me, basically like me not doing anything about it.

16  Q     Okay.  Well, you agree that -- that people can protest

17  to the police, correct?

18  A     That's correct.

19  Q     And you agree that that's not a game, that people have

20  a constitutional right to do that, correct?

21  A     Correct.

22  Q     And you agree that people can say almost anything to

23  the police except for fighting words, imminent fighting

24  words, and they have a constitutional right to say that,

25  right?

1   A      Correct.

2   Q      But yet you weren't going to play that game, correct?

3   A      Correct.

4   Q      And you weren't going to let Mr. Georgia walk all over

5   you, correct?

6   A      That's correct.

7   Q      That's what you're saying here.

8   A      Yes.

9   Q      And by walk all over you, what you mean is that you

10   were not going to allow Mr. Georgia to exercise his

11   constitutional right to protest you being there, correct?

12   A      No.

13   Q      By saying you weren't going to let him walk all over

14   you, you were not going to tolerate him ordering you off the

15   property, correct?

16   A      Correct.

17   Q      Now, you agree that Mr. Georgia had every right to

18   order you off of the property, correct?

19   A      That's correct.

20   Q      But you decided that nobody was going to order you off

21   of that property, correct?

22   A      No.

23   Q      You decided that Georgia was not going to order you

24   off of that property --

25   A      Correct.

1    Q     -- right?

2          And you were going to stay on the property, right?

3    A     I wasn't going to stay on the property.

4    Q     Why didn't you just turn around and leave, then?

5    A     Because I wanted to solve the problem with the noise.

6    Q     Well, you say solve the problem.  Deputy, you were the

7    one who thought there was a problem, correct?

8    A     Myself and Mr. Gonzalez.

9    Q     You never talked to Gonzalez, we already went over all

10   of that stuff.  You were the one who decided that there was

11   a problem, correct?

12   A     Myself and Mr. Gonzalez.  I believe that

13   Mr. Gonzalez --

14          MR. KOPKO:  Well --

15   A     -- also had a problem.

16          MR. KOPKO:  -- I object to that, your Honor, I

17   move to strike.  What he believes about Gonzalez is of no

18   moment.

19          THE COURT:  No, Mr. Kopko, I mean your -- your

20   questions, last several, are really getting into the mind of

21   the witness and asking him to articulate what was going on

22   in his mind.  The witness can say whatever it is, and you

23   can obviously examine him about the logic or illogic of that

24   statement, but I think that's where you've gone with this is

25   you're asking him to tell you what's going on in his head

DAVENPORT - CROSS                    21

1    and what he's doing or not doing and why, and so on, and so.

2              MR. KOPKO:  My motion to strike, that was a little

3    bit more directed, your Honor.  He never talked to Gonzalez.

4    He doesn't know anything about Gonzalez.

5              THE COURT:  I know that, and I think the record's

6    clear of that, but I think the -- the witness is

7    articulating, whether rightly or wrongly, why he did what he

8    did, and you may be right that he never spoke to Gonzalez,

9    and I believe the witness has said that.  But the witness is

10   also saying dispatch gave me the following information, and

11   he's putting two and two together in his mind.  All that

12   being said, it's his mental state and state of mind when

13   these things unfolded.  If you don't want to hear, then

14   don't ask him the question.  Don't say what were you

15   thinking or why were you doing this or why weren't you.  But

16   that's where we've gone, which, again, I don't have a

17   problem with that, because I think it's legitimate for you

18   to explore this witness's state of mind in connection with

19   the actions he took or failed to take.

20             MR. KOPKO:  We're going to move on here, Judge.

21   Go ahead.

22             (Video played)

23   BY MR. KOPKO:

24   Q    You heard the part where you said that Mr. Georgia was

25   being an ass?

1   A      Yes.

2   Q      Did you hear that part?

3   A      Yes.

4   Q      And you heard the part again where you said you're not

5   playing these fucking games --

6   A      Yes.

7   Q      -- right?

8          Is that the same game that you described earlier?

9   A      Yes.

10  Q      Now, after this, you had a conversation with your

11  lieutenant.  What is his name?  I have difficulty

12  pronouncing that.

13  A      It's Lieutenant Koskinen.

14  Q      Koskinen?

15  A      That's correct.

16  Q      Koskinen.  So Lieutenant Koskinen watched this tape,

17  correct?

18  A      That's correct.

19  Q      And he told you that your language on this tape was

20  inappropriate, unprofessional, correct?

21  A      That's correct.

22  Q      Do you agree with that?

23  A      I do.

24  Q      All right.  You didn't agree with it initially,

25  though, did you?

1   A      No.

2   Q      What -- what happened between the couple of minutes

3   between when you said you didn't do anything inappropriate

4   and to the time where you acknowledge that you were

5   inappropriate, what happened in between that time?

6   A      I think I matured as a police officer and I realized

7   that being professional is pretty important, and not cursing

8   to people, to citizens, while we're on call, I think that's,

9   I guess, important not to do that.  And that's our policy

10  now.

11  Q      Well, Deputy, you -- you knew on June 1st, 2019, that

12  it was inappropriate to be using that language, didn't you?

13  A      No.

14  Q      You didn't realize that?

15  A      No.

16  Q      You didn't get any of that training in the police

17  academy?

18  A      No.

19  Q      Nothing like that.

20  A      No.

21  Q      Had you used -- have you seen other supervisory

22  personnel at Tompkins County using that sort of language

23  towards a member of the public?

24  A      Not that I can remember.

25  Q      Well, what was your model for doing that?

1  A    Well, I was -- when I was working in the Village of
2  Groton, my field training officer told me sometimes you need
3  to talk on other people's level to get their attention.
4  Q    To get their attention.
5  A    That's correct.
6  Q    So you were trying to -- you were -- you were using
7  unprofessional language to get the attention of
8  Mr. Georgia --
9  A    That's correct.
10 Q    -- right?
11       It seems to me from the tape that you have
12 Mr. Georgia's undivided attention.  Tell us all of the
13 reasons why you thought you didn't have Mr. Georgia's
14 attention.
15 A    He was talking over me, every time -- every time I
16 tried to explain the reasons why I was there, he was talking
17 over me.
18 Q    Well, people have a right to talk over a police
19 officer, don't they?
20 A    They do, yes.
21 Q    Yeah.  Now, that irritated you, though, didn't it?
22 A    Can you repeat the question?
23 Q    Yeah.  You were irritated about the fact that
24 Mr. Georgia was talking over you.
25 A    No, I wasn't irritated.

1    Q     The tone of your voice is louder, right?  You're more

2    insistent.  You don't describe that as being irritated?

3    A     No, I think I was just doing my best to get his

4    attention.

5    Q     To get his attention.

6    A     That's correct.

7    Q     Well, I began this segment by asking what made you

8    believe that you didn't have his attention.  He was standing

9    right in front of you.

10   A     Because, like I said before, he was talking over me

11   and wouldn't let me finish sentences when I was trying to

12   explain the reason why I was there, what I was hoping to

13   accomplish.

14   Q     All right.  You agree that Mr. Georgia had the right

15   to say anything he wanted on his own property.  Right?  You

16   agree with that?

17   A     That's correct.

18   Q     Yeah.  And if he wanted to, you agree that he had the

19   right to talk over you.

20   A     That's correct.

21   Q     That's correct?  Yeah.  And you agree now that your

22   behavior was unprofessional, correct?

23   A     My language was unprofessional.

24   Q     Your language was unprofessional.  You don't think

25   anything else that you did there was unprofessional?

1    A      No.

2    Q      All right.  So your language was unprofessional.  You

3    agree, Deputy, that because your language was unprofessional

4    that you could have been escalating this encounter.

5    A      On June 1st, 2019?  No, I did not believe that.

6    Q      You didn't believe that?

7    A      No.

8    Q      You believe it now?

9    A      I do.

10   Q      And that you contributed to this unfortunate outcome?

11   A      There's a possibility of that, yeah.

12   Q      Well, you say possibility.  Your lieutenant says it

13   was unprofessional, you agree today that you -- that it's

14   unprofessional, right?  Don't -- don't you further agree

15   that your language was unprofessional on that occasion and

16   it led to a further escalation?

17   A      I don't know that.

18   Q      You don't know that?

19   A      No.

20   Q      If you had just turned around and walked away, none of

21   this would have happened, right?

22   A      That's correct.

23   Q      All right, now, you grabbed Mr. Georgia's arm, right?

24   A      Yes.

25   Q      And then you shoved him backwards, correct?

1   A     Correct.

2   Q     All right.  And then you continued, what you say,

3   trying to get Mr. Georgia's attention, right?

4   A     Correct.

5   Q     Did anything happen that led you to believe that you

6   did not have his attention?

7   A     Yes.

8   Q     What was that?

9   A     Again, like I stated before, he was talking over me

10  and he was not -- I was trying to explain the reasons why I

11  was there and what I was hoping to accomplish, and he

12  wouldn't let me finish my sentences.

13  Q     He did not have to let you finish sentences, did he?

14  A     Correct.

15  Q     All right, so.

16        (Video played)

17  Q     Now, again, you've repeated now for the third time I'm

18  not playing this game.  Correct?

19  A     Correct.

20  Q     All right.  Did it occur to you to call a supervisor

21  at that point?

22  A     Yes, it did.

23  Q     All right.  To just stop, right?  Did it occur to you

24  just to stop?

25  A     It did.

1    Q    All right.  But you didn't stop, correct?

2    A    Correct.

3    Q    You kept going with your same line of behavior.

4    Correct?

5    A    That's correct.

6    Q    In fact, you escalated your behavior by grabbing his

7    arm, correct?

8    A    I was trying to -- no.  That's not correct.

9    Q    You escalated your -- his -- your behavior when you

10   pushed him backwards, correct?

11   A    No, I don't -- I mean, I don't know what escalated his

12   behavior.

13   Q    You don't know what escalate means?  You have a

14   bachelor's degree and you don't know what escalate means?

15   A    I didn't say that.  I said I don't know what escalated

16   Mr. Georgia's behavior.

17   Q    I'm not talking about Mr. Georgia's behavior, I'm

18   talking about your behavior.  You escalated your behavior.

19   A    Is that a question?

20   Q    Yes.

21   A    I guess I'm confused.  You just said you escalated

22   your behavior, and then --

23   Q    I'm asking you, do you agree that you escalated your

24   behavior instead of stopping and just calling a supervisor?

25   A    No.  I don't -- I don't agree to that.

1   Q     So you continued to play this game with Mr. Georgia,

2   correct?  Is that correct?

3   A     I don't know what game you're talking about.

4           MR. TROY:  Objection, characterization, your

5   Honor.

6           MR. KOPKO:  It's his -- I'm sorry.

7           THE COURT:  Go ahead, Mr. Kopko.  Mr. Troy's

8   objecting, and your response?

9           MR. KOPKO:  Yes.  I'm using his words, that --

10  that -- this game.

11          THE COURT:  If you can rephrase that, Mr. Kopko,

12  I -- I get why Mr. Troy's objecting, if you could just

13  rephrase it, I think.

14  BY MR. KOPKO:

15  Q     All right, you said several times that you're not

16  playing the game.  Correct?

17  A     Correct.

18  Q     Yeah, but you continued to play the game, correct?

19  A     No.

20  Q     No?  You continued to yell at Mr. Georgia, correct?

21  A     I was just -- wasn't yelling at Mr. Georgia.

22  Q     You weren't yelling at him?

23  A     I raised my voice to get his attention.

24  Q     Oh, okay, well, let's use that.  Is that part of the

25  game?  Raising your voice?

1   A     No.

2   Q     That's not part of the game?

3   A     I wasn't playing a game.

4   Q     Well, now I'm confused.  You said three times that

5   you're not going to play this game.

6   A     That's correct.

7   Q     All right.  Weren't you participating in the game?

8   A     Obviously not because I wasn't going to play the game.

9   Q     You weren't going to play the game.  But you were

10  raising your voice, correct?

11  A     That's correct.

12  Q     You were pushing him back, which you acknowledge was

13  a -- a violation, harassment violation, correct?

14  A     That's correct.

15  Q     You grabbed his arm, which you acknowledge was a

16  harassment violation, correct?

17  A     That is correct.

18  Q     All right.  So you were playing the game.

19  A     No, I wasn't.

20  Q     No?

21  A     No.

22  Q     Okay.  So at what point did it dawn on you that you

23  were going to call a supervisor?

24  A     I believe a few minutes from right now, from this --

25  where the video stops.

1    Q    All right.  You want us to run forward to that part?

2    A    If you want to.

3         (Video played)

4    Q    You said because you're bothering your fucking

5    neighbors.  Correct?

6    A    Correct.

7    Q    Plural, neighbors.  You used the word neighbors.  Do

8    you want to play that again?

9    A    Are you asking a question?  I'm sorry?

10   Q    Yeah, I'm asking you, do you agree that you were --

11   that you used the word neighbors?

12   A    Yes.

13   Q    All right.  But there -- there were not neighbors,

14   there was one neighbor, correct?

15   A    That's -- I had only one name that dispatch gave me.

16   Q    So you don't know when you said neighbors, there was

17   no basis for saying neighbors, correct?

18   A    There's a possibility if somebody else is in

19   Mr. Gonzalez's house that was annoyed by the noise.

20   Q    There was a possibility of that, right?

21   A    That's correct.

22   Q    You could have determined that if you had done a

23   proper investigation, correct?

24   A    That's correct.

25   Q    Yeah, you chose not to do that, correct?

1    A      Correct.

2    Q      You could have checked with actually other neighbors,

3    correct?

4    A      That's correct.

5    Q      And you chose not to do that.  Correct?

6    A      Correct.

7    Q      So when you said to him that he was bothering other

8    neighbors, there -- you didn't know what you were talking

9    about, correct?

10           MR. TROY:  Objection to form.

11           THE COURT:  I'm sorry, Mr. Troy?

12           MR. TROY:  Objection to form.  It's argumentative.

13           THE COURT:  Yeah, Mr. Kopko, I mean we are

14    arguing, again.

15           MR. KOPKO:  We'll move on, your Honor.

16           THE COURT:  I want to make sure that you can

17    elicit the information, but once you have it, arguing with

18    this witness about what he should have done or shouldn't

19    have done or could have done, I don't know where that's

20    going to lead us.

21           MR. KOPKO:  I just want -- I'm actually focusing

22    on the component of maliciousness for the punitive damages,

23    Judge, I think I have to establish that in the record.  From

24    his behavior.

25             THE COURT:  All right.  I'll -- I'll allow it,

1   Mr. Kopko.  Let's get to it.

2            MR. KOPKO:  Thank you, sir.

3            (Video played)

4   BY MR. KOPKO:

5   Q    Now, you said get in line.  You heard that?

6   A    I did hear that.

7   Q    All right.  You have been sued before?

8   A    No, I have not.

9   Q    Your statement get in line was not true?

10  A    That's correct, it's not true.

11  Q    You were lying to Mr. Georgia?

12  A    I don't think I was lying.  I just said get in line.

13  Q    You just admitted that that's not true.

14  A    That was not true, that I haven't been sued before?

15  Q    That's right.

16  A    Right, I have not been sued before.

17  Q    So when you told Mr. Georgia to get in line, you were

18  referring to being sued before, correct?

19  A    Yeah, that's correct.

20  Q    But you had not been sued before --

21  A    Correct.

22  Q    -- correct?

23            So what you said to him was a lie.

24  A    Okay, if you want to interpret it that way.

25  Q    No, I'm asking you, don't you agree that it wasn't

1    true?

2    A    Yeah.  I guess I will, yeah.  I guess it was --

3    Q    So it was a lie.

4    A    Yeah.

5    Q    Now, do you agree that lying to Mr. Davenport would

6    tend to further escalate the situation?

7    A    By lying to myself, is that what you're asking?

8    Q    I'm trying to figure out a way so that we can do this

9    faster.  I said do you agree that lying to Mr. Davenport

10   would escalate the situation?

11   A    I guess I'm just confused, sir.  I don't --

12   Q    I don't want to --

13   A    Can you rephrase the question, I guess?

14   Q    Well, no.  No.  Let -- I ask the questions.  But I

15   don't want to confuse you.  And his Honor controls

16   everything, okay.  Do you agree, yes or no, that lying to

17   Mr. Davenport would escalate the situation?

18   A    No.

19   Q    Do you agree as a professional police officer that you

20   should not lie to people?

21   A    Yeah, I agree with that.

22   Q    But yet you lied to Mr. Davenport.

23   A    Are you saying I lied to myself?  Because I'm

24   Mr. Davenport.

25   Q    Oh.

1    A      That's why I'm confused here.

2    Q      No.  No.  No, that -- that's my fault.  Georgia.

3    Mr. Georgia.  I'm sorry.  Yeah.  You lied to Mr. Georgia, I

4    beg your pardon, thank you.  Do you agree that lying to

5    Mr. Georgia escalated the circumstances?

6    A      No.

7    Q      Do you agree as you, I think you just said that, that

8    as a professional police officer you should not lie to

9    people?

10   A      That's correct.

11   Q      All right.  But yet you lied to Mr. Georgia.

12   A      That's correct.

13   Q      All right.  Do you think that had any effect at all on

14   the circumstances here?

15   A      No, I don't.

16          (Video played)

17   Q      You were heard to say that do you want to get arrested

18   or do you want to get in handcuffs.  Do you remember saying

19   that?

20   A      No.

21          MR. KOPKO:  Play it again.

22          (Video played)

23   BY MR. KOPKO:

24   Q      You hear that?

25   A      Yes, I did.

1   Q     Okay.  Do you want to get arrested or get in

2   handcuffs.  That's what I heard.  Is that what you heard?

3   A     No.

4   Q     What did you hear?

5   A     Do you want to get arrested or do you want to turn the

6   music down.

7   Q     I thought it said something about handcuffs.  No?

8   Okay.  So Mr. Georgia's only alternative at that point was

9   to get arrested or to turn the music down.  Is that correct?

10  A     Correct.

11  Q     Now, at that particular point, what were you going to

12  arrest Mr. Georgia for?

13  A     Disorderly conduct.

14  Q     Disorderly conduct.

15  A     Correct.

16  Q     But you knew, Deputy, and we talked about this before,

17  you knew that you could not arrest someone for disorderly

18  conduct unless you had someone other than yourself --

19  A     That's correct.

20  Q     -- right?

21        And you agree that you could not legally arrest

22  Mr. Georgia for disorderly conduct, correct?

23  A     No.

24  Q     There was no one else immediately present at the scene

25  when you were there, correct?

1    A      That's correct.

2    Q      And Mr. Gonzalez wasn't there whispering in your ear

3    saying that he's complaining, correct?

4    A      Correct.

5    Q      There was no one else there, there was no member of

6    the public there, correct?

7    A      Correct.

8    Q      And you knew that.

9    A      Correct.

10   Q      Right.  And you knew that you could not make a valid

11   arrest for disorderly conduct without a member of the public

12   being there, correct?

13   A      No.

14   Q      No?  You thought that you could do that?

15   A      Yeah, if someone makes a complaint, when I have that

16   individual's name.

17   Q      But you didn't arrest him for disorderly conduct.

18   A      No, I did not.

19   Q      You never arrested him for disorderly conduct.

20   A      I believe we did charge him for that.

21   Q      But not we.  Assistant District Attorney Bonavia did

22   that; you agree?

23   A      Yes.

24   Q      You did not do that?

25   A      That's correct.

1  Q    All right.  On this night, on this occasion, even

2  though you're telling him you're going to arrest him for

3  disorderly conduct, you told him that he was actually under

4  arrest for disorderly conduct, correct?

5  A    No.

6  Q    You didn't do that?

7  A    I don't believe I did.

8         (Video played)

9  Q    I heard you say turn the music down, you're not

10  understanding.

11  A    Correct.

12  Q    And that was even your goal here as you were getting

13  in at it with Mr. Georgia, right?

14  A    Correct.

15  Q    He had to turn that music down.

16  A    That's correct.

17  Q    No matter what, he had to turn that music down,

18  correct?

19  A    That's correct.

20         (Video played)

21  Q    I heard you say you're bothering everyone else in the

22  area.  Did you hear that?

23  A    I did hear that.

24  Q    All right.  But that's not true, is it?

25  A    It's a possibility.

1  Q     I didn't ask you that.  You had no facts that lead you

2  to believe that he was bothering everyone else in the area.

3  Is that --

4  A     That's correct, no other facts.

5  Q     All right.  So when you made that statement to

6  Mr. Georgia, it was lie, correct?

7  A     No.

8  Q     You had no factual basis for saying that, correct?

9  A     That's correct.

10 Q     All right.  You were just angry.

11 A     I was not angry.

12 Q     You were not angry?

13 A     No.

14 Q     What is your state of mind here now?

15 A     I'm a little nervous.

16 Q     A little nervous?

17 A     Yep.  And fearful.

18 Q     And fearful.  Okay.  Wow.  But yet you didn't just

19 turn around and walk away.  Correct?

20 A     That's correct.

21 Q     So you're nervous and you're fearful, but you stay

22 right there, correct?

23 A     That's correct.

24 Q     And you agree that your nerves could have been quelled

25 and your fear could have been extinguished if you just

1  walked away, correct?

2  A     That's correct.

3  Q     And you chose not to do that.

4  A     Correct.

5           (Video played)

6  Q     Okay.  You said you were calling your supervisor right

7  now.

8  A     Correct.

9  Q     Is that what you said?

10  A     Yes.

11  Q     Who -- and you called Sergeant Vann?

12  A     Correct.

13  Q     All right.  Now, you turned off your video recorder

14  when you made that call.

15  A     Uh-huh.  That's correct, sorry.

16  Q     But you told us earlier that you're not supposed to

17  turn off your video recorder when you're having a contact

18  with a person involved in an incident.

19  A     That's correct.

20  Q     So you violated departmental policy when you turned

21  off your audio.

22  A     No, I didn't.

23  Q     No, you didn't?

24  A     No.

25  Q     All right.  Well, I'm a little confused.  Maybe we'll

1  go through this again.  You're aware --

2             THE COURT:  Mr. Kopko, just a suggestion.  I have

3  a tough time hearing --

4             MR. KOPKO:  I'm sorry, Judge.

5             THE COURT:  -- if you're not near the microphone.

6  I just want to make sure the court reporter's getting

7  everything.  And also that we all can hear it, so.  If you

8  do move over, just keep in mind you're probably not going to

9  be heard.

10  BY MR. KOPKO:

11  Q    So you told us that you know the departmental policy

12  requires you to keep on the audio portion and the video

13  portion when you're in a contact, correct?

14  A    Correct.

15  Q    And you were certainly in a contact with Mr. Georgia,

16  correct?

17  A    When I made the phone call to Sergeant Vann, is that

18  what you're talking about?

19  Q    You were standing right there, correct?

20  A    That's correct.

21  Q    I -- I can see your phone.  You were right there.

22  Correct?

23  A    That's correct.

24  Q    So even though you know you're not supposed to turn

25  off the audio, you turned it off, correct?

1  A    I could turn it off in this situation.

2  Q    Well, I'm confused here, Deputy.  You told us several

3  times you know you can't turn off the audio when you're

4  having a contact, right?

5  A    Correct.

6  Q    Okay, then we have that part done, correct?

7  A    That's correct.

8  Q    All right.  But yet you turned off your audio,

9  correct?

10 A    Correct.

11 Q    And in doing that, you violated the departmental

12 policy.

13 A    No.

14 Q    No.  Okay.  Now, you understand that you have taken an

15 oath to tell the truth, the whole truth, and nothing but the

16 truth, correct?

17 A    That's correct.

18 Q    And you understand that you're under oath here now in

19 front of a federal judge.

20 A    I do, yes.

21      MR. TROY:  Your Honor, it's an improper question.

22 He should ask fact questions, please.

23      THE COURT:  Yeah, Mr. Kopko, I think Mr. Troy is

24 getting that you're starting to ask him about the legality

25 of something or not as far as the oath, but I'm not sure

1  where you're going with this, unless there's a factual

2  question you're going to ask him about what he said or

3  didn't say or contradicted himself on.

4  BY MR. KOPKO:

5  Q    What did you say to Sergeant Vann?

6  A    I asked him --- I don't even think I got a -- I

7  didn't -- I didn't even get ahold -- I didn't get ahold of

8  him on the phone.  He never answered the phone.

9  Q    Did you text him?

10 A    No.

11 Q    Did you ever communicate with Sergeant Vann?

12 A    Until he got on scene, no.

13 Q    How did Sergeant Vann know to come to the scene?

14 A    He knew where I was at, and I tried to call him

15 multiple times, and he also heard on the radio transmission

16 that I called for another unit.

17 Q    You tried calling Vann multiple times?

18 A    Maybe just once.  I can't recall.  I just know I

19 definitely tried calling him.

20 Q    Deputy, I'm confused by your testimony.  Did you call

21 him multiple times or did you call him one time?

22 A    I don't recall.

23 Q    That was the answer, all right?  And you did not text

24 him.  Is that correct?

25 A    I don't recall that either.  I don't believe I did.

1   Q     The phone that you were using, is that your personal

2   phone?

3   A     That's correct.

4   Q     Are you issued a departmental phone?

5   A     No.

6   Q     Do any of the deputies use departmental phones?

7   A     Yes, some of them do.

8   Q     Okay.  Do most of them use their personal phones?

9   A     That's correct.

10  Q     And they text on those personal phones?

11  A     That's correct.

12  Q     Are those text messages preserved to be delivered as

13  part of discovery?

14  A     Yes.

15  Q     Did you make any text messages here in this case?  In

16  this whole case?

17  A     I don't believe I did.

18        (Video played)

19  Q     Now, tell us what you said, what you said there.

20  A     You need to back the fuck up.

21  Q     You were angry then, right?

22  A     I was definitely scared.

23  Q     I didn't ask you that.

24  A     No, I wasn't angry.

25  Q     You weren't angry.

```
 1   A      No.

 2   Q      I heard you say you're going to back the fuck up.

 3   A      Uh-huh.  That's correct.

 4   Q      And you said that you were fearful?

 5   A      Yes.

 6   Q      And you have on a gun, correct?

 7   A      That's correct.

 8   Q      You have on a Taser, correct?

 9   A      That's correct.

10   Q      Right.  You had pepper spray?

11   A      That's correct.

12   Q      Right?

13          You were trained as a police officer in dealing

14   with unruly people, correct?

15   A      That's correct.

16   Q      You didn't see any visible weapons on Mr. Georgia,

17   correct?

18   A      That's correct.

19   Q      You didn't pat him down, though, correct?

20   A      That's correct.

21   Q      You could -- you knew that you could pat him down for

22   your own safety, correct?

23   A      Correct.

24   Q      You know that the United States clearly allows that

25   for officer safety, correct?
```

1  A     Correct.

2  Q     But you never did that.

3  A     Correct.

4  Q     You could have addressed your concerns about being

5  fearful if you had simply patted Mr. Georgia down, right?

6  A     No.

7  Q     That wouldn't have done it for you?

8  A     No.

9  Q     So when you said you're going to back the fuck up,

10 right, did you push him right then --

11 A     Yeah.

12 Q     -- is that when you pushed him?

13 A     I believe so, yeah.

14 Q     And he fell to the ground.

15 A     Correct.

16 Q     Now, in the instant before you said you're going to

17 back the fuck up, right, you agree that you could have

18 de-escalated this by just turning around, right?

19        MR. TROY:  Excuse me, I didn't hear that question.

20        THE COURT:  I'm sorry, Mr. Troy?

21        MR. TROY:  I did not hear the last part of his

22 question.

23 BY MR. KOPKO:

24 Q     That -- that you could have de-escalated this by just

25 turning around, right?

1    A     Are you trying to ask turning around and walking away

2    or turning --

3    Q     Yeah.

4    A     Okay.  Yes.

5    Q     You tried to call your supervisor, correct?

6    A     Correct.

7    Q     You were looking for guidance, correct?

8    A     Correct.

9    Q     You were confused about what to do, correct?

10   A     That's correct.

11   Q     You didn't know how to handle the situation, correct?

12   A     Correct.

13   Q     All right.  You were looking for guidance, correct?

14   A     Correct.

15   Q     And you knew that all you had to do was just turn

16   around and walk or walk away or walk backwards, and that

17   would have addressed your concerns about being fearful,

18   correct?

19   A     No.

20   Q     That would not have?

21   A     It would have but I didn't believe I could just walk

22   away.

23   Q     Well, you certainly know that you could have said to

24   Mr. Georgia, you know what, I -- I beg your pardon, I heard

25   you say several times for me to get off your property, and

1    I'm going to do that now, and I'm sorry.  You could have

2    done that.

3    A    Correct.

4    Q    All right.  But you didn't do that.

5    A    That's correct.

6    Q    You chose to stay there and escalate the

7    circumstances.  Correct?

8    A    Try to de-escalate the circumstances, so no.

9    Q    I didn't ask you that.

10   A    Okay.

11   Q    I didn't ask you.  You chose to stay there and

12   escalate the circumstances by pushing Mr. Georgia backwards.

13              MR. TROY:  Objection to form.

14              THE COURT:  I'll allow it.  You've asked three

15   times but I'll allow it one more time so we can get an

16   answer from the witness.

17   A    Can you repeat the question?

18   BY MR. KOPKO:

19   Q    You chose to stay there and escalate the situation by

20   pushing Mr. Georgia backwards.  Is that correct?

21   A    No.

22   Q    Did you believe that pushing him backwards would

23   escalate the circumstances?

24   A    No.

25   Q    Did you believe that pushing him to the ground would

1    escalate the circumstances?

2    A    No.

3    Q    In your experience, pushing someone to the ground

4    would not -- would not tend to escalate the circumstances?

5    Is that correct?

6    A    I don't know.  It may or may not.

7    Q    If someone pushed you to the ground, would that, in

8    your mind, escalate it?

9    A    It depends on how big the person is that pushed me to

10   the ground.

11   Q    So if a person bigger than you pushed you to the

12   ground, you would -- would that escalate it?

13   A    No.

14   Q    If a person smaller than you pushed you to the ground,

15   would that escalate it?

16   A    Possibly.

17   Q    And the deciding factor is what you thought you could

18   do in response to that?

19   A    Can you repeat the question?

20   Q    Yeah.  Your response in deciding whether it's

21   escalated or not would be determined by the size of the

22   person.  Is that what you're telling us?

23   A    If I was being pushed to the ground.

24   Q    Yeah.

25   A    Possibly.

1   Q      Did you -- did you have any concerns that by pushing

2   Mr. Georgia to the ground that you could injure him?

3   A      Yeah.

4   Q      But you pushed him anyway.

5   A      Correct.

6   Q      And when he was on the ground, right, you went over

7   and handcuffed him.

8   A      Correct.

9   Q      Now, you filed a written report of this incident,

10  correct?

11  A      Correct.

12  Q      And you learned in the police academy to make proper

13  reports, correct?

14  A      That's correct.

15  Q      And you learned that the reports that you make would

16  be relied upon by the prosecuting attorneys in making

17  prosecutorial decisions, correct?

18  A      Correct.

19  Q      And you knew that the reports had to be accurate,

20  right?

21  A      Correct.

22  Q      And you knew that judges would be relying upon your

23  reports for accuracy, right?

24  A      Correct.

25  Q      And you made no entry in your report that you checked

1   for the tightness of the handcuffs by putting your finger in

2   between the jaw and the wrist, correct?

3   A     Correct.

4   Q     And you know that the Tompkins County policy for

5   handcuffs requires you to do that, correct?

6   A     Correct.

7   Q     So when you put the handcuffs on and you did not check

8   the tightness of them, you knew that you were violating the

9   departmental policy, correct?

10  A     I didn't know at that time, no.

11  Q     Well, weren't you trained before they gave you a gun

12  and sent you out?  Weren't you trained?

13  A     Yeah.

14  Q     And you knew that you had to check the tightness of

15  the handcuffs, correct?

16  A     I did not know that, no.  At that time.

17  Q     Don't you read the departmental policies?

18  A     Yeah.  Yep.

19  Q     Do you read the part of the departmental policy that

20  requires you to put your little finger in between the jaw

21  and the wrist?

22  A     I don't recall reading that.

23  Q     You don't recall that.

24  A     No.

25  Q     In any event, you made no attempt to determine how

1   tight the handcuffs were, correct?

2   A      Correct.

3   Q      And you know that by cranking down the handcuffs,

4   people can suffer a severe injury, correct?

5   A      That's correct.

6   Q      And you made no attempt to check whether that was

7   happening, correct?

8   A      No, I did make an attempt.

9   Q      You did make an attempt?

10  A      Correct.

11  Q      Oh, well, let's see it.

12             (Video played)

13  Q      Now, you say that in that sequence you checked the

14  tightness of the handcuffs?

15  A      No, I did not.

16  Q      Now, in that same sequence, Mr. Georgia is on the

17  ground, correct?

18  A      Correct.

19  Q      He's highly intoxicated --

20  A      Correct.

21  Q      -- correct?

22             He has his back facing you, correct?

23  A      Correct.

24  Q      And you pull out your pepper spray, correct?

25  A      Correct.

1   Q      And you try to pepper spray him, correct?

2   A      No.

3   Q      I can see you pushing on the -- the lever to do that.

4   That's not what you're doing?

5   A      That's not what I'm doing.

6   Q      I can see you on several occasions shaking the

7   canister.  Are you not trying to spray him?

8   A      No.

9   Q      What were you doing?

10  A      Trying to get his hands behind his back.

11  Q      No.

12         MR. KOPKO:  Play that again.

13         (Video played)

14  Q      Now, you have the canister in your left hand, correct?

15  A      Correct.

16  Q      And your thumb is on the top of the canister, correct?

17  A      Correct.

18  Q      And that, that is where the discharge valve is for the

19  pepper spray, correct?

20  A      The discharge valve is underneath that, so no.

21  Q      No?  Aren't you then trying to pepper spray him?

22  A      No.

23  Q      Why do you have it out?

24  A      If he's going to start to fight with me, then I have

25  it out ready to utilize it.

1   Q      Yeah, but he's on the ground, right?

2   A      Yeah.

3   Q      He's intoxicated, right?

4   A      Correct.

5   Q      He's a 62-year-old man, right?

6   A      I didn't know that at the time.

7   Q      No, he told you that earlier.  You want -- do you want

8   to replay that?

9   A      If you want.

10  Q      Not what I want, do you want it?

11  A      No.

12  Q      And he's on the ground with his back to you, and

13  you're attempting to pepper spray him, correct?

14  A      No.

15  Q      Well, why do you even have it out?

16  A      Like I said before, in case he tries to fight with me,

17  then I have it ready to utilize.

18  Q      Well, instead of taking out the pepper spray, why --

19  why didn't you just handcuff him then?

20  A      I couldn't get his hands.

21  Q      You can't get his hands when you had your one hand

22  filled with pepper spray, can you?

23  A      That's true.

24  Q      So you didn't want to handcuff him at that time,

25  correct?

1    A      No; I did want to handcuff him at that time.

2    Q      Well, why even bring out the pepper spray?  Why didn't

3    you use your hands, your two hands, and handcuff him?

4    A      I believe I tried, and he was tensing all of his

5    muscles up and I couldn't get both hands behind his back.

6    Q      But you didn't have any trouble getting both hands

7    behind his back when you put the pepper spray away?

8    A      That's correct.

9           (Video played)

10   Q      Now, is it your testimony that you're not trying to

11   pepper spray him there?

12   A      That's correct.

13   Q      Well, if -- if you're not trying to pepper spray him

14   and he's right in front of you on the ground, tell us why

15   you even have it out.

16   A      Like I said before, in case he tries to fight with me,

17   I'll have it out ready to utilize if I needed it.  He was --

18   had all his muscles tensed up, I was trying to get his hands

19   behind his back, and he wouldn't put his hands behind his

20   back.

21   Q      Let me see that I follow this.  You can't get his

22   hands behind his back because of the pepper spray in your

23   arm, right?  In your hand.

24           MR. TROY:  Objection, your Honor.

25           THE COURT:  I'm sorry, Mr. Troy, objection over?

1           MR. TROY:  I'm sorry?

2           THE COURT:  Objection as to?

3           MR. TROY:  It assumes a fact that he didn't

4   testify to.

5           THE COURT:  I'm not sure I heard the same thing.

6   Mr. Kopko?

7           MR. KOPKO:  I didn't either, Judge.  Let me try it

8   again.

9           THE COURT:  Plus, I think Mr. Kopko is asking a

10  long question.  I think he was kind of in the middle of it

11  so that's why I'm not sure.  I don't think I heard the whole

12  question yet.

13          MR. KOPKO:  Indeed, let me try this.

14          THE COURT:  And again, because we don't have a

15  jury here, it's okay if you let the question all come out

16  and then there was an objection, we'll it take it up, but.

17  BY MR. KOPKO:

18  Q    Okay.  So you say in this sequence what you really

19  want to do is get him handcuffed.  Is that correct?

20  A    That's correct.

21  Q    So instead of getting the handcuffs out, you get the

22  pepper spray out.  Is that what you're saying?

23  A    I tried to get his hands behind his back before I got

24  the pepper spray out.  And he wouldn't give me his hands.

25  So I got the pepper spray out.

1    Q     So you got the pepper spray out.

2    A     Correct.

3    Q     And then you put the pepper spray away?

4    A     That's correct.

5    Q     These movements that you're making with the canister,

6    you're -- you're saying that you're not trying to activate

7    the pepper spray?

8    A     That's correct.

9          (Video played)

10   Q     Now, in this sequence you have handcuffed him, right?

11   A     Correct.

12   Q     It didn't appear where you were having any particular

13   difficulty in handcuffing him.  Did you say that occurred?

14   A     Yeah, it did.

15   Q     It did?

16   A     Yeah.

17   Q     What -- I don't see it.  What -- what was it that you

18   said happened?

19   A     He wouldn't give me his hands, he had all of his

20   muscles tightened up, and when I told him to put his hands

21   behind his back he wouldn't, and.  So it was difficult for

22   me to physically move his arms behind his back.

23   Q     Difficult.

24   A     Yes.

25   Q     How old were you when this happened?

1   A      2019, I was 28.

2   Q      28.  You're a young strong guy, right, a deputy.

3   You're saying you couldn't put the arm of a 62-year-old

4   drunk guy's arm behind him?

5   A      That's correct.

6   Q      But you got it behind him.

7   A      I did, yeah.

8   Q      Within a couple of seconds of this shows that you got

9   him handcuffed, right?

10  A      Correct.

11  Q      You didn't have to do anything other than pull his arm

12  behind his back, right?

13  A      Once he untensed his muscles, then yes.

14  Q      That's all it was, you just pulled his arm behind his

15  back and handcuffed him, right?

16  A      Yeah.  Eventually I did.

17  Q      Eventually.  Like we're talking about seconds here.

18  This only took you a couple seconds, right?

19  A      Yes.

20         (Video played)

21         MR. KOPKO:  I beg your pardon, may I leave the

22  courtroom for a brief second?

23         THE COURT:  Oh, absolutely.  I mentioned to I

24  believe one of your colleagues, you guys can get up and

25  leave and come back.  Again, we don't have a jury here, so.

1          MR. KOPKO:  I just need to go to the men's room

2     right here.

3          THE COURT:  Do you want to take a short break,

4     Mr. Kopko?

5          MR. KOPKO:  Five minutes, would that be --

6          THE COURT:  Absolutely.  Why don't we take a

7     five-minute break.  Is that okay?

8          MR. TROY:  That's fine.

9          MR. KOPKO:  Five minutes.  Thanks, Judge.

10         THE COURT:  Deputy, you can just have a seat over

11    at the table and take a break too, go to the bathroom, or.

12              (Recess taken)

13         THE COURT:  All right, we're back from the break.

14    Mr. Kopko and Mr. Troy, just to let you know, my intention

15    was to break for lunch at 12:30-ish, unless one of you says

16    hey, we're going to finish up this witness in 5 or 10

17    minutes, whatever.  So we got another 45 minutes.  Does that

18    sound good?

19         MR. KOPKO:  Thank you, sir.

20         MR. TROY:  And there's a restriction today.  What

21    time does that take effect?

22         THE COURT:  Oh.  Oh.  Oh, the real restriction.

23    I'm just checking to make sure.  I have a detention hearing

24    at 3 p.m.

25         MR. TROY:  Okay.

```
 1          THE COURT:  And it involves an interpreter so I
 2   know from past experience that will -- excuse me, it's a
 3   plea, it was going to be a detention hearing but the
 4   individual is pleading guilty.  So that takes about an hour
 5   and a half for the entire process with an interpreter, so my
 6   thinking is we will break for this trial ten minutes of
 7   three, wherever we are.
 8          MR. TROY:  Okay.
 9          THE COURT:  Mr. Kopko, you may continue.
10          MR. KOPKO:  Thank you, sir.  We're trying to get a
11   particular segment of the video.
12          THE COURT:  Okay.
13          MR. KOPKO:  We had it marked but it's not in the
14   same sequence, the same synchronized.
15          THE COURT:  When you get it, Mr. Kopko, you can
16   start, take your time.  Get it where you need to be.
17          (Video played)
18   BY MR. KOPKO:
19   Q    Deputy, let me see if I can save some time here.
20          MR. TROY:  I couldn't hear.
21          MR. KOPKO:  I'm sorry.
22          THE COURT:  Use the microphone, Mr. --
23          MR. KOPKO:  I should not have done that.
24          We're trying to find this.
25   BY MR. KOPKO:
```

1   Q     Deputy, do you remember saying if you don't shut up or

2   you don't be quiet I'm going to pepper spray you?

3   A     I don't.

4   Q     Then we've got to find that.

5            (Video played)

6   Q     So, Deputy, at this point I hear you saying you're

7   going to shut the fuck up, okay?  You're saying that.

8   A     Correct.

9   Q     All right.

10           THE COURT:  Mr. Kopko, just pull the microphone to

11   the side.  Even if you put it to the side, it will help.

12           MR. KOPKO:  Jason told me.

13   BY MR. KOPKO:

14   Q     You're saying shut the fuck up, you're going to shut

15   the fuck up, right?

16   A     I did say that, correct.

17   Q     Now, at this point, Deputy, you know that you have

18   absolutely no authority as a law enforcement officer to tell

19   someone to shut the fuck up, correct?

20   A     Correct.

21   Q     So when you're telling him to shut the fuck up, you

22   knew that that was not true.

23   A     Correct.

24   Q     And you knew that you had no authority to say that --

25   A     Correct.

1    Q      -- right?

2           But yet you repeat it several times, correct?

3    A      Correct.

4    Q      Now, Deputy, in this part of the sequence here when

5    you're yelling like that, and you're pushing him backwards,

6    you are uncontrollably angry, correct?

7    A      No.

8    Q      You are unaware of your surroundings.  Is that

9    correct?

10   A      That is correct.

11   Q      All right.  And you don't even realize that the music

12   has stopped playing.  Is that correct?

13   A      That's correct.

14   Q      And the whole purpose of you coming there before you

15   told Mr. Georgia to shut the fuck up, before you pushed him

16   backwards, before you handcuffed him, you did not realize

17   that the music was not playing.  Is that correct?

18   A      Can you repeat?  Can you repeat the question?

19   Q      Deputy, do you agree that when you told Mr. Georgia to

20   shut the fuck up, when you pushed him backwards, when he

21   landed on the ground, when you handcuffed him, you were so

22   angry that you did not realize that the music had stopped.

23   Is that true or not?

24   A      That's not true.

25   Q      That's not true.  Okay.  When did you realize that the

1   music stopped playing?

2   A      After I got Mr. Georgia in handcuffs.

3   Q      In handcuffs.

4   A      That's correct.

5          (Video played)

6   Q      Could you tell on that in the last couple of seconds

7   there that the music stopped?

8   A      No.

9   Q      You couldn't tell that?

10  A      No.

11         (Video played)

12  Q      Deputy, do you hear the music in the background in

13  that sequence?

14  A      I do.

15  Q      You do?

16  A      Yes.

17  Q      What -- maybe I -- your hearing is probably more acute

18  than mine.  Can you -- we're going to play this again.  Can

19  you tell me when you think the music stops --

20  A      Okay.

21  Q      -- please?

22         (Video played).

23  Q      You still hear music?

24  A      I heard music in that sequence.

25         MR. KOPKO:  Keep going.

1              (Video played)

2    A     Right there.

3    BY MR. KOPKO:

4    Q     Right there?  All right.  You told us several times

5    that your whole goal here was to stop the music --

6    A     That's correct.

7    Q     -- right?

8              That's why you were there, right?

9    A     That's correct.

10   Q     You don't want to do anything else but stop the music,

11   right?

12   A     That's correct.

13   Q     You're not going to leave until the music is stopped.

14   Correct?

15   A     Till it's turned down.  So no, it's not correct.

16   Q     Well, the music stopped, right?

17   A     At that point, yes.

18   Q     Yeah, okay.  Well, the music stopping, you'll -- and

19   for your purposes is much better than the music being turned

20   down, correct?

21   A     Doesn't matter to me.

22   Q     Doesn't matter to you.  So there's no music, right?

23   A     Correct.

24   Q     And whatever purpose you had was fulfilled because

25   there's no music, right?

1   A      Correct.

2   Q      And at that point you just needed to leave.  Right?

3   A      Correct.

4   Q      But you didn't do that.

5   A      No.

6   Q      You pushed him backwards onto the ground, right?

7   A      Correct.

8   Q      You threatened to pepper spray him if he didn't shut

9   up, correct?

10  A      I don't believe I said that.

11  Q      Yeah, but you didn't stop talking, you said, you

12  threatened to pepper spray him?

13  A      I don't believe I said that.  I might be wrong.

14  Q      You handcuffed him, right?

15  A      Correct.

16  Q      You didn't check on the tightness of the handcuffs,

17  correct?

18  A      Correct.

19  Q      You called your supervisor --

20  A      Correct.

21  Q      -- right?

22         Supervisor came to the scene?

23  A      Correct.

24  Q      Another heavy-set deputy came over there.  Who was

25  that?

1    A      Deputy Murray.

2    Q      Deputy Murray?

3    A      That's right.

4    Q      Okay.  He came over there too.  So now we have three

5    deputies on the scene, correct?

6    A      Two deputies and a sergeant.

7    Q      Oh, okay.  Thank you.  We have three law enforcement

8    personnel on the scene.

9    A      Correct.

10   Q      We have Mr. Georgia on the ground in handcuffs.

11   Correct?

12   A      That's correct.

13   Q      And no music playing.

14   A      That's correct.

15   Q      And you could have, if you wanted to, you could have

16   just said to Sergeant Vann, look, the music's off, why don't

17   we just drop this whole thing.  You could have said that.

18   A      That's correct.

19   Q      But you didn't do that.

20   A      No.

21   Q      You dragged him down the driveway, right?

22   A      No.

23   Q      He wasn't walking.

24   A      Yes, he was.

25   Q      You were partially dragging him --

```
 1   A      No.

 2   Q      -- right?

 3          You took him to the sheriff's station, right?

 4   A      Correct.

 5   Q      Handcuffed?  And you booked him there, right?

 6   A      Correct.

 7   Q      And you took him up to CMC, correct?

 8   A      Correct.

 9   Q      And you just left him there.

10   A      No.

11   Q      Did you stay with him at CMC?

12   A      No.

13   Q      You just left him there, right?

14   A      No.

15   Q      You took him to CMC and then you left --

16   A      That's correct.

17   Q      -- correct?  You left him there.

18   A      That's correct.

19   Q      Okay, well, I asked you that three times and you said

20   no.

21   A      Okay.

22   Q      You -- you left him at CMC.

23   A      That's correct.

24   Q      Now.

25          (Video played)
```

1   Q    You said to Mr. Georgia you need to fuck the shut --

2   you need to shut the fuck up, okay.  In a very animated way.

3   Do you remember, did you see that part?

4   A    I did.

5   Q    Yeah.  That was different than the tone that you were

6   using before.  Did something happen that you changed your

7   affect and your tone?

8   A    Yes.

9   Q    And what happened was that you had pushed him over,

10  right?

11  A    No.

12  Q    What happened was that you handcuffed him, correct?

13  A    No.

14  Q    What happened was that you just got sick and tired of

15  him challenging you, correct?

16  A    No.

17           (Video played)

18  Q    Now, I hear Mr. Georgia saying put the handcuffs on.

19  Do you hear that too?

20  A    I do.

21  Q    All right.  And I hear the click of a ratchet of the

22  handcuffs.  Do you hear that?

23  A    I do.

24  Q    So he's just telling you to put the handcuffs on, and

25  he's cooperating with you, correct?

1    A      Correct.

2    Q      So this business about you saying, you know, he --

3    you're struggling to put the handcuffs on, that's not true?

4    A      Before he put his hands behind his back I was.

5    Q      You were.  When it actually came time to put the

6    handcuffs on, he didn't resist you at all.

7    A      No.  Not at that point.

8           (Video played)

9    Q      Now, you said that he was being aggressive, right?

10   A      Correct.

11   Q      Being aggressive is not a crime.

12   A      Correct.

13          (Video played)

14   Q      Now, I heard you say that you be quiet, right?

15   A      That's correct.

16   Q      That's because you're angry and irritated at

17   Mr. Georgia, correct?

18   A      No.

19   Q      You recognize and you agree that he has the right to

20   say whatever he wants to say, right?

21   A      That's correct.

22   Q      And you recognize and agree that you have no right

23   whatsoever to tell him to be quiet.

24   A      If he is being too loud bothering the other neighbors,

25   it's a continuous noise complaint.

1  Q     Oh.  So did you get another complaint from the

2  neighbors in the meantime?

3  A     No.

4  Q     Well, what are you talking about?  There was no

5  complaint from the neighbors, correct?

6  A     Correct.

7  Q     You're just imagining that, correct?

8          MR. TROY:  Objection, your Honor, argumentative.

9          THE COURT:  Yeah, Mr. Kopko, we're starting to get

10  into, you know, arguing with the witness about he tells you,

11  and he told you what is in his mind, I mean.  After that,

12  you can make the arguments to the Court, but it doesn't

13  really do any good to argue with the witness to say that

14  could not have been in your mind or that wasn't the reason.

15          MR. KOPKO:  Thank you for that guidance, your

16  Honor.

17          Go ahead.

18          (Video played)

19  BY MR. KOPKO:

20  Q     Excuse me, just, who -- who just walked up there with

21  the flashlight?

22  A     That's Sergeant Vann.

23          (Video played)

24  Q     Now, Deputy, afterwards --

25          MR. KOPKO:  This is Exhibit 30.  Exhibit 30, your

 1   Honor.

 2           THE COURT:  Okay.  So you're going to Exhibit 30

 3   now, Mr. Kopko?

 4           MR. KOPKO:  Yes, sir.  Yes, sir.

 5           THE COURT:  Okay.

 6   BY MR. KOPKO:

 7   Q     Do you see Exhibit 30?

 8   A     I do.

 9   Q     Now, this is a subject management report that you

10   filled out regarding the arrest that we've been talking

11   about, right?

12   A     Correct.

13   Q     And you arrested Mr. Georgia for resisting arrest,

14   right?

15   A     That's correct.

16   Q     And for obstruction of governmental administration.

17   Two -- two offenses.  Right?

18   A     That's correct.

19   Q     Now, and incidentally, both of those offenses were

20   dismissed by the Lansing Town Court, correct?

21   A     I believe so.

22   Q     Now, in this report in Roman Numeral III at about the

23   top third of the page --

24           MR. TROY:  Can Counsel speak just a little louder?

25   I'm not getting --

```
 1            THE COURT:  Really important to use the
 2     microphones.
 3            MR. KOPKO:  I got to.  I'm actually doing that
 4     intentionally so Bill can't hear anything.
 5            MR. TROY:  I suspected as much.
 6            THE COURT:  Well, it might carry over to the Court
 7     too.  I'm not sure we're too far apart in ages here, any of
 8     us.
 9            MR. TROY:  Counsel's actually three times older
10     than we are.
11            THE COURT:  Just for the record, these are all pun
12     jokes.
13            MR. KOPKO:  Yes.
14            THE COURT:  We can do that when there's no jury.
15            MR. KOPKO:  Yes, indeed.  And that's quite an
16     indulgence, your Honor, that I very much appreciate.
17     BY MR. KOPKO:
18     Q    So in Roman Numeral Number III, I'm about the top
19     third of the page, do you see resistance information?
20     A    I do.
21     Q    All right.  Now, you know that when you're completing
22     this, you have an obligation as a police officer to provide
23     accurate and complete information, right?
24     A    That's correct.
25     Q    And do you remember testifying in your examination
```

1  before trial?

2  A     I do.

3  Q     Yeah.  And do you remember saying that this report was

4  false in some remarks?

5  A     Yes, I do.

6  Q     Now, with regard to Roman Numeral Number III, subject

7  resisted by, check all that apply and explain in a

8  narrative.  Right?

9  A     Correct.

10  Q     So you -- you checked that he resisted verbal --

11  A     Correct.

12  Q     -- right?

13        Now, you understand from your training and law

14  enforcement education that resisting verbally can never

15  constitute resisting arrest.  You understand that?

16  A     Correct.

17  Q     And then you described in that section that there were

18  verbal threats.  Verbal threats.

19  A     Correct.

20  Q     Now, I -- I listened to the tape.  What -- what verbal

21  threats are you talking about?

22  A     When Mr. Georgia said I will fuck you up.

23  Q     You considered that to be a verbal threat?

24  A     I do.

25  Q     Do you think that you prompted that by your

1    high-handed techniques here?

2             MR. TROY:  Objection, your Honor.

3             THE COURT:  No, I'm going to allow it.  I think

4    Mr. Kopko's trying to get the witness to tell him what his

5    state of mind and his actions were in relation to what he

6    heard or allegedly heard the plaintiff say, so I'm going to

7    allow it.

8    A     Could you repeat the question?

9    BY MR. KOPKO:

10   Q     In light of the objection I'm just going to withdraw

11   that.

12            The other thing that you checked off was passive

13   resistance.  Do you see that?

14   A     Yes, I do.

15   Q     Now, you know under New York Law that simple passive

16   resistance can never constitute resisting arrest, correct?

17   A     Correct.

18   Q     And you know that you have the obligation on this form

19   to put down all of the information that you were relying

20   upon to justify your actions, correct?

21   A     Correct.

22   Q     And in the Roman Numeral Number IV part, it says

23   tactic -- tactics information.  Describe additional

24   information in SMR narrative as necessary.  So this

25   describes what you were doing, you -- you were giving verbal

1  commands.  Is that right?

2  A    That's correct.

3  Q    And you used an open hand, a bar?  Is that -- is that

4  where you grabbed his arm and shoved him backwards twice, is

5  that what you're referring to?

6  A    Yes.

7  Q    Now, and you indicate pepper spray displayed.  And

8  then that it was effective.  Right?

9  A    Correct.

10  Q    What do you mean by that?

11  A    When I had the pepper spray, all his muscles were

12  tensed, and then when I threatened to use pepper spray he

13  loosened up his muscles and I was able to holster my pepper

14  spray up and put him in handcuffs.

15  Q    But it didn't look to me as though he even saw the

16  pepper spray.  Do you know that he saw the pepper spray?

17  A    I don't know that he saw it or not.

18  Q    Now, in the Roman Numeral V, you acknowledge that

19  Mr. Georgia was injured in this incident, correct?

20  A    That's correct.

21  Q    And you write subject obtained lacerations on his

22  wrists due to him struggling after proper application of the

23  handcuffs --

24  A    Correct.

25  Q    -- right?

1          Now, I saw all of that.  I mean we all saw it.

2   Mr. Georgia was not struggling.  Do you want to see that

3   again?

4   A    No, I don't want to see it again.

5          I can explain what that means, if you want me to.

6   Q    No, I ask the questions.

7   A    Okay.

8   Q    You wrote that he was struggling after proper

9   application of the handcuffs, and we -- we all saw it, and

10  he was not struggling.  That's a false statement, isn't it?

11  A    No, it's not.

12  Q    In the narrative part in Roman Numeral Number VII, you

13  wrote, open quote, I then unholstered my department-issued

14  OC spray and told the subject that if he did not place his

15  hands behind his back then he would be sprayed, closed

16  quote.  I -- I saw that, I listened to it.  I didn't hear

17  you say that.  Is that a true statement?

18  A    We can watch the video again, just to double-check.

19  Q    I didn't ask you that.  Did you say that to him?

20  A    I don't recall.  I may have.

21  Q    Well, you wrote it here, right?

22  A    Correct.

23  Q    You -- you wouldn't write something in the report that

24  was intentionally false?

25  A    That's correct.

DAVENPORT - CROSS                    77

1  Q     So either this is false or your recollection that you

2  testified to is false.  Do you know which is true?

3  A     I don't.

4          MR. KOPKO:  A brief indulgence, your Honor.

5          THE COURT:  Certainly.

6          (Pause in proceedings)

7  BY MR. KOPKO:

8  Q     Now, Deputy, you answered my question that you -- that

9  you knew that passive resistance could never support a

10 charge for resisting arrest, correct?

11 A     Correct.

12 Q     But you nevertheless charged him with resisting

13 arrest, correct?

14 A     That's correct.

15 Q     And when you charged him with resisting arrest, you

16 knew that there was no probable cause under New York Law to

17 do so.

18 A     No.

19 Q     You did not describe any other behaviors in justifying

20 the arrest other than these three.  You agree with that?

21 A     I do.

22 Q     All right.  And you agree that none of these three

23 categories that you checked off are justification for a

24 resisting arrest charge?

25 A     That's correct.

1   Q      And you didn't put anything else down.

2   A      That's correct.

3   Q      Now, you also charged him with obstruction of

4   governmental administration, correct?

5   A      That's correct.

6   Q      And you know that in order to sustain that charge

7   there has to be a proper governmental administration,

8   correct?

9   A      That's correct.

10  Q      And you admitted in response to questions that you had

11  no authority under the Lansing ordinance because there was

12  no ordinance.  Is that correct?

13  A      That's correct.

14  Q      And you obviously knew, because of the multiple

15  commands, that you were being ordered to get off the

16  property, correct?

17  A      That's correct.

18          MR. KOPKO:  Just a brief indulgence, your Honor.

19          THE COURT:  Certainly.

20          (Pause in proceedings)

21          (Video played)

22  BY MR. KOPKO:

23  Q      Deputy, in the early part of your encounter with

24  Mr. Georgia, you -- and we saw it, I don't want to go back

25  to that, but you put your hand on his chest and you pushed

1  him back, right, that's --

2  A     Correct.

3  Q     -- that's the first time that you pushed him?

4  A     Yeah, that's correct.

5  Q     All right.  And then later on in what we just saw, you

6  actually shoved him again.  Correct?

7  A     That's correct.

8  Q     And then you shoved him a third time, and that third

9  time knocked him to the ground, correct?

10  A     That's correct.

11          THE COURT:  Just, Mr. Kopko, for the record, you

12  just showed Exhibit -- part of Exhibit 30 again, right?

13          MR. KOPKO:  Yes, sir.

14          THE COURT:  Okay, just --

15          MR. KOPKO:  Yes.

16          THE COURT:  -- I just want to make sure the

17  record's clear as to what the witness is answering your

18  questions as to.

19          MR. KOPKO:  Jason's telling me that the video is,

20  excuse me, 14, Exhibit 14.

21          THE COURT:  I'm sorry.  I misspoke.  I apologize.

22  I'm thinking Exhibit 30 was the last Exhibit 14 video which

23  we had been watching previous questioning.  You just played

24  part of it again for the witness, and that was his answer

25  response.  Right.  Thank you.

1  BY MR. KOPKO:

2  Q     And, Deputy, you shoved Mr. Georgia three times

3  because you were angry at him, correct?

4  A     No.

5  Q     You shoved him three times because you were tired of

6  this so-called game that you thought he was playing,

7  correct?

8  A     No.

9  Q     You shoved him because you were just out of control,

10 correct?

11 A     No.

12 Q     But, Deputy, after all of this stuff, you never

13 charged Mr. Georgia with assault.

14 A     Is that a question?

15 Q     Yes.

16 A     I did not charge Mr. Georgia with assault.

17 Q     But if you thought that Mr. Georgia was being

18 aggressive, as you said here, and was coming at you, that

19 you had to shove him one time and then the games continued

20 and you had to shove him a second time, and then the games

21 continued and you had to shove him a third time, but you

22 still did not charge him with assault?

23 A     That's correct.

24 Q     So you never felt threatened by Mr. Georgia.

25 A     I did feel threatened by Mr. Georgia.

1    Q      You did?

2    A      Yes.

3    Q      You -- you charged him with other crimes, and you're

4    telling the Court that you felt threatened but you never

5    charged him with assault.

6    A      That's correct.

7    Q      That's correct.

8           MR. KOPKO:  Your Honor, I respectfully invite the

9    Court's attention to the fact that it's 12:28.  I'm close to

10   the time that your Honor was going to adjourn.  Would it be

11   convenient, if instead of closing the examination, if I just

12   stopped here and think about it over the lunch hour and then

13   be able to pick up?  If I do, it will be very brief.

14          THE COURT:  Yeah, that's fine.

15          Mr. Troy, I take it you don't have any objection

16   to breaking for lunch?

17          MR. TROY:  I do not, your Honor.  Just for the

18   record, I propose not to examine my witness today but when I

19   put him on my case he will respond to --

20          THE COURT:  But you can do that as well.  You can

21   choose whether you want to do examination now, which would

22   be your cross-examination, or call him as your witness,

23   that's fine.

24          MR. TROY:  I'm going to call him as my witness.

25          THE COURT:  Okay.  So the question I have,

1  Mr. Kopko, Mr. Troy, how long do you want to take for lunch?

2  Mr. Kopko?

3          It cannot be three hours, so.

4          MR. KOPKO:  Okay.  I -- I don't -- I'm not

5  familiar so much with downtown.  There used to be a little

6  restaurant just right around the corner here.

7          THE COURT:  There -- I do not endorse anything,

8  first of all, nor do I -- I don't give any ratings of food.

9  There is a diner on this street, on this side of the

10  building that I'm pointing to, and there's a diner maybe

11  50 yards from here.  I don't know if Burger Monday's, which

12  is right here on the corner, if they're open.  But it's

13  burgers and sandwiches.  Then on the other side of the

14  building there is a taco garage, has tacos and burritos, and

15  just one block past that is the Lost Dog, which has

16  sandwiches, burgers, salads.  Those are your immediate

17  options.  And then around the corner to this side of the

18  building there is a small pizza place, I know that that's

19  still there, so.  And then if you walk over to the

20  Metrocenter one block on Main Street, there's a couple of

21  places, so.

22          MR. KOPKO:  Thank you so much, Judge.  What's the

23  Court's pleasure?

24          THE COURT:  I'll give you guys whatever, you know,

25  within reason that you want.  Half hour, 45 minutes, an

```
 1   hour?  You know, I'll give you an hour if you want an hour.
 2            MR. KOPKO:  45 minutes will do it.
 3            THE COURT:  45?  Mr. Troy?
 4            MR. TROY:  That's fine, your Honor.
 5            THE COURT:  Okay.  So let's say we'll be back at
 6   1:15 p.m.  1:15, 45 minutes?
 7            MR. TROY:  Yes, sir.
 8            MR. KOPKO:  Yes.
 9            THE COURT:  Okay, very good.  We'll see everybody
10   after lunch.
11            (Recess taken)
12            THE COURT:  Let's go back on the record.  All
13   right.  Welcome back, everyone, from our lunch break.  We
14   are back in court, and the parties are all here and all
15   counsel are here.  Hope you had a good lunch.
16            So, Mr. Kopko, we ended before the lunch break.
17   You had Deputy Davenport on examination.  Do you have
18   additional questions, Mr. Kopko?
19            MR. KOPKO:  I have none at this time, your Honor,
20   but I reserve my right to conduct an examination after
21   Mr. Troy does his examination in his case-in-chief.
22            THE COURT:  Yes.  You would be entitled, my
23   understanding is that Mr. Troy, he can speak for himself,
24   but I understood that he would be calling Deputy Davenport
25   in his direct case-in-chief and then you would have the
```

1    opportunity to do cross-examination, obviously.

2             MR. KOPKO:  Yes, your Honor.

3             THE COURT:  Okay.  All right.  So you don't have

4    any further questions at this time?

5             MR. KOPKO:  No, sir.

6             THE COURT:  Okay.  And, with that, I need 30

7    seconds to grab my laptop and plug it in here, which I

8    forgot to bring.

9             (Pause in proceedings)

10            THE COURT:  All right.  So we're back on the

11   record.  And did you indicate, Mr. Kopko, that you have no

12   further questions at this time for Deputy Davenport?  Is

13   that correct?

14            MR. KOPKO:  Yes, your Honor.

15            THE COURT:  All right.  And then obviously

16   reserving the right to cross-examine him if and when

17   Mr. Troy calls him.

18            MR. KOPKO:  Yes, sir.

19            THE COURT:  All right.  Mr. Kopko, you may

20   proceed.

21            **END OF EXCERPT**

22                      - - - - -

23

24

25

DAVENPORT - CROSS

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4      I, RUTH I. LYNCH, RPR, RMR, NYS Realtime Certified

5   Reporter, Federal Official Court Reporter, in and for the

6   United States District Court for the Northern District of

7   New York, DO HEREBY CERTIFY that pursuant to Section 753,

8   Title 28, United States Code, that the foregoing is a true

9   and correct transcript of the stenographically reported

10  proceedings held in the above-entitled matter and that the

11  transcript page format is in conformance with the

12  regulations of the Judicial Conference of the United States.

13

14

15

16              /s/ Ruth I. Lynch

17

                RUTH I. LYNCH, RPR, RMR, NYSRCR
18              Official U.S. Court Reporter

19

20

21

22

23

24

25